UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THE HON. JOSEPH WAPNER AND MICKEY WAPNER; JAMES LIPPMAN**, as trustee of the James And Linda Lippman 1998 Trust**; DANIEL DEVOR; JUDITH S. BALL; THOMAS L. HEENEY; DR. JOHN RICHARDS AND CHRIS STEIG RICHARDS; KEITH JANZEN,** as trustee of the J. Emerson Chisholm Trust Dtd 7/18/97; and **JAMES R. GUY, JR.,** | **Civil Case No. 1:16-cv-12077** <br><br> **FIRST AMENDED COMPLAINT** <br><br> By Consent of the Parties <br><br> **DEMAND FOR JURY TRIAL** |

        Plaintiffs,

    v.

**HKALLEN LIMITED PARTNERSHIP; HK ALLEN, INC.; HKN ALLEN LLC; HKN MANAGER LLC; HALL KEEN INVESTMENTS LLC; HALL KEEN MANAGEMENT, INC.; HALLKEEN LLC; JOHN L. ALLEN; ANDREW P. BURNES; DAVID A. CARLEN; EQUITY RESOURCE INVESTMENTS, LLC; EQUITY RESOURCE NEWTON FUND LIMITED PARTNERSHIP; EQUITY RESOURCE MILTON FUND LLC; ERF MANAGER LLC; ERF FUND 2011 GP LLC; ERF FUND 2013 GP LLC; and EGGERT DAGBJARTSSON,**

        Defendants,

and

**HOTEL DANVILLE COMPANY,**

        Nominal Defendant.

**SUMMARY OF THE CASE**

    1.    Hotel Danville Company is a Virginia limited partnership formed in 1982 (the

"**Partnership**"). When the Partnership was formed, its limited partners invested over $2.5 million.

The general partners invested essentially nothing: $100.  For 33 years, the Partnership owned and

managed Danville House, a 106-unit, low-income apartment complex for senior citizens in Danville, Virginia (the "**Property**"). For at least the last 30 of those 33 years, the Property enjoyed occupancy rates of 96% to 100%. Collecting rents has never been problematic; the federal government has paid approximately 80% of the Partnership's rental income every year since at least 1999. But, unbeknownst to the limited partners, all was not well with the Partnership. By perpetrating at least three different fraudulent schemes, the Partnership's former and current managing general partners – sometimes acting alone and sometimes acting with others – wrongfully took valuable property from limited partners to whom they owed fiduciary duties. All said, the former and current managing general partners, together with their co-conspirators and collaborators, wrongfully took more than $6.75 million from the plaintiffs in this action.

2.      The managing general partners completed the first two of these three schemes over relatively short periods of time: the first in 1990-91 ("**Scheme One**") and the second in 2002 ("**Scheme Two**"). The third scheme was a broad, ongoing conspiracy, hatched in 2004 (the "**Conspiracy**") to defraud all of the limited partners who were not affiliated or collaborating with the general partners (such limited partners from time to time, the "**Independent Limited Partners**").

3.      None of the plaintiffs could have discovered Scheme One, Scheme Two or the Conspiracy before 2015. As it happened, plaintiffs discovered Scheme One and Scheme Two during one limited partner's 2015 investigation of the Conspiracy.

4.      Current and former limited partners of the Partnership bring this action against the former and current managing general partners of the Partnership, as well as their affiliates and co-conspirators, to obtain relief for the economic harm they suffered on account of the defendants' numerous wrongful acts that include: violations of 18 U.S.C. §§ 1962(c) and 1962(d),

breaches of fiduciary duty, aiding and abetting others' breaches of fiduciary duty, constructive fraud, fraud, theft, and elder financial abuse. By deceit, materially misleading omission, and other means, defendants have knowingly and intentionally taken property rightfully belonging to each plaintiff, in some cases for grossly inadequate consideration, and in other cases for no consideration at all.

5.      Scheme One occurred in 1990-91, when John Allen, the managing general partner at the time, usurped an opportunity that the general partner was required to present to all of the limited partners.

6.      Scheme Two occurred in 2002, when HKAllen Limited Partnership ("**HKAllen**"), the Partnership's managing general partner since the middle of 2001, solicited, arranged, and expressly approved purchases by its affiliate of two limited partners' interests in the Partnership for an unconscionably low price.

7.      The Conspiracy was a fraudulent scheme to cheat every Independent Limited Partner out of most of the value of his/her interest in the Partnership, while also substantially eroding the governance rights all of the Independent Limited Partners. The general partner and its co-conspirators took at least 61% of the value of every Independent Limited Partner's interest in the Partnership. In several cases, they took nearly 100%. The Conspiracy began some time after 2002, most likely 2004 or very early 2005. Upon information and belief, HKAllen and several of the defendants agreed to participate in the Conspiracy to defraud all of the Independent Limited Partners. The Conspiracy had two phases. In the first phase ("**Phase One**"), they accumulated enough of the Partnership's 20 limited partner units (each, an "**LP Unit**") to control all Partnership decisions, including those decisions that required consent of the limited partners, and they concealed their accumulated ownership from the Independent Limited Partners even though HKAllen and its co-general partner were obligated to disclose it. In the

second phase ("**Phase Two**"), they used their undisclosed, accumulated ownership of LP Units to approve and execute a transaction that: (a) transferred, for no consideration whatsoever, most of the value of every LP Unit from the limited partners to HKAllen and its co-conspirators and collaborators; and (b) substantially eroded the Independent Limited Partners' ability to hold accountable those who manage the Property and its finances. Phase One and Phase Two were inextricably linked to each other. Successful execution of the Conspiracy required successful execution of Phase One and Phase Two, in that order.

    8.    The Conspiracy involved, at various times, the cooperation and coordinated action of several parties, including the following defendants: (a) HKAllen and its affiliates HK Allen Inc.; HKN Allen LLC; HKN Manager LLC; Hall Keen Investments LLC; Hall Keen Management, Inc.; HallKeen LLC; Andrew P. Burnes; and David A. Carlen (collectively, the "**HK Collaborators**"); and (b) Equity Resource Investments, LLC ("**ERI**") and its affiliates Equity Resource Newton Fund Limited Partnership; Equity Resource Milton Fund LLC; ERF Manager LLC; ERF Fund 2011 GP LLC; ERF Fund 2013 GP LLC; and Eggert Dagbjartsson (collectively, the "**ERI Collaborators**" and together with the HK Collaborators, the "**Collaborators**").  In Phase One, several of the ERI Collaborators and the HK Collaborators conspired to acquire nearly half of the twenty LP Units in the Partnership by buying them from limited partners in manipulative transactions for pennies on the dollar. HKAllen facilitated and expressly approved each of these purchases. HKAllen gave the Independent Limited Partners' names and addresses, and information about the Partnership's operations and finances, to at least one of the ERI Collaborators. In exchange, ERI promised to deliver to HKAllen and/or its affiliates a substantial portion of the profits ERI would realize from the scheme. ERI acted as middleman, attempting to insulate HKAllen from transacting directly with the Independent

Limited Partners, but allowing HKAllen to reap nearly the same gains as if it had dealt directly with the Independent Limited Partners.

9.      Having secured this opportunity to profit at the Independent Limited Partners' expense, the individuals who controlled (and still control) HKAllen caused several of the HK Collaborators to act in furtherance of the Conspiracy. For example, Andrew Burnes, in his capacity as principal of one such affiliate, sent a letter in 2005 to the limited partners in which he falsely represented that the Property was in a "discouraging and perilous financial position," and falsely suggested that the Partnership's "longer term ability … to pay the mortgage and operating expenses is bleak." Mr. Burnes' letter attributed the predicament to factors beyond the general partner's control, and said that the Property's "per unit expenses are very reasonable for comparable properties." Those two statements were materially false. The Partnership was overpaying by approximately $60,000 per year for certain expense items. In the context of a property whose total annual rental income is approximately $1.2 million, that was a consequential overpayment. It was enough to make the Partnership's finances look tight when they should have had substantial cushion. It was also one reason why, from 2004-2008, and again from 2012-2013, the Partnership allocated taxable income to the limited partners, but distributed no cash to them. This situation created the possibility that some of the limited partners were forced to spend money to hold their LP Units in these years – a possibility that the ERI Collaborators repeatedly exploited, as set forth below. Mr. Burnes' misrepresentations of bleak prospects and the creation of conditions where some limited partners might need to spend money to hold their LP Units were designed to increase the odds that limited partners would accept offers from an ERI Collaborator to buy LP Units for an outrageously low price.

10.      The ERI Collaborators who mailed offers to Independent Limited Partners to buy their LP Units took full advantage of Mr. Burnes' manipulation of the limited partners. The

offers highlighted the tax liabilities the limited partners faced, and the ERI Collaborators mailed the offers only in years when limited partners received no money from the Partnership to off-set those tax bills.

11.     The first year in which an ERI Collaborator sent the limited partners offers to purchase LP Units was the third consecutive year in which limited partners had to pay taxes on Partnership income without receiving any distributions from the Partnership. That was 2006. ERI Collaborators sent offers again in 2007, 2008 and 2012. The Partnership distributed cash to limited partners in 2009-2011; the ERI Collaborators sent no offers in those years. None of the ERI Collaborators, HKAllen or any of the HK Collaborators ever told the limited partners that the Partnership would be able to make cash distributions to limited partners if HKAllen managed the Partnership's expenses properly. Even more importantly, none of the ERI Collaborators, HKAllen or any of the HK Collaborators ever told the limited partners that an owner of one LP Unit could expect to receive stable and predictable income from the Partnership in excess of $33,000 per year as soon as the Partnership fully repaid its existing mortgage debt in early 2014.

12.     By late 2013, the Collaborators had acquired, under false pretenses, 48.75% of the LP Units in the Partnership.  In so doing, they wrongfully took approximately $7,600,000 from the limited partners who sold to them.  For example, in November 2013, just three months before the Partnership fully repaid its mortgage loan, an affiliate of ERI purchased one LP Unit, then worth more than $780,000, for the paltry sum of $35,000.  HKAllen violated its fiduciary duty to every limited partner who sold LP Units to an ERI affiliate. HKAllen not only facilitated and induced each sale (by direct action and by conspiring with the other Collaborators), but it also expressly approved each sale in writing even though it knew that: (a) the terms of the sale were abusive to the limited partner who was selling; and (b) it would profit at the expense of the limited partner who was selling.

13.     The Partnership fully repaid its mortgage loan in February 2014. At that point, it owned the Property free of any debt. The Partnership had paid approximately $698,000 per year to service its loan. With the loan repaid, the Partnership was able to pay that amount to the limited partners as cash distributions. An owner of one LP Unit would receive nearly $35,000 per year.

14.     In March 2015, HKAllen announced the transaction at the heart of Phase Two of the Conspiracy: in its "Consent Request for Hotel Danville Company: Solicitation by General Partner of Limited Partner Consent" (the "**Consent Request**"), HKAllen asked the limited partners to approve a transaction called the "Sale and Exchange" (the "**Sale and Exchange**"). HKAllen led the Independent Limited Partners, many of whom were senior citizens, to believe the lie that the Sale and Exchange was in their best interest: that it would pay them the full amount they would receive in a legitimate third-party sale of the Property plus, as a bonus, continued cash flow and participation in the Property's future capital appreciation. HKAllen failed to tell the Independent Limited Partners that the Sale and Exchange was in reality a mechanism by which HKAllen and its collaborators and co-conspirators would take for themselves at least $480,000.00 of the value of every LP Unit.

15.     HKAllen's description of the Sale and Exchange was littered with mischaracterizations and materially misleading omissions, all designed to prevent the 19 Independent Limited Partners who then owned the 51.25% of the LP Units from objecting in writing to the Sale and Exchange.  The entire process by which HKAllen obtained the Independent Limited Partners' "consent" to the Sale and Exchange was a sham, the success of which was inextricably linked to the success of Phase One. The wrongful and undisclosed accumulation of LP Units by the HKAllen Trusted Parties transformed the limited partners' consent to the Sale and Exchange from a possible, but by no means guaranteed occurrence, to a

fait accompli.  Under the Partnership's limited partnership agreement (the "**Partnership Agreement**"), HKAllen would obtain consent to the Sale and Exchange as long as limited partners owning more than 49% of the LP Units did not oppose the Sale and Exchange in writing within 30 days after HKAllen requested consent. HKAllen knew that its trusted co-conspirators, who together owned 48.75% of the LP Units, would support the Sale and Exchange. Because of that, HKAllen knew that all it had to do to clinch consent was either: (a) to cause just one of the 15 Independent Limited Partners owning 0.5 or more LP Units either to approve the Sale and Exchange in writing or not to respond in writing to the request for consent; or (b) to cause any two of the four Independent Limited Partners owning less than 0.5 LP Units either to approve the Sale and Exchange or not to respond in writing to the request for consent. In contrast, for HKAllen not to obtain consent to the Sale and Exchange, the impossible had to occur: all 15 Independent Limited Partners who owned at least 0.5 LP Units and at least three of the four Independent Limited Partners who owned less than 0.5 LP Units would have to object in writing to the Sale and Exchange within 30 days after HKAllen's request for consent. HKAllen knew that this latter scenario would never occur.  Because HKAllen successfully executed Phase One of the Conspiracy, HKAllen was certain when it mailed the Consent Request to the limited partners that it would obtain the formal consent required under the Partnership Agreement to execute the Sale and Exchange.

16.    HKAllen was right. Its deception worked. The vast majority of the limited partners did not oppose the Sale and Exchange – so formal "consent" to the Sale and Exchange was obtained.

17.    At least two limited partners expressly objected to the Sale and Exchange. Shortly after receiving the Consent Request, Plaintiffs Heeney and Ball explained to the general partner in detail the ways in which the Sale and Exchange was grossly unfair to the limited

partners.  But even though HKAllen was – and still is – a fiduciary to the limited partners,

HKAllen knowingly and intentionally, in bad faith, and with malice, refused to acknowledge the

egregious breaches of fiduciary duty inherent in the Sale and Exchange, and refused to change

course.  Instead, HKAllen knowingly and intentionally misrepresented to all of the limited

partners the concerns that Heeney and Ball expressed about the Sale and Exchange, and

impugned the motives of Heeney and Ball, all in an effort to complete the Sale and Exchange by

which HKAllen and its affiliate HKN Manager LLC would receive, for no consideration

whatsoever, more than half of the fair market value of every LP Unit in the Partnership.

18.    HKAllen completed the Sale and Exchange on September 10, 2015.  In so doing,

it stole more than $4,920,000 from the remaining Independent Limited Partners who owned, in

the aggregate, 10.25 LP Units.  Thus, the completion of the Sale and Exchange caused an owner

of one LP Unit to suffer a loss of approximately $480,000.

19.    Completion of the Sale and Exchange also reduced the value of every LP Unit

owned by the ERI Collaborators. Even so, the ERI Collaborators still made out like bandits: for

their part in the Conspiracy, they "invested" $88,750 over a period of seven years. Two years later,

they had a profit of more than $2 million.


**PARTIES**

20.    Plaintiffs THE HON. JOSEPH AND MICKEY WAPNER ("**Wapners**") are a

married couple who are now, and at all relevant times mentioned in this Complaint were,

residents of Los Angeles County, California.  They purchased ½ of one LP Unit in December

1982, when the LP Units were offered for sale in a private securities offering, and purchased

another ½ of one LP Unit in January 1983 as part of the same securities offering.  The Wapners

still own one LP Unit.

21.    Plaintiff JAMES LIPPMAN, trustee of the JAMES & LINDA LIPPMAN 1998 TRUST ("**Lippman Trust**"), is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizens of Los Angeles County, California.  James Lippman purchased ½ of one LP Unit in 1982, when the LP Units were offered for sale in a private securities offering, and he transferred that interest to the Lippman Trust on or about January 1, 2012.  James Lippman, as trustee of the Lippman Trust, still owns ½ of one LP Unit.

22.    Plaintiff DANIEL DEVOR ("**Devor**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of Riverside County, California.  He purchased ½ of one LP Unit in 1982, when the LP Units were offered for sale in a private securities offering.  He still owns ½ of one LP Unit.

23.    Plaintiff JOHN SHERMAN ("**Sherman**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of Riverside County, California.  He purchased ½ of one LP Unit in 1982, when the LP Units were offered for sale in a private securities offering.

24.    Plaintiffs IRVING RICHARDS AND REGINA RICHARDS, co-trustees of the RICHARDS FAMILY TRUST ("**Richards Family Trust**"), are a married couple who are now, and at all relevant times mentioned in this Complaint were, citizens of Riverside County, California.  They purchased ½ of one LP Unit in 1982, when the LP Units were offered for sale in a private securities offering.

25.    Plaintiffs BRIAN WEIDE AND ROBERTA WEIDE, co-trustees of the WEIDE FAMILY TRUST ("**Weide Family Trust**"), are a married couple who are now, and at all relevant times mentioned in this Complaint were, citizens of San Bernardino County, California.  The Weide Family Trust has one beneficiary, Beatrice Weide, whose now-deceased

husband purchased one LP Unit in 1982, when the LP Units were offered for sale in a private securities offering.

26.     Plaintiff TERUKO TAKAHASHI ("**Takahashi**") is an individual who is now a resident of San Diego County, California, and at all relevant times mentioned in this Complaint was a citizen of San Mateo County, California.  Ms. Takahashi is the sole heir to the estate of her father, Teruo Hirokawa ("**Hirokawa**"), who purchased ½ of one LP Unit in 1982, when the LP Units were offered for sale in a private securities offering.  From the time Hirokawa purchased his interest in the Partnership until he died in 2013, Hirokawa was a citizen of California.

27.     Plaintiff JUDITH S. BALL ("**Ball**") is an individual who is a citizen of Alameda County, California. She became a California citizen in July 2016.  Before July 2016, she was a citizen of Montgomery County, Maryland.  She owns 1/3 of one LP Unit, which was purchased in a private securities offering in 1982.  She still owns 1/3 of one LP Unit.

28.     Plaintiff THOMAS L. HEENEY ("**Heeney**") is an individual who is now a citizen of Florida. He purchased 1/3 of one LP Unit in 1982, when the LP Units were offered for sale in a private securities offering.  He still owns 1/3 of one LP Unit.

29.     Plaintiff EARL MCKINNEY ("**McKinney**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a resident of Fayette County, Kentucky. He purchased one full LP Unit in 1982, when the LP Units were offered for sale in a private securities offering.

30.     Plaintiff JAMES HAMILL ("**Hamill**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a resident of Dallas County, Texas.  He purchased one full LP Unit in 1982, when the LP Units were offered for sale in a private securities offering.

31.     Plaintiff NANCY LEUSCHEL ("**Leuschel**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of Island County, Washington.  She and her husband, Otto Leuschel, purchased ½ of one LP Unit in 1982, when the LP Units were offered for sale in a private securities offering. They held their ½ LP Unit as joint tenants with right of survivorship.

32.     Plaintiff RICHARD ADELMAN ("**Adelman**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of Miami-Dade County, Florida. He inherited ¼ LP Units in 2004 from his mother, Helen W. Adelman, who purchased 0.5 LP Units in 1982, when the LP Units were offered for sale in a private securities offering.

33.     Plaintiff JAMES R. GUY, JR. ("**Guy**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of Mecklenburg County, North Carolina.  He purchased 0.75 LP Units in 1982, when the LP Units were offered for sale in a private securities offering.  In 2002, he inherited an additional 0.75 LP Units from his father, James Guy, Sr., who purchased 0.75 LP Units in 1982, when the LP Units were offered for sale in a private securities offering.  Guy currently owns 1.5 LP Units.

34.     Plaintiffs DR. JOHN RICHARDS AND CHRIS STEIG RICHARDS ("**Steig Richards Family**") are a married couple who are now, and at all relevant times mentioned in this Complaint were, residents of Cowlitz County, Washington.  They purchased ½ of one LP Unit in 1982, when the LP Units were offered for sale in a private securities offering.  The Steig Richards Family still owns ½ of one LP Unit.

35.     Plaintiff KEITH JANZEN ("**Janzen**"), trustee of the J. EMERSON CHISHOLM TRUST DTD 7/18/97 ("**Chisholm Trust**"), is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of McPherson County, Kansas.  The primary beneficiary of the Chisholm Trust is Mildred F. Chisholm, a 96 year-old woman who is

now and at all relevant times mentioned in this Complaint was, a citizen of Johnson County, Kansas. The Chisholm Trust purchased one LP Unit in January 1983, when the LP Units were offered for sale in a private securities offering. The Chisholm Trust still owns one LP Unit.

36.    Because they still own LP Units, Plaintiffs Devor, Heeney, Ball, Guy, Lippman Trust, Steig Richards Family, Wapners and Chisholm Trust are referred to, collectively, as the "**Holder LPs**."

37.    Because they have sold the LP Units that they used to own, Plaintiffs Sherman, Richards Family Trust, Weide Family Trust, Takahashi, McKinney, Hamill, Leuschel and Adelman are referred to, collectively, as the "**Seller LPs**."

38.    Defendant HKALLEN, LP ("**HKAllen**"), is a Massachusetts limited partnership, all of whose partners are, upon information and belief, citizens of Massachusetts. HKAllen has been a general partner of the Partnership since approximately January 2001. HKAllen has been the sole general partner of the Partnership since July 1, 2014. HKAllen has two general partners: HK Allen, Inc. and HKN Allen LLC.

39.    Defendant HK ALLEN, INC. ("**HK Allen Inc.**"), is a Massachusetts corporation with its nerve center in Massachusetts, and is now, and at all relevant times mentioned in this Complaint was, a citizen of Massachusetts. HK Allen Inc. was the sole general partner of HKAllen from HKAllen's formation in 1999 until March 15, 2015. From March 16, 2015 to the present, HK Allen Inc. has been one of two general partners of HKAllen, the other being HKN Allen LLC. HK Allen Inc. has two directors: Andrew Burnes and John L. Hall II. Burnes is also its President and Secretary. John L. Hall II is its Treasurer.

40.    Defendant HKN ALLEN LLC ("**HKN Allen**") is a Massachusetts limited liability company, all of whose members are, upon information and belief, citizens of Massachusetts. HKN Allen became a limited partner of HKAllen on July 1, 2014, and has been a

general partner of HKAllen since March 16, 2015. HKN Allen is also the sole Class B Member of

HKN Danville House LLC, a Massachusetts limited liability company that, as a result of the

Conspiracy, now owns the Property. HKN Allen has one manager: Andrew Burnes.

41.    Defendant HKN MANAGER LLC is a Massachusetts limited liability company,

all of whose members are, upon information and belief, citizens of Massachusetts. HKN

Manager LLC is the sole manager of HKN Danville House LLC, a Massachusetts limited liability

company that, as a result of the Conspiracy, now owns the Property. HKN Manager LLC's sole

member is HKN Allen. HKN Manager LLC's sole manager is Andrew Burnes.

42.    Defendant HALL KEEN MANAGEMENT, INC. ("**HKM**"), is a Massachusetts

corporation with its nerve center in Massachusetts, and is now, and at all relevant times

mentioned in this Complaint was, a citizen of Massachusetts. HKM has three directors: Andrew

Burnes, John L. Hall II and Denison M. Hall. Burnes is also its President and Secretary. Denison

Hall is its Treasurer.

43.    Defendant HALL KEEN INVESTMENTS LLC ("**Hall Keen Investments**") is

a Massachusetts limited liability company, all of whose members are, upon information and belief,

citizens of Massachusetts. Hall Keen Investments has four managers: Andrew Burnes, John L.

Hall II, Denison M. Hall and William A. Hoffman, Jr.

44.    Defendant HALLKEEN LLC is a Massachusetts limited liability company, all of

whose members are, upon information and belief, citizens of Massachusetts. HallKeen LLC has

one manager: Andrew Burnes.

45.    Defendant JOHN L. ALLEN ("**Allen**"), is an individual who is now, and at all

relevant times mentioned in this Complaint was, a citizen of Massachusetts.  Allen was the

managing general partner of the Partnership from the Partnership's formation until

approximately January 2001, when: (a) HKAllen became managing general partner; (b) Allen

merged his property management business with HKM; and (c) Allen acquired an ownership interest in HKAllen.

46.    Defendant ANDREW P. BURNES ("**Burnes**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of Massachusetts.  Burnes is: (1) the President, Secretary and a Director of HK Allen Inc.; (2) the sole Manager of HKN Allen; (3) the sole Manager of HKN Manager LLC; (4) the President, Secretary and a Director of HKM; (5) a Manager of Hall Keen Investments; and (6) the sole Manager of HallKeen LLC.

47.    Upon information and belief, HKAllen, HK Allen Inc., HKN Allen, HKN Manager LLC, HKM, Hall Keen Investments and HallKeen LLC and are all affiliates of one another and are: (i) under the common control of and (ii) beneficially owned by one or more of Burnes, John L. Hall II, Denison M. Hall and William A. Hoffman, Jr. (such individuals, collectively, the "**HK Controlling Persons**"). Upon information and belief, Burnes exercises control on a day-to-day basis over each of HKAllen, HK Allen Inc., HKN Allen, HKN Manager LLC, HKM, Hall Keen Investments and HallKeen LLC. The HK Controlling Persons caused the above-listed entities to act in a coordinated manner to plan and to execute substantial parts of the Conspiracy alleged herein. Because these entities share a unity of identity and of interest, and because they acted in coordination with each other to harm Plaintiffs by fraud and other means, adherence to the fiction of the separate existence of each entity would sanction fraud and promote injustice. Upon information and belief, the dominance of each of HKAllen, HK Allen Inc., HKN Allen, HKN Manager LLC, HKM, Hall Keen Investments and HallKeen LLC by the HK Controlling Persons was so complete that any individuality or separateness of these entities does not, and at all times herein alleged did not, exist.

48.    Nominal defendant Hotel Danville Company is a Virginia limited partnership whose sole general partner is HKAllen.

49.     Defendant DAVID A. CARLEN ("**Carlen**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of Massachusetts.

50.     Defendant ERI is a Massachusetts limited liability company, all of whose members are, upon information and belief, citizens of Massachusetts or Maine. ERI has two principal owners and managers: Eggert Dagbjartsson and Victor Paci.

51.     Defendant EQUITY RESOURCE NEWTON FUND LIMITED PARTNERSHIP ("**Newton Fund**") is a Massachusetts limited partnership, all of whose partners are, upon information and belief, citizens of Massachusetts or Maine. From its formation in 2005 until March 2009, the general partner of Newton Fund was ERI N, LLC, a Massachusetts limited liability company whose sole member during those years was ERI. Since March 2009, the general partner of Newton Fund has been ERF Manager LLC, a Massachusetts limited liability company that has for its entire existence been controlled by ERI.

52.     Defendant EQUITY RESOURCE MILTON FUND LLC ("**Milton Fund**") is a Massachusetts limited liability, all of whose members are, upon information and belief, citizens of Massachusetts or Maine. Milton Fund's sole Manager has always been ERF Manager LLC, which has always been controlled by ERI.

53.     Defendant ERF MANAGER LLC ("**ERF Manager**") is a Massachusetts limited liability company, all of whose members are, upon information and belief, citizens of Massachusetts or Maine. ERF Manager has controlled Newton Fund since March 2009, and has controlled Milton Fund for Milton Fund's entire existence. ERF Manager is controlled by ERI.

54.     Defendant ERF FUND 2011 GP LLC ("**ERF Fund 2011**") is a Massachusetts limited liability company, all of whose members are, upon information and belief, citizens of Massachusetts or Maine. For its entire existence, ERF Fund 2011 has been controlled by the same individuals who control ERI.

55.     Defendant ERF FUND 2013 GP LLC ("**ERF Fund 2013**") is a Massachusetts limited liability company, all of whose members are, upon information and belief, citizens of Massachusetts or Maine. For its entire existence, ERF Fund 2013 has been controlled by the same individuals who control ERI.

56.     Defendant EGGERT DAGBJARTSSON ("**Dagbjartsson**") is an individual who is now, and at all relevant times mentioned in this Complaint was, a citizen of Massachusetts. Dagbjartsson is a Manager and a principal owner of ERI.

57.     Upon information and belief, ERI, Newton Fund, Milton Fund, ERF Manager, ERF Fund 2011, ERF Fund 2013 and Dagbjartsson (defined above as the "**ERI Collaborators**") are all affiliates of one another and are: (i) under the common control of and/or (ii) substantially and beneficially owned by Dagbjartsson and Victor Paci (Dagbjartsson and Paci, collectively, the "**ERI Controlling Persons**"). One or both of the ERI Controlling Persons caused the above-listed entities to act in a coordinated manner to plan and to execute substantial parts of the Conspiracy alleged herein. Because these entities share a unity of identity and of interest, and because they acted in coordination with each other to harm Plaintiffs by fraud and other means, adherence to the fiction of the separate existence of each entity would sanction fraud and promote injustice. Upon information and belief, the dominance of each of ERI, Newton Fund, Milton Fund, ERF Manager, ERF Fund 2011, ERF Fund 2013 by the ERI Controlling Persons was so complete that any individuality or separateness of these entities does not, and at all times herein alleged did not, exist.

## JURISDICTION AND VENUE

58.     This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332. No plaintiff is a citizen of a state in which a defendant is a citizen. Each plaintiff's claim exceeds $75,000.

59.     In addition, this Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1964(c), and 18 U.S.C. 1367(a).

60.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions transpired in this District and/or a substantial number of defendants reside in this district.

## STATEMENT OF FACTS

### *Formation, Purpose and Control of the Partnership*

61.     Morton Myerson ("**Myerson**") and Allen formed the Partnership in 1982. They served as the Partnership's original general partners, each holding a 50% general partner interest in the Partnership.

62.     In 1982 and 1983, the Partnership conducted a private securities offering, pursuant to which it sold twenty (20) LP Units to investors it referred to as Investor Limited Partners (collectively, and as the number and the names of such Investor Limited Partners changed from time to time, the "**Limited Partners**"). The Partnership sold LP Units for $126,000.00 each. In the aggregate, the Limited Partners invested $2,520,000.00 into the Partnership. By contrast, Allen and Myerson each invested only $50.

63.     The Partnership was formed to purchase, substantially rehabilitate and operate as a Section 8 subsidized housing project, a historic 106-unit apartment building located in downtown Danville, Virginia.

64.    Myerson and Allen were both general partners of the Partnership from its formation in 1982 until January 1, 2001.

65.    Allen assigned his general partner interest in the Partnership to HKAllen, effective on or about January 1, 2001. Allen remained an owner of HKAllen. After that assignment, HKAllen and Myerson were the Partnership's two general partners, and HKAllen was the Partnership's managing general partner.

66.    Myerson resigned as general partner on July 1, 2014. Since that date, HKAllen has been the sole general partner of the Partnership and the managing general partner of the Partnership.

*The Partnership's Financial Performance Has Been*

*Consistently Strong for 30 Years*

67.    From the Partnership's formation until May 31, 1997, the Boston Financial Technology Group, Inc. ("**BFTG**") or one of its affiliates served as the Partnership's Investor Service Agent. BFTG and/or its affiliates sent each year's audited financial results to the Limited Partners. In addition, for a time, BFTG and/or its affiliates also sent the Limited Partners one or more memoranda annually containing descriptions and analyses of recent operations at the Property, historical analyses of the Partnership's investment performance, discussion and analysis of Partnership tax issues, and a comparison of actual operating performance to original projections. These memoranda consistently reported strong performance at the Property and for the Partnership. The following memoranda are not exhaustive, but are exemplary:

68.    On March 27, 1984, BFTG sent a memorandum to the Limited Partners stating that 76% of the apartments at the Property were leased by January 31, 1984, and that BFTG expected all the apartments to be leased in April 1984. By August of the following year, BFTG

reported that, due to the excellent occupancy rate, the property had a waiting list of prospective tenants.

69.     On September 9, 1986, Boston Financial Investor Services ("**BFIS**"), a division of BFTG, sent a memorandum to the Limited Partners stating that the property was fully occupied, rents had increased 3%, and management continued to maintain a waiting list of prospective tenants.

70.     In 1986, major changes to the Internal Revenue Code were enacted that phased-out over five years the ability of the Limited Partners to deduct from their active income their losses from the Partnership.  This change in the law eliminated the Limited Partners' ability to realize some of the income tax savings that the Partnership formerly produced for them.  On December 22, 1986, BFIS sent a three-page memorandum to the Limited Partners explaining its analysis of the effect of this legal change on the Partnership (the "**1986 Tax Memo**").

71.     The Summary of the 1986 Tax Memo stated:

> **Your investment was structured to generate cash flow, residual value**, and substantial early tax savings to reduce the net cost of acquiring the property. **Although the new tax bill limits the value of the tax benefits, we believe tax reform may increase Danville Hotel's residual value**.  (Emphasis added.)

72.     On March 26, 1987, BFIS sent a memorandum to the Limited Partners stating that, "Hotel Danville continues to operate smoothly with a 98% occupancy level. This should continue throughout 1987 and allow the property to operate at breakeven."  Two and a half months later, BFIS reported that the property remained fully occupied, despite another rent increase, and was operating at breakeven with a 10-person waiting list.

73.     On October 10, 1988, BFIS sent a memorandum to the Limited Partners stating that the Property was 100% occupied with a waiting list.

74.     On November 1, 1990, BFTG, now operating as The Boston Financial Group Incorporated ("**BFG**"), sent a memorandum to the Limited Partners analyzing the residual value of one LP Unit.  In its analysis, BFG concluded that the current value of the Property was

$7,817,340 and an owner of one full LP Unit would receive $124,334.00, if the Property were sold at that time, which payment would be subject to a tax of $46,133.00. This analysis took account of the fact that the Partnership had an outstanding mortgage debt of approximately $5.3 million. The following month, a division of BFG sent another memorandum reporting the property was 99% occupied.

75.     On November 5, 1991, BFIS sent a memorandum to the Limited Partners stating that the Property was 100% occupied in the first nine months of 1991 and that it operated "ahead of budget" during that time.

76.     In November 1993, a division of BFG reported on recent operations, noting that the Property had a 100% occupancy rate and had generated $51,676 in unaudited cash flow, and that the balance in the replacement reserve account as of September 30, 1993 was $285,365.

77.     On August 22, 1994, BFG sent a memorandum to the Limited Partners describing recent operations and stating that the Property was 100% occupied, total income was on budget, expenses were 5% under budget, net operating income was 3% over budget, and the property was expected to "operate at breakeven."

78.     On November 16, 1995, BFG sent a memorandum to the Limited Partners stating that an owner of one full LP Unit had, from 1982 through 1994, received "$15,504.00 in benefits in excess of [its] original contribution." The memo also described recent operations, stating the Property was 100% occupied, that total income was 1.8% over budget, expenses were 50.1% under budget, net operating income was 34.3% over budget, and the property was expected to "operate at breakeven."

79.     On October 3, 1996, BFG reported to the Limited Partners that: (i) as of year-end 1995, "property operations were above break-even;" and (ii) as of the end of June 1996, the Property was 98.7% occupied and BFG expected "the property to operate above break-even."

80.     On December 3, 1996, BFG sent a memorandum to the Limited Partners announcing its resignation as Investor Service Agent for the Company. BFG wrote, "It is our belief that it may be more efficient and beneficial for the Limited Partners to deal with the General Partner directly."

81.     On October 20, 1997, Allen Management Company ("**AMC**"), which, upon information and belief, was owned and controlled by Allen, sent a memorandum to the Limited Partners describing recent operations, stating the property maintained 99.9% occupancy at the end of 1996, had a net operating income before debt service of $836,694 at the end of 1996, and was expected to "continue to operate above break-even." AMC sent a similar memorandum on September 9, 1998.

82.     On or about May 1, 1999, HKM assumed the role of Management Agent of the Property, meaning it was the property manager of the Property. On October 26, 1999, HKM sent a memorandum to the Limited Partners. That memorandum (i) announced that HKM was assuming the role of Investor Service Agent because AMC sold its property management business to HKM; and (ii) described recent operations, noting the Property maintained 99.9% occupancy at the end of 1998, was 96% occupied as of the end of September 1999, had a net operating income before debt service and depreciation of $831,369 in 1998, and was expected to "continue to operate above break-even."

83.     On November 8, 2000, HKM sent a memorandum to the Limited Partners stating the Property maintained 99.9% occupancy at the end of 1999, was 98% occupied as of the end of September 2000, had a net operating income before debt service and depreciation of $822,092 in 1999, and was expected to "continue to operate above break-even."

84.     As set forth above, Allen assigned his general partner interest in the Partnership to HKAllen, effective on or about January 1, 2001.  After that assignment, HKAllen and Myerson were the Partnership's two general partners.

85.     In December 2001, HKM sent a memorandum to the Limited Partners describing recent operations, stating the property maintained 99.9% occupancy at the end of 2000 and through October 2001, and net operating income before debt service and depreciation was $822,092 in 2000.  Based on 2001 year-to-date performance, HKM expected the property to "continue to operate above break-even."

86.     On March 29, 2002, HKM sent a memorandum to the Limited Partners stating operations were going smoothly and, while distributions would be somewhat lower due to settlement of a dispute, HKM anticipated being able to distribute the full amount of the distribution the following year.

87.     Upon information and belief, the March 29, 2002 memo is the last such memo HKM, HKAllen or any affiliate of HKAllen ever sent to all of the Limited Partners.

88.     Upon information and belief, after March 29, 2002 and through 2014, none of HKM, HKAllen or HKAllen's affiliates sent the Limited Partners reports or analyses of the Partnership's operations and performance; HKM sent only one set of documents to the Limited Partners each year: the Partnership's audited financial statements, which were prepared by a third-party accounting firm.

89.     Occupancy at the Property has remained high, and vacancy has remained very low, from 2004 through the present.  The Property's economic vacancy has also been very low in the same period; the highest economic vacancy between 2004 and 2014 was in 2012 – at 4.4%. It was only 1.5% in 2014, and the average from 2004 through 2014 was 2.2%.

*Every General Partner of the Partnership Was a Fiduciary to the Limited Partners*

90.     At all times, each general partner of the Partnership was a fiduciary to the Limited Partners and to the Partnership.  This is because every general partner of a limited partnership is a fiduciary to the limited partnership itself and to its limited partners.

91.     In a limited partnership, general partners are legally bound to act in the highest good faith to their limited partners, and general partners may not obtain any advantage over limited partners in the partnership affairs by even the slightest misrepresentation, concealment, threat or adverse pressure of any kind.

*Scheme One: Allen and Myerson Quietly Usurped an Opportunity That Belonged to the Limited Partners*

92.     By letter dated March 20, 1989, acting on behalf of Allen and Myerson in their capacities as general partners, BFG formally notified one of the Limited Partners, Art Pfeiffer ("**Pfeiffer**"), that he was in default under the Partnership Agreement because he failed to pay the seventh installment of his capital contribution to the Partnership.

93.     At the time of his default, Pfeiffer owned 0.5 LP Units.

94.     When a Limited Partner defaults as Pfeiffer did, Section 5.2 of the Partnership Agreement gives the general partner the option to purchase from the defaulting Limited Partner the entirety of that Limited Partner's interest in the Partnership.  However, if the general partner does not exercise this option and complete its purchase within thirty (30) days after the default, then Section 5.2 requires the general partner to notify all the other Limited Partners that the Limited Partners have the option to purchase the interest of the defaulting Limited Partner.  All of the Limited Partners, with the exception of Pfeiffer, were in compliance with their obligations under the Partnership Agreement at the time of Pfeiffer's default and thus were entitled to rely on the general partners to comply with Section 5.2.

95.     Neither Allen nor Myerson exercised his option to purchase Pfeiffer's 0.5 LP Units within thirty (30) days after the date of Pfeiffer's default.  Rather, more than 21 months after BFG sent its March 20, 1989, letter to Pfeiffer notifying Pfeiffer that he was formally in default under the Partnership Agreement, Allen and Myerson caused Pfeiffer's 0.5 LP Units to be assigned to themselves: 0.25 LP Units to Allen and 0.25 LP Units to Myerson.  This action was in direct breach of Allen's and Myerson's contractual duties under Section 5.2.

96.     Allen and Myerson notified Pfeiffer of their election to take ownership of his interest by a letter dated January 5, 1991, signed by Allen.  That letter stated the General Partners were exercising their option to purchase Pfeiffer's entire interest in the Property, effective December 30, 1990.  Included with the letter was $100.00 as payment in full for the interest.

97.     In breach of the Partnership Agreement and their fiduciary duties to the Limited Partners, neither Allen nor Myerson ever notified or caused anyone else to notify the other Limited Partners that: (i) Pfeiffer had failed to pay the final installment of his capital contribution to the Partnership; (ii) the general partners formally declared Pfeiffer to be in default under the Partnership Agreement; (iii) the general partners neglected to timely exercise their 30-day option to purchase the interest; or (iv) the other Limited Partners had a right to purchase Pfeiffer's 0.5 LP Unit at a price established by a formula in the Partnership Agreement.  Without such notice, the other Limited Partners could not and did not know, and had no reason to suspect, that any of these facts was true.

98.     Allen and Myerson waited nearly ten years to notify the Limited Partners that Pfeiffer's interest had been assigned to Allen and Myerson.  Even then, they buried this fact to prevent the Limited Partners from noticing the transfer, and they never revealed facts that would alert the Limited Partners to the transfer's impropriety.  The fact was not communicated in a memo or a letter.  Instead, the fact of the transfer was contained in an endnote to the Schedule A

that was attached to Amendment Two to Amended and Restated Limited Partnership Agreement and Certificate ("**Amendment Two**"), which was dated January 1, 2001. The notation in Schedule A to Amendment Two read simply, "Arthur M. Pfeiffer -1/2 Unit. Arthur M. Pfeiffer's interest has been transferred as follows:" and then listed each of Allen's and Myerson's name, Social Security number and address, and indicated that each received 0.25 LP Units. Without more, the Limited Partners could not have been expected to suspect that the transfer was the result of default or, even if it was, that the general partners had not timely exercised their rights upon such default.

99.     The bare fact that Pfeiffer's interest had been transferred to Allen and Myerson in equal parts was the only information about the transfer that has to this day been communicated by or on behalf of any general partner of the Partnership to the Limited Partners other than Pfeiffer.

100.     Had Allen fulfilled his obligation to notify the Limited Partners other than Pfeiffer that they had the right to purchase 0.5 LP Units in 1989 for $100.00, some or all of those Limited Partners (other than Pfeiffer) would have exercised that right. They would have realized a substantial gain in the value of that interest, because 0.5 LP Unit, as of June 2015, had a fair market value of at least $390,000.00.

101.     Plaintiffs discovered only very recently – in 2015 – that Allen wrongfully usurped an opportunity from each of them. They discovered this fact as a result of one Limited Partner's investigation of a March 2015 Consent Request document that HKM sent to the Limited Partners on behalf of HKAllen.

*Scheme Two: Affiliate of General Partner Paid McKinney and Hamill $100 per 1.0 LP Unit*

102.     Upon information and belief, in or before April 2002, HKAllen, Burnes and Hall

Keen Investments knowingly and willfully entered into an agreement and conspiracy to defraud

McKinney.

103.     In 2002, HKAllen was the managing general partner and one of two general

partners of the Partnership (the other being Myerson). The sole general partner of HKAllen was

HK Allen Inc. According to documents HK Allen Inc. filed with the Secretary of the

Commonwealth of Massachusetts, HKAllen Inc. had three directors in 2002: Andrew Burnes;

John L. Hall, II; and Alison Carnduff. Each of those directors was also an officer: Burnes was

President; Hall was Treasurer; and Carnduff was Clerk.

104.     According to documents Hall Keen Investments filed with the Secretary of the

Commonwealth of Massachusetts, Hall Keen Investments had two managers when it was formed

in December 1998 (Andrew Burnes, William A. Hoffman, Jr.), and five managers in 2002:

Andrew Burnes, William A. Hoffman, Robert H. Kuehn, Jr., John L. Hall, II, and Denison M.

Hall. Upon information and belief, in 2002, Hall Keen Investments and HKAllen were affiliates

who were controlled by the same individuals.

105.     In or about April 2002, a representative of HKAllen called McKinney to ask

whether McKinney was interested in selling his interest in the Partnership, which was 1.0 LP Unit.

The HKAllen representative told McKinney that the LP Unit he owned was not worth much, but

that he would pay McKinney $100 for it.  McKinney asked whether HKAllen was buying all the

LP Units in the Partnership.  The HKAllen representative falsely stated that he was making the

same offer to all of the Limited Partners.  McKinney asked how many Limited Partners had

decided to sell, and the representative falsely stated that a large number of Limited Partners had

sold their LP Units.  (In fact, no other Limited Partner had sold its LP Units at that time.)  Based

in part on his reliance on the fiduciary duty owed to him by HKAllen, McKinney decided to accept the $100 offer for his LP Unit. McKinney had no knowledge, nor any reason to suspect, that HKAllen would act in a manner contrary to his best interest or misrepresent the value of his LP Unit.

106.    At about the same time, McKinney called Hamill to tell Hamill about the call he had received from HKAllen and his decision to sell his LP Unit. Like McKinney, Hamill also owned 1.0 LP Unit. McKinney and Hamill trusted one another, having worked together for more than 10 years and having known each other for more than 25 years. McKinney explained to Hamill that HKAllen viewed the LP Units as worthless but would, nonetheless, buy them for $100 per LP Unit. Shortly after having this conversation with McKinney, Hamill spoke with a representative of HKAllen by telephone about selling his LP Unit to HKAllen. During this conversation, the representative confirmed Hamill's understanding that his LP Unit was worthless, that holding onto it would cost him money, that it was in his best interest to dump it, and that the $100 payment he would receive from HKAllen was essentially a token or nominal payment because the LP Unit's true value was essentially zero.

107.    Upon information and belief, one of the following occurred. Either: (a) Before Hamill spoke with HKAllen as set forth above, HKAllen, Burnes and Hall Keen Investments agreed not only to defraud McKinney by convincing him to sell his LP Unit for only $100.00, but also to defraud other Limited Partners buy purchasing their LP Units at the same, abusively low price; or (b) After Hamill spoke with HKAllen as set forth above, the person with whom Hamill spoke that conversation with Burnes, after which time Burnes, acting for himself and on behalf of HKAllen and Hall Keen Investments, caused HKAllen and Hall Keen Investments to enter into an agreement with him to extend their conspiracy to defraud McKinney such that they also agreed to defraud Hamill.

108.    Based upon his conversations with McKinney and HKAllen, and his reliance on HKAllen's fiduciary duties, Hamill decided to sell his LP Unit to HKAllen for $100. Hamill had no knowledge, nor any reason to suspect, that HKAllen would act in a manner contrary to his best interest or misrepresent the value of his LP Unit.

109.    In May 2002, HKAllen sent a document entitled Assignment of Limited Partner Interest to each of Hamill and McKinney. Burnes had signed each document twice. First, Burnes signed in his capacity as Manager of the assignee, Hall Keen Investments. Second, Burnes signed in his capacity as President of HK Allen Inc., which was then the sole general partner of HKAllen, to evidence HKAllen's express approval of the transfer from Hamill to Hall Keen Investments and of the transfer from McKinney to Hall Keen Investments.

110.    Later in May 2002, McKinney signed and returned to Burnes one copy of the Assignment of Limited Partner Interest he had received (the "**McKinney Assignment**") by which McKinney sold his 1.0 LP Unit to Hall Keen Investments. At about the same time, Hamill signed and returned to Burnes one copy of the Assignment of Limited Partner Interest he had received (the "**Hamill Assignment**"), by which Hamill sold his 1.0 LP Unit to Hall Keen Investments. Although the McKinney Assignment and the Hamill Assignment were signed in May 2002, each document was dated to be effective on December 31, 2001. Hall Keen Investments paid $100 to each of McKinney and Hamill.

111.    At the time each of McKinney and Hamill sold his LP Unit to Hall Keen Investments, $100.00 represented just a small fraction of the fair market value of McKinney's LP Unit or Hamill's LP Unit, a fact that was known to Burnes, Myerson, HKAllen, HK Allen Inc., and Hall Keen Investments.

112.    In connection with the McKinney Assignment and Hamill Assignment, Defendant HKAllen knowingly, intentionally, and with malice, failed to fulfill its obligation as

fiduciary to McKinney and to Hamill to show complete good faith and fairness to McKinney or to Hamill. HKAllen did this so that it and/or its affiliate would profit at McKinney's and at Hamill's expense. With the same knowledge, Defendants Burnes, HK Allen Inc., and Hall Keen Investments aided and abetted HKAllen in breaching its fiduciary duties to each of McKinney and Hamill.

113.    Defendants HKAllen, Burnes, Hall Keen Investments and HK Allen Inc. knowingly, intentionally, and with malice, failed to ensure that: (i) the purchase by Hall Keen Investments of McKinney's 1.0 LP Unit produced a fair financial outcome for McKinney; and (ii) the purchase by Hall Keen Investments of Hamill's 1.0 LP Unit produced a fair financial outcome for Hamill. They did this so they would profit at McKinney's and Hamill's expense.

114.    Had HKAllen fulfilled its obligations as Hamill's and McKinney's fiduciary to show complete good faith and fairness to Hamill and McKinney, Hamill and McKinney would not have agreed to sell their 1.0 LP Units for only $100.00.

*115.*    Each of McKinney and Hamill discovered only very recently – in 2015 – the failure of HKAllen to fulfill its obligation as fiduciary to each of McKinney and Hamill to show complete good faith and fairness to McKinney and to Hamill in connection with the negotiation and execution of the McKinney Assignment and the Hamill Assignment. Neither McKinney nor Hamill had any knowledge or any reason to suspect that HKAllen would take advantage of them and violate their fiduciary duties of loyalty, fairness and disclosure. Each of Hamill and McKinney discovered these facts as a result of one Limited Partner's investigation of a March 2015 Consent Request document that HKM sent to the Limited Partners on behalf of HKAllen.

*The Conspiracy Was Hatched: HKAllen and at Least One ERI Collaborator Agreed to Work Together to*

*Defraud All of the Independent Limited Partners*

116.    In approximately 2004 or early 2005, after a series of conversations in which one or more of the ERI Collaborators asked one or more of the HK Collaborators for the names and addresses of the Limited Partners and for other Partnership-related information, HKAllen entered into an agreement with one or more of the ERI Collaborators (the "**Collaboration Agreement**"). One part of the Collaboration Agreement gave HKAllen an option to acquire a percentage of all the LP Units that the ERI Collaborators would acquire from the Limited Partners. Upon information and belief, the Collaboration Agreement, taken as a whole, was an agreement to defraud all of the Independent Limited Partners by executing the Conspiracy. Upon information and belief, all parties to the agreement understood that successful execution of the Conspiracy would require: (a) completion of both Phase One and Phase Two; and (b) participation at various times by many, if not all, of the Collaborators.

117.    By entering into the Collaboration Agreement, HKAllen knowingly and intentionally put itself in a position where its interest conflicted directly with those whose interests its fiduciary duties required it to protect: the Limited Partners. At the same time, each ERI Collaborator who entered into the Collaboration Agreement became a knowing and willing aider and abettor of HKAllen's breach of its fiduciary duties to the Limited Partners and a co-conspirator with HKAllen in its plans to take property from the Limited Partners by completing the Conspiracy.

118.    As described below, the Collaborators successfully executed both phases of the Conspiracy.

*Phase One of the Conspiracy Launched: Burnes Sent Letter To Limited Partners Falsely Reporting the Partnership's "Bleak" Financial Prospects – and Conditioning the LPs to Accept the ERI Collaborators' Later Low-Ball Offers*

119.    On or about February 15, 2005, Burnes, in his capacity as Principal of HallKeen LLC, sent a two-page letter (the "**2005 Burnes Letter**") on HallKeen LLC letterhead to the Limited Partners.  HallKeen LLC's letterhead described HallKeen LLC as "A Joint Enterprise of Hall Properties, Inc. and Keen Development Corporation," and the letter described HallKeen LLC as an affiliate of HKAllen. The 2005 Burnes Letter is attached as **Exhibit A** to this Complaint.[1]

120.    With the mailing of the 2005 Burnes Letter, Phase One was underway; the Collaborators began their campaign to gobble up nearly half of the LP Units from Limited Partners at prices far below fair market value.  With HKAllen's knowledge and blessing, HallKeen LLC falsely represented to the Limited Partners that their interests in the Partnership were unsound investments whose future performance was likely to be poor.  HallKeen LLC made these false representations, knowing that they were false, in order to condition the Limited Partners to sell their LP Units for pennies on the dollar so that it, HKAllen and the other Collaborators could profit at the expense of the Limited Partners.

121.    The 2005 Burnes Letter described the Partnership's financial condition as "discouraging" and "perilous." It suggested that the Partnership's ability to cover its expenses and mortgage payments was "bleak."  The crux of the negative assessment was in the second paragraph of the letter, under the heading "Background," which is excerpted below:

---

[1] Plaintiffs attached to their prior Complaint (filed on October 17, 2016) numerous exhibits.  Those exhibits and exhibit numbers remain unchanged.  Accordingly, Plaintiffs will not re-file those exhibits, and simply incorporate them by reference herein.

**Background:** . . . Unfortunately, a combination of rule changes by the federal government to the Section 8 program and VHDA's unwillingness to refinance the underlying first mortgage debt of the **Hotel Danville** has created a **discouraging and perilous financial position for the property**. Essentially, the federal rule changes to the Section 8 program are severely limiting the partnership's ability to seek rent increases to Section 8 rents. This means that our overall income growth in the partnership is flat or very, very minimal. Unfortunately, there is no such cap on expenses; while the property's per unit expenses are very reasonable for comparable properties, expenses do increase regularly, most notably taxes, insurance, payroll benefits, and cost of maintenance materials. . . . **The result of flat income and rising expenses is, first of all, that the partnership will not be able to pay dividends to the investors. Secondly, and most importantly, if this trend continues, the longer term ability for the partnership to pay the mortgage and operating expenses is bleak**. (Emphasis added.)

122.     In its third paragraph, under a heading of "Solutions," the 2005 Burnes Letter described HallKeen LLC's unsuccessful efforts to solve the problem it described – and attributed its failure to factors beyond its own control: that HUD issued new rules for the Section 8 housing subsidy program, and that the Virginia Housing Development Authority "flatly rejected" several alternatives Burnes personally proposed to modify the Partnership's outstanding loan. This third paragraph concluded by stating that HallKeen LLC would look into "sell[ing] the property to a non-profit organization. While HallKeen has considerable concern about the impacts of such a sale to all the partners, HallKeen will be exploring this option over the next several months."

123.     Upon information and belief, none of Burnes, HKAllen, HKM, HallKeen LLC or Myerson ever sent any correspondence to the Limited Partners updating them on the continued search for solutions to the Partnership's purportedly "perilous" financial situation.

124.     Despite these statements of doom, the Partnership's financial situation was <u>not</u> perilous.  Its long-term ability to pay its mortgage and operating expenses was <u>not</u> bleak.  To the contrary, the Partnership's finances were healthy.

125.     Burnes, HKAllen, HallKeen LLC and their affiliates all knew at the time Burnes sent his 2005 Burnes Letter that its dramatically negative assessment of the Partnership's

prospects was not and could not be true.  In February 2005, the Partnership owned an apartment building whose vacancy losses had averaged just 0.84% for 19 consecutive years (1986 through 2004), with the highest single-year vacancy loss being just 3.27%.  The building had a fair market value of at least $7.5 million using conservative assumptions, and the Partnership's outstanding debt secured by the building was only about $3.6 million.

126.    HallKeen LLC and the HK Controlling Persons were and are sophisticated and experienced real estate owners and investors.  As such, they all knew the Partnership had at least $4 million of equity and would become highly profitable as soon as its primary mortgage loan was repaid in February 2014, at which point it would be able to pay substantial cash distributions to the Limited Partners.  For these reasons, HallKeen LLC and the HK Controlling Persons knew that they would be able, if necessary, to find a way to obtain money for the Partnership to ensure that the Partnership could and would make its loan payments and pay its costs and expenses until it began to produce large profits in early 2014.  In fact, from 2005 through 2014, the Partnership made its mortgage payments and paid all its expenses without any extra infusion of cash.  If HKAllen had not completed the Sale and Exchange transaction in September 2015, the Partnership would today be able to pay cash dividends to the Limited Partners at an annual rate of more than $33,000 per LP Unit.

127.    An appraisal of the Property that was prepared in late 2014 in conjunction with the Sale and Exchange proves that the doom-saying in the 2005 Burnes Letter could not have been true and, moreover, was enabled in part by the Defendants' own deliberate (and readily fixable) mismanagement.  The appraisal shows that any financial stress that the Partnership experienced between the writing of the 2005 Burnes Letter and January/February 2014, when the Partnership fully repaid its mortgage loan on-schedule and owned the Property free of debt, was likely caused by deliberate mismanagement on the part of HKAllen and/or its affiliate HKM.

128.    The lender who, as part of the Sale and Exchange transaction, issued a HUD-guaranteed loan in September 2015 that is secured by the Property, hired the national accounting firm of Novogradac & Company LLP ("**Novogradac**") to produce an appraisal of the Property as part of the HUD-required underwriting process for loans of this type.  Novogradac issued its 'HUD MAP 223(F) Firm Commitment Appraisal Report' (the "**Novogradac Appraisal**") on October 14, 2014, with an effective date of September 11, 2014.

129.    In evaluating the Property, the Novogradac Appraisal compared the Property to comparable properties.  In so doing, it found that the Partnership paid approximately $60,000 more per year for payroll, taxes and benefits for on-site building staff than is typical for a property of its type, size and location.  The Partnership's audited annual financial statements show that this overpayment dates back at least as far as 2001-2002.

130.    Had the Partnership not overpaid by approximately $60,000 per year for payroll, taxes and benefits, the Partnership's average annual operating expenses from 2005 through 2013 would have been lower than its operating expenses in 2004.

131.    According to the audited financial statements sent to the Limited Partners, from 2005 through 2013, the Partnership's average annual operating expenses net of acquisitions of fixed assets were $486,949.  That is $50,583 more than the Partnership's total operating expenses net of acquisitions of fixed assets in 2004, which were $436,366.[2]  Upon information and belief,

---

[2] Expense line items included in "total operating expenses net of acquisitions of fixed assets" are the following line items from the Partnership's annual, audited Statements of Cash Flows: Administrative, Management Fees, Utilities, Salaries and Wages, Operating and Maintenance, Real Estate Taxes, Property and Liability Insurance, Misc. Taxes and Insurance, and Grant Expenses. Monies paid for acquisitions of fixed assets are excluded because, during the years 2005 through 2013, the Partnership's aggregate withdrawals from its replacement reserve account ($580,532.00) exceeded the aggregate amount spent to acquire fixed assets ($558,778.00).  Similarly, 2014 figures are excluded from these totals because the general partner had to know that 2014 would be a highly profitable year.  This is because the Partnership's primary mortgage loan was scheduled to be fully repaid in January or February 2014, meaning that the Partnership would have to make mortgage

other expenses charged to the Partnership from 2005 through 2013 were either unnecessary or unnecessarily high, and the Partnership's finances would have been still healthier had HKAllen and its affiliate, HKM, not paid more than they should have paid for those expense items.

132.    HKAllen hired its own affiliate, HKM, to provide property management services to the Property.  HKM manages over 80 low-income housing properties all along the East Coast. Based on the individual and combined experience of HKM, HKAllen, and the HK Controlling Persons in the ownership and operation of properties similar to the Property, HKAllen and HKM both knew or should have known that the Partnership could have saved approximately $60,000 in annual expenses by not over-paying for payroll, taxes and benefits.  As a result, both HKAllen and HKM knew or should have known that the Partnership's total operating expenses net of acquisitions of fixed assets in 2004 should have been approximately $376,366 ($436,366 less $60,000).  At that level, based on figures from the Partnership's annual audited financial statements, the Partnership's total operating expenses net of acquisitions of fixed assets could have increased by $77,541.00, <u>or more than 20%</u>, before the Partnership experienced a net decrease in cash-on-hand in 2005.

133.    None of HKAllen, Myerson, Burnes, HKM or any of their respective affiliates could have reasonably predicted in February 2005 that the Partnership would likely encounter difficulty making its mortgage and operating expense payments through 2014.  Despite this, Burnes deliberately and maliciously misrepresented the Partnership's financial condition in his 2005 Burnes Letter.  Upon information and belief, Burnes, HKAllen, Myerson, HKM, HK Allen Inc., and the ERI Collaborators all knew, at the time Burnes sent his 2005 Burnes Letter to the Limited Partners, that Burnes' characterization of the Partnership's financial prospects as "bleak,"

---

payments in 2014 that total no more than one-sixth of the amount of its total mortgage payments in each year from 2005-2013 – and the other five-sixths would be profit.

"discouraging," and "perilous" was inaccurate and dishonest – and designed to advance the Conspiracy.

134.    Upon information and belief, Burnes, acting knowingly, intentionally, and with malice, grossly mischaracterized the Partnership's financial condition in furtherance of the Conspiracy. The 2005 Burnes Letter conditioned the Limited Partners to believe that the LP Units had little or no value.  Then, as described below, ERI Collaborators took full advantage of the set-up; they sent offers to the Limited Partners to purchase their LP Units for low-ball prices. They stressed the tax liabilities of holding the LP Units and sent offers only in years when the Limited Partners would be most receptive to that issue – when the Partnership allocated taxable income to the Limited Partners but paid no cash distributions. Thanks to HKAllen's failure to provide the Limited Partners with a complete and honest assessment of the Partnership's finances and prospects, and its failure to explain the likelihood of handsome profits from 2014 onward, the offers did not need to downplay those benefits or even weigh them against the short-term tax liabilities. They ignored the benefits altogether and just echoed the same false story of bleak prospects. By the time the ERI Collaborators began sending offers to buy LP Units, 24 years had passed since the Limited Partners invested in the Partnership. HKAllen and the ERI Collaborators bet that a good number of the Limited Partners would easily – and reasonably – have forgotten many details of the investment they made 24 years earlier. They also bet that a good number of the Limited Partners would believe what they read in the 2005 Burnes Letter because they were entitled to trust that HKAllen was honoring its fiduciary obligations to them. Their bet paid off. As described below, from 2006 to 2013, Limited Partners sold 7.25 LP Units to the ERI Collaborators – enough to allow the Collaborators to launch Phase Two in 2015 with complete confidence it would be successful.

*Capitalizing on HKAllen's Set-Up, Newton Fund Mailed Offer to Buy LP Units; When Limited Partners*
*Decided to Sell, HKAllen Approved Every Sale Knowing It Will Profit at the Limited Partner's Expense*

135.    On or about May 11, 2006, ERI mailed to the Limited Partners an envelope containing the following documents from Newton Fund: (i) a three-page letter dated May 11, 2006 (the "**2006 ERI Letter**") stating that Newton Fund was offering to purchase the LP Units owned by the Limited Partners; (ii) an Agreement of Sale and Assignment and a Power of Attorney for each Limited Partner to execute if he/she decided to sell his/her LP Units (the "**2006 Sale Agreement**"); and (iii) a 12-page Offer To Purchase For Cash 9 Units of Hotel Danville Company for $5,000.00 per LP Unit (the "**2006 ERI Offer**" and together with the 2006 ERI Letter and 2006 Sale Agreement, the "**2006 Offer Package**"). The 2006 Offer Package is attached as **Exhibit B** to this Complaint.

136.    In 2006, ERI controlled Newton Fund. ERI N, LLC was the general partner of Newton Fund. ERI was the managing member and sole member of ERI N, LLC.

137.    In 2006, Dagbjartsson and Paci were ERI's managers and principal owners. They controlled ERI.

138.    At the time Newton Fund sent the 2006 ERI Letter, $5,000.00 represented a small fraction of the fair market value of one LP Unit.

139.    At the time Newton Fund sent the 2006 ERI Letter, Defendants HKAllen, ERI, Newton Fund and Burnes knew: (a) that $5,000.00 represented only a small fraction of the fair market value of one LP Unit; and (b) that, in the two immediately preceding years, 2004 and 2005, the Limited Partners had to pay tax on Partnership income but received no cash distributions from the Partnership. Upon information and belief, Defendants ERI and Newton Fund were familiar with the 2005 Burnes Letter and knew that Burnes had mailed it to all of the Limited Partners for the purpose of conditioning the Limited Partners to sell their LP Units so that

HKAllen and other Collaborators could profit at the expense of the Limited Partners. Upon information and belief, ERI and Newton Fund also knew that neither HKAllen nor any of its affiliates had explained to the Limited Partners: (a) the real reasons why the Partnership had not made cash distributions in 2004 or 2005; (b) the real likelihood that the Partnership would not make cash distributions in future years; or (c) the fact that the Limited Partners could expect to receive income in 2014 and beyond that would dwarf any outlays they might make in the years before 2014.

140.    In sending the 2006 ERI Letter, Newton Fund took full advantage of the informational asymmetry that HKAllen and other HK Collaborators fostered to advance the Conspiracy.

141.    The 2006 ERI Letter stressed the liabilities associated with holding LP Units, and overstated the benefits of selling LP Units.

142.    Newton Fund, in its 2006 ERI Letter, knowingly downplayed the possibility that selling LP Units might trigger adverse tax consequences for a Limited Partner. Upon information and belief, Newton Fund or one of its affiliates received the Partnership's financial information from HKAllen or one of its affiliates. As a result, Newton Fund knew when it mailed the 2006 ERI Letter that every Independent Limited Partner had a negative capital account balance. Newton Fund knew, and the 2006 ERI Letter explained, that a Limited Partner who sold its LP Unit when it had a negative capital account balance faced the possibility of an adverse tax consequence – recapture – upon sale. Yet the last sentence of the paragraph devoted to tax consequences of selling LP Units blithely overlooked this potential problem and stated what Newton Fund knew could not be true: "The Purchaser believes that the typical limited partner should have after-tax proceeds on a Federal basis from the sale of units under this Offer."

143.    Newton Fund made no effort in the 2006 ERI Letter to explain or quantify the benefits of holding LP Units. Instead, it offered boilerplate disclaimers.

144.    Neither the 2006 ERI Letter nor the 2006 ERI Offer disclosed the fact that Newton Fund and other ERI Collaborators were working together with HKAllen and other HK Collaborators to fleece all of the Independent Limited Partners by executing the Conspiracy. The first paragraph the 2006 ERI Offer stressed the Newton Fund's separation from the Collaborators: "neither Newton Fund nor Equity Resource Investments, LLC, the manager of Newton Fund's general partner, is an affiliate of the Partnership or the general partner of the Partnership." Only on the very last page of the Offer did Newton Fund acknowledge: (a) conversations that affiliates of Newton Fund had with affiliates of the Partnership and affiliates of HKAllen; and (b) an agreement between an affiliate of Newton Fund and HKAllen, one part of which gave HKAllen the right to purchase up to 50% of the LP Units Newton Fund purchased.

145.    The fact that the 2006 ERI Letter and the 2006 ERI Offer contained cautionary statements and disclaimers made the offer appear to the Limited Partners to be a legitimate offer from a sophisticated buyer who knew and understood the legal implications of circulating offers of this kind. The 2006 Offer Package did not give the Limited Partners any reason to suspect that HKAllen had breached its duties to the Limited Partners.

146.    In fact, the 2006 Sale Agreement did the opposite. It reminded the Limited Partners in a paragraph printed in ALL CAPS that the sale would not be completed without HKAllen's approval, thus reinforcing the Limited Partners' belief that the sale was proper and above-board.

147.    When it mailed the 2006 Offer Package, Newton Fund knew that, under the Partnership Agreement, no Limited Partner may sell its LP Units without approval from

HKAllen, "the giving or withholding of which is exclusively within [HKAllen's] discretion." Similarly, and separately, Newton Fund also knew that no Limited Partner may cause a person who buys its LP Units to be admitted into the Partnership as a Limited Partner without approval from HKAllen, "the giving or withholding of which is exclusively within [HKAllen's] discretion." Despite other provisions in the 2006 Sale Agreement that purported to make the 2006 Sale Agreement irrevocable once a Limited Partner signed it and sent it to Newton Fund, regardless of whether HKAllen approved the sale, the last paragraph in the 2006 Sale Agreement, printed in ALL-CAPS in that agreement, emphasized that Newton Fund's obligation to pay for the LP Unit was conditioned on HKAllen approving the sale.

148.    Because Newton Fund retained the right to cancel its purchase if HKAllen did not approve the purchase, HKAllen could have prevented every one of these sales from happening – simply by refusing to approve them.

149.    HKAllen was required by its fiduciary duties to put the interests of the Limited Partners ahead of its own in matters related to the Partnership.

150.    But every time a Limited Partner signed the 2006 Sale Agreement, HKAllen expressly approved the sale. It did so with knowledge that the sale would cause it to profit at the expense of the selling Limited Partner, to whom HKAllen still owed a fiduciary duty. For that reason, each time HKAllen approved a purchase of LP Units by Newton Fund, HKAllen breached its fiduciary duty to the Limited Partner who was selling to Newton Fund. And Newton Fund aided and abetted every one of those breaches of fiduciary duty, because, among other actions, Newton Fund solicited and documented each such sale, asked HKAllen to approve each such sale, and then completed each such sale by paying the Limited Partner – all with the knowledge that its actions enabled HKAllen to breach its fiduciary duties to that Limited Partner.

*Newton Fund Bought LP Units from Sherman, Hirokawa and Leuschel for Abusively Low Prices,*

*and HKAllen Approved Every Sale*

151.    On or about May 21, 2006, after receiving the 2006 ERI Letter and the 2006 ERI Offer, Sherman signed an Agreement of Sale and Assignment (the "**Sherman Assignment**") by which Sherman sold his 0.5 LP Unit to Newton Fund.

152.    On or about May 24, 2006, after receiving the 2006 ERI Letter and the 2006 ERI Offer, Hirokawa signed an Agreement of Sale and Assignment (the "**Hirokawa Assignment**") by which Hirokawa sold his 0.5 LP Unit to Newton Fund.

153.    Hirokawa was 84 years of age when he received the 2006 ERI Letter and the 2006 ERI Offer, and when he signed the Hirokawa Assignment.  Defendants knew or should have known that Hirokawa was over 65 years of age when he received the 2006 ERI Letter and the 2006 ERI Offer, and when he signed the Hirokawa Assignment.

154.    On or about June 12, 2006, after receiving the 2006 ERI Letter and the 2006 ERI Offer, Leuschel and husband (now deceased) signed an Agreement of Sale and Assignment (the "**Leuschel Assignment**") by which Leuschel sold her 0.5 LP Unit to Newton Fund.

155.    Leuschel and her husband were both over 65 years of age when they received the 2006 ERI Letter and the 2006 ERI Offer, and when they signed the Leuschel Assignment. Defendants knew or should have known that Leuschel and her husband were over 65 years of age when they received the 2006 ERI Letter and the 2006 ERI Offer, and when they signed the Leuschel Assignment.

156.    On a date after May 21, 2006, but no later than July 14, 2006, Dagbjartsson, in his capacity as Authorized Representative of Newton Fund, signed the Sherman, Hirokawa, and Leuschel Assignments on behalf of Newton Fund, as assignee.

157.    Upon information and belief, Dagbjartsson has had primary responsibility for ERI's investment decisions since 1990.

158.    Before July 14, 2006, Dagbjartsson caused the Sherman, Hirokawa, and Leuschel Assignments to be sent to HKAllen for approval by HKAllen.

159.    On July 14, 2006, Burnes signed the General Partner Consent by which HKAllen, with knowledge of the terms and price of the sales from Sherman, Hirokawa and Leuschel to Newton Fund, made the wholly discretionary decision expressly to approve each of the sales from Sherman, Hirokawa and Leuschel to Newton Fund, and admitted Newton Fund to the Partnership as a Substitute Limited Partner.

160.    Upon information and belief, the Sherman Assignment, Hirokawa Assignment and Leuschel Assignment, the participation in each by Newton Fund, Dagbjartsson, HKAllen and Burnes, were all part of the Conspiracy.

161.    Newton Fund paid each of Sherman, Hirokawa, and Leschel $2,500.00 each in exchange for its 0.5 LP Units.

162.    At the time each of Sherman, Hirokawa and Leuschel transferred his/her 0.5 LP Unit to Newton Fund, $2,500.00 represented just a very small fraction of the fair market value of 0.5 LP Unit.

163.    At the time each of Sherman, Hirokawa and Leuschel transferred his/her 0.5 LP Unit to Newton Fund, Defendants knew that $2,500.00 represented just a very small fraction of the fair market value of Sherman's 0.5 LP Unit.

164.    HKAllen knowingly, intentionally, and with malice: (i) purposefully misled all of the Limited Partners for the purpose of conditioning them to accept Newton Funds' offers to buy their LP Units; (ii) conspired with HallKeen LLC and Burnes to help them to mislead all of the Limited Partners for the purpose of conditioning them to accept Newton Funds' offers to

buy their LP Units; (iii) gave the Limited Partners' names and addresses to Newton Fund or one of its affiliates to enable Newton Fund to mail to enable Newton Fund to mail the 2006 Offer Package to the Limited Partners; and (iv) made the wholly discretionary decisions to approve the sales of LP Units by each of Sherman, Hirokawa and Leuschel to Newton Fund and the admission of Newton Fund to the Partnership with the knowledge that each of those sales would cause HKAllen to profit at the expense of the Limited Partner who was selling, and with further knowledge that the terms of each of those sales were materially unfair to the seller. Thus, HKAllen breached its fiduciary duty to each of Sherman, Hirokawa and Leuschel.

165.    Newton Fund aided and abetted every one of those breaches of fiduciary duty by, among other acts: soliciting and documenting the Sherman Assignment, Hirokawa Assignment and Leuschel Assignment; asking HKAllen to approve each of those assignments; and completing each of those assignments by paying each of Sherman, Hirokawa and Leuschel – at all times with the knowledge that its actions enabled HKAllen to breach its fiduciary duties to each of Sherman, Hirokawa and Leuschel.

166.    For the reasons stated above, Burnes, HKM, HK Allen Inc., Dagbjartsson and at least one affiliate of Newton Fund also aided and abetted HKAllen's breach of the fiduciary duty it owed to each of Sherman, Hirokawa and Leuschel.

167.    Had HKAllen fulfilled its obligation as fiduciary to Sherman, Hirokawa and Leuschel to show complete good faith and fairness to Sherman, Hirokawa and Leuschel, then none of Sherman, Hirokawa or Leuschel would have sold his/her 0.5 LP Unit for only $2,500.00.

168.    Sherman, Hirokawa and Leuschel had no knowledge, nor any reason to suspect, that HKAllen, Burnes, or any of the other HK Collaborators would act in a manner contrary to the Limited Partners' best interests or would misrepresent the value of the LP Units.  Moreover, Sherman, Hirokawa and Leuschel had no reason to suspect that the terms of their transactions

with Newton Fund were substantially unfair and not in their financial interests. They also had no

reason to suspect that HKAllen breached its fiduciary duty to them when it approved those

transactions.

169.    Sherman, Hirokawa's heir Takahashi, and Leuschel discovered only very recently

– in 2015 – the following: (i) that HKAllen breached its fiduciary duty by agreeing to participate

in the Conspiracy and by approving the Sherman, Hirokawa and Leuschel Assignments; and (ii)

that Burnes, HKM, HK Allen Inc., Newton Fund, Dagbjartsson and at least one affiliate of

Newton Fund materially assisted HKAllen's breaches of its fiduciary duties. They discovered

these facts as a result of one Limited Partner's investigation of a March 2015 Consent Request

document that HKM sent to the Limited Partners on behalf of HKAllen.

### _Newton Fund Transferred LP Units to Affiliates of General Partner_

170.    Upon information and belief, Newton Fund assigned some of its LP Units to

Franklin 81 Associates and to David Carlen as partial compensation to HKAllen for: (i) HKAllen

having given Newton Fund and its affiliates the names and addresses of the Limited Partners;

and (ii) HKAllen having approved all purchases of LP Units that Newton Fund had by that time

made, including the Sherman Assignment, the Hirokawa Assignment and the Leuschel

Assignment.

171.    David Carlen is a certified public accountant who was formerly a vice president at

BFG and is currently Treasurer of BFG.  Upon information and belief, he has been an advisor to

HKAllen and/or certain of its affiliates since at least 2007, and he was involved in the structuring

and execution of the Sale and Exchange.  (The Consent Request, Update Number One, Update

Number Two and Update Number Three (defined below) all provided Carlen's name, phone

number and email address, and invited Limited Partners to contact Carlen with questions about

the Sale and Exchange.)  Also upon information and belief, both Carlen and Franklin 81

Associates had actual or constructive knowledge that Newton Fund had wrongfully obtained the

LP Units that Newton Fund transferred to Carlen and to Franklin 81 Associates. In July 2014,

Carlen sent a memo about the Partnership to the Limited Partners asking them to consent to a

series of changes including causing HKAllen to become the Partnership's sole general partner.

That memo was on the letterhead of Norwich Management, LLC, an entity that Carlen controls.

In the memo, Carlen implied that he "will be part of HKAllen."

172.    On February 13, 2007, Newton Fund assigned 0.54 LP Units to Franklin 81

Associates.  David Carlen signed the Assignment of Partnership Interests (the "**Franklin 81**

**Assignment**") on behalf of Franklin 81 Associates, and the notice address provided for Franklin

81 Associates in the Franklin 81 Assignment is the same address that is provided for David

Carlen personally on the Schedule A attached to Amendment Three to Amended and Restated

Limited Partnership Agreement and Certificate ("**Amendment Three**"), dated July 14, 2001.

173.    Dagbjartsson, in his capacity as Manager of ERI, which was Managing Member of

ERI N LLC, which was General Partner of Newton Fund, signed the Franklin 81 Assignment on

behalf of Newton Fund, as assignor.

174.    On February 13, 2007, Newton Fund assigned 0.14 LP Units to David Carlen

personally.  David Carlen signed the Assignment of Partnership Interests (the "**Carlen**

**Assignment**") on his own behalf, and the notice address provided for David Carlen in the

Carlen Assignment is the same as (i) the address that is provided for Franklin 81 Associates in the

Franklin 81 Assignment, and (ii) the address that is provided for David Carlen personally on the

Schedule A attached to Amendment Three.

175.     Dagbjartsson, in his capacity as Manager of ERI, which was Managing Member of ERI N LLC, which was General Partner of Newton Fund, signed the Carlen Assignment on behalf of Newton Fund, as assignor.

176.     On June 26, 2007, Burnes, acting on behalf of HKAllen, made the wholly discretionary decision to sign the General Partner Approval for the Franklin 81 Assignment and for the Carlen Assignment.

177.     Upon information and belief, the Carlen Assignment and the Franklin 81 Assignment, and the participation in each by ERI, Newton Fund, Dagbjartsson, Carlen, Franklin 81, HKAllen and Burnes, were all part of the Conspiracy. Upon information and belief, in order to receive LP Units from Newton Fund with the express approval of Burnes and HKAllen, Carlen and Franklin 81 had to agree – and did in fact agree – to support the Conspiracy. Among other things, Carlen and Franklin 81 promised that they would consent to the transaction that would eventually be proposed to execute Phase Two of the Conspiracy.


*Capitalizing on HKAllen's Set-Up, Milton Fund Mailed Two Offers in 2007 to Buy LP Units; When Limited Partners Decided to Sell, HKAllen Approved Every Sale Knowing It Will Profit at the Limited Partner's Expense*

178.     On or about March 27, 2007. Equity Resource Milton Fund LLC ("**Milton Fund**") mailed to several of the Limited Partners an envelope containing: (i) a three-page letter dated March 27, 2007 (the "**March 2007 ERI Letter**") stating that Milton Fund was offering to purchase the LP Units owned by the Limited Partners; (ii) an Agreement of Sale and Assignment for each Limited Partner to execute if he/she decided to sell his/her LP Units; and (iii) a 12-page Offer To Purchase For Cash 9 Units of Hotel Danville Company for $5,000.00 per LP Unit (the "**March 2007 ERI Offer**"). The March 2007 ERI Letter and March 2007 ERI Offer are attached as **Exhibit C** to this Complaint.

179.    On March 27, 2007, ERI controlled Milton Fund. ERF Manager was Milton Fund's manager. ERI was the sole member of ERF Manager.

180.    In March 2007, Dagbjartsson and Paci were ERI's managers and principal owners. They controlled ERI.

181.    At the time Milton Fund sent the March 2007 ERI Letter, $5,000.00 represented just a small fraction of the fair market value of one LP Unit.

182.    At the time Milton Fund sent the March 2007 ERI Letter, Defendants HKAllen, ERI, Milton Fund and Burnes knew: (a) that $5,000.00 represented only a small fraction of the fair market value of one LP Unit; and (b) that, in the three immediately preceding years, 2004-2006, the Partnership allocated taxable income to the Limited Partners but paid no cash distributions. Upon information and belief, Defendants ERI and Milton Fund were familiar with the 2005 Burnes Letter and knew that Burnes had mailed it to all of the Limited Partners for the purpose of conditioning the Limited Partners to sell their LP Units so that HKAllen and other Collaborators could profit at the expense of the Limited Partners. Upon information and belief, ERI and Milton Fund also knew that neither HKAllen nor any of its affiliates had explained to the Limited Partners: (a) the real reasons why the Partnership had not made cash distributions in 2004, 2005 or 2006; (b) the real likelihood that the Partnership would not make cash distributions in future years; or (c) the fact that the Limited Partners could expect to receive income in 2014 and beyond that would dwarf any outlays they might make in the years before 2014.

183.    In sending the March 2007 ERI Letter, Newton Fund took full advantage of the informational asymmetry that HKAllen and other HK Collaborators fostered to further the Conspiracy.

184.    There were several differences between the March 2007 ERI Letter and the 2006

ERI Letter. However, the March 2007 ERI Letter, like the 2006 ERI Letter, stressed and

explained at great length the purported liabilities associated with holding LP Units.

185.    The March 2007 ERI Letter provided three benefits of selling. Two were tax-

related:

> First, the offer represents an opportunity to receive cash for an investment that has
> been in existence for twenty-five years. Limited partners who sell their units at this
> time will be able to terminate their investment in 2007. Second, as discussed
> immediately above, this investment is a former tax shelter, and changes in the tax
> laws have both rendered most of the original tax benefits obsolete and created
> significant tax disadvantages to continuing to own this investment. Third, you may
> also simplify your tax return by eliminating future K-1 reporting for this Partnership.

186.    Milton Fund made no effort in the March 2007 ERI Letter to explain or quantify

the benefits of holding LP Units. Instead, it offered boilerplate disclaimers like the following:

"The Purchaser is making the offer with a view toward making a profit. Accordingly, there is a

conflict between the Purchaser's desire to acquire your units at a low price and your desire to sell

your units at a high price. The Purchaser's intent is to acquire units at a discount to the value the

Purchaser might ultimately realize from owning the units."

187.    Neither the March 2007 ERI Letter nor the March 2007 ERI Offer disclosed the

fact that Milton Fund and other ERI Collaborators were working together with HKAllen and

other HK Collaborators to fleece all of the Independent Limited Partners. The first paragraph

the March 2007 ERI Offer stressed the Milton Fund's separation from the Collaborators:

"neither Milton Fund nor Equity Resource Investments, LLC, the manager of Milton Fund's

general partner, is an affiliate of the Partnership or the general partner of the Partnership." Only

on the very last page of the Offer did Milton Fund acknowledge: (a) conversations that affiliates

of Milton Fund had with affiliates of the Partnership and affiliates of HKAllen; and (b) an

agreement between an affiliate of Milton Fund and HKAllen, one part of which gave HKAllen the right to purchase up to 33% of the LP Units Milton Fund purchased.

188.    The fact that the March 2007 ERI Letter and the March 2007 ERI Offer contained cautionary statements and disclaimers made the offer appear to the Limited Partners to be a legitimate offer from a sophisticated buyer who knew and understood the legal implications of circulating offers of this kind.  The March 2007 ERI Letter and March 2007 ERI Offer did not give the Limited Partners any reason to suspect that HKAllen had breached its duties to the Limited Partners.

189.    None of the Plaintiffs signed the March 2007 Sale Agreement.

190.    On or about September 7, 2007, Milton Fund mailed to several of the Limited Partners of the Partnership a new offer – this time offering to pay $15,000.00 for each LP Unit. The mailing contained a three-page letter dated September 7, 2007 (the "**September 2007 ERI Letter**"), an Agreement of Sale and Assignment for each Limited Partner to execute if he/she decided to sell his/her LP Units (the "**September 2007 Sale Agreement**"), and a 12-page Offer To Purchase For Cash 5 Units of Hotel Danville for $15,000.00 per LP Unit (the "**September 2007 ERI Offer**" and together with the September 2007 ERI Letter and September 2007 Sale Agreement, the "**September 2007 Offer Package**"). The September 2007 Offer Package is attached as **<u>Exhibit D</u>** to this Complaint.

191.    On September 7, 2007, ERI controlled Milton Fund. ERF Manager was Milton Fund's manager. ERI was the sole member of ERF Manager.

192.    In September 2007, Dagbjartsson and Paci were ERI's managers and principal owners. They controlled ERI.

193.    At the time Milton Fund sent the September 2007 ERI Letter, $15,000.00 represented just a small fraction of the fair market value of one LP Unit.

194.    At the time Milton Fund sent the September 2007 ERI Letter, Defendants HKAllen, ERI, Milton Fund and Burnes knew: (a) that $15,000.00 represented only a small fraction of the fair market value of one LP Unit; and (b) that, in the three immediately preceding years, 2004-2006, when the Partnership allocated taxable income to the Limited Partners but paid no cash distributions. Upon information and belief, Defendants ERI and Milton Fund were familiar with the 2005 Burnes Letter and knew that Burnes had mailed it to all of the Limited Partners for the purpose of conditioning the Limited Partners to sell their LP Units so that HKAllen and other Collaborators could profit at the expense of the Limited Partners. Upon information and belief, ERI and Milton Fund also knew that neither HKAllen nor any of its affiliates had explained to the Limited Partners: (a) the real reasons why the Partnership had not made cash distributions in 2004, 2005 or 2006; (b) the real likelihood that the Partnership would not make cash distributions in future years; or (c) the fact that the Limited Partners could expect to receive income in 2014 and beyond that would dwarf any outlays they might make in the years before 2014.

195.    The September 2007 Letter is a full page shorter than the 2006 ERI Letter and the March 2007 ERI Letter, and it is heavily revised. As in the previous letters, however, Milton Fund, in the September 2007 Offer Package: (a) took full advantage of the informational asymmetry that HKAllen and other HK Collaborators fostered to advance the Conspiracy; (b) stressed and explained at some length the tax liabilities associated with holding LP Units; (c) made no effort to explain or quantify the benefits of holding LP Units; and (d) failed to disclose the fact that Milton Fund and other ERI Collaborators were working together with HKAllen and other HK Collaborators to fleece all of the Independent Limited Partners by executing the Conspiracy.

196.    Like the offers from 2006, March 2007 and September 20007, the first paragraph of the 2008 ERI Offer stressed the Milton Fund's separation from the Collaborators: "neither Milton Fund nor Equity Resource Investments, LLC, the manager of Milton Fund's general partner, is an affiliate of the Partnership or the general partner of the Partnership."

197.    Also like the offers from 2006 and March 2007, the last page of the September 2007 ERI Offer contained a paragraph whose heading was "Past Contact and Negotiations with the General Partner."  That paragraph was similar in content to the paragraphs with the similar headings in the 2006 ERI Offer and the March 2007 ERI Offer, but there was at least one important difference. The 2006 ERI Offer and the March 2007 ERI Offer stated precisely what HKAllen had an option to buy: a certain portion of the LP Units in the Partnership that Newton Fund or Milton Fund acquired on account of the 2006 ERI Offer and the March 2007 ERI Offer, respectively. By contrast, the September 2007 ERI Offer lacked the same precision. It did not clearly define what HKAllen had an option to buy. As a result, it did not affirmatively state that HKAllen had an option to buy a portion of the LP Units that Milton Fund bought from Limited Partners of the Partnership who accepted the September 2007 ERI Offer.

198.    The fact that the September 2007 ERI Letter and the September 2007 ERI Offer contained cautionary statements and disclaimers made the offer appear to the Limited Partners to be a legitimate offer from a sophisticated buyer who knew and understood the legal implications of circulating offers of this kind.  The September 2007 Offer Package did not give the Limited Partners any reason to suspect that HKAllen had breached its duties to the Limited Partners.

*Milton Fund Bought LP Units from Adelman, and HKAllen Knowingly Approved the Improper Sale*

199.    On or about September 9, 2007, after receiving the September 2007 Offer Package, Adelman signed the September 2007 Sale Agreement (the "**Adelman Assignment**"), by which Adelman sold his 0.25 LP Unit to Milton Fund.

200.    On a date after September 9, 2007, but no later than November 26, 2007, Dagbjartsson signed the Adelman Assignment on behalf of Milton Fund, the assignee. Dagbjartsson signed in his capacity as Manager of ERI, which was the sole member of ERF Manager LLC, which was Manager of Milton Fund.

201.    On November 26, 2007, Burnes signed the General Partner Consent by which HKAllen, with knowledge of the terms and price of the sale from Adelman to Milton Fund, made the wholly discretionary decision expressly to approve the sale from Adelman to Milton Fund, and admitted Milton Fund to the Partnership as a Substitute Limited Partner.

202.    Upon information and belief, the Adelman Assignment, and the participation in it by ERI, Milton Fund, Dagbjartsson, HKAllen and Burnes, were all part of the Conspiracy.

203.    Milton Fund paid Adelman $3,750.00 in exchange for Adelman's 0.25 LP Unit.

204.    At the time Adelman transferred his 0.25 LP Unit to Milton Fund, $3,750.00 represented just a very small fraction of the fair market value of 0.25 LP Unit.

205.    At the time Adelman transferred his 0.25 LP Unit to Milton Fund, Defendants ERI, Milton Fund, Dagbjartsson, HKAllen and Burnes all knew that $3,750.00 represented just a very small fraction of the fair market value of Adelman's 0.25 LP Unit.

206.    HKAllen knowingly, intentionally, and with malice: (i) purposefully misled all of the Limited Partners for the purpose of conditioning them to accept Milton Funds' offers to buy their LP Units; (ii) conspired with HallKeen LLC and Burnes to help them to mislead all of the Limited Partners for the purpose of conditioning them to accept Milton Funds' offers to buy their LP Units; and (iii) made the wholly discretionary decision to approve the sale of LP Units by Adelman to Milton Fund and the admission of Milton Fund to the Partnership with the knowledge that the sale from Adelman would cause HKAllen to profit at Adelman's expense, and also that the terms of that sale were materially unfair to Adelman. Thus, HKAllen breached

its fiduciary duty to Adelman. And Milton Fund aided and abetted every one of those breaches of fiduciary duty, because, among other actions, Milton Fund solicited and documented the Adelman Assignment, asked HKAllen to approve the Adelman Assignment, and then completed the Adelman Assignment by paying Adelman – all with the knowledge that its actions enabled HKAllen to breach its fiduciary duties to Adelman.

207.    Had HKAllen fulfilled its obligation as Adelman's fiduciary to show complete good faith and fairness to Adelman, then Adelman would not have sold its 0.25 LP Unit for only $3,750.00.

208.    Burnes, HKM, HK Allen Inc., Milton Fund, Dagbjartsson and at least one affiliate of Milton Fund aided and abetted HKAllen's breach of its fiduciary duty to Adelman.

209.    Adelman had no knowledge, nor any reason to suspect, that HKAllen, Burnes, or any of the other HK Collaborators would act in a manner contrary to the Limited Partners' best interests or would misrepresent the value of the LP Units.  Nor did Adelman have any reason to suspect that his understanding regarding the fairness of his sale to Milton Fund, which he had formed in part on account of his reasonable and rightful reliance on his fiduciary's representations, was inaccurate. Adelman also had no reason to suspect that HKAllen breached its fiduciary duty to him when it approved his sale to Milton Fund.

210.    Adelman discovered only very recently – in 2015 – the following: (i) that HKAllen breached its fiduciary duty by agreeing to participate in the Conspiracy and by approving Adelman's sale of his LP Units to Milton Fund even though HKAllen knew it would, from that sale, profit at Adelman's expense; and (ii) that Burnes, HKM, HK Allen Inc., Milton Fund, Dagbjartsson and at least one affiliate of Milton Fund materially assisted HKAllen's breaches of its fiduciary duties to Adelman. Adelman discovered these facts as a result of one Limited Partner's investigation of a March 2015 Consent Request document that HKM sent to

the Limited Partners on behalf of HKAllen.

*In 2008, Milton Fund Mailed Another $15,000 Offer and Reminder; Milton Fund Bought LP Units from Richards Family Trust; and HKAllen Knowingly Approved the Improper Sale*

211.    On or about July 15, 2008, Milton Fund mailed to several of the Limited Partners of the Partnership a new offer – again offering to pay $15,000.00 for each LP Unit. The mailing contained a three-page letter dated July 15, 2008 (the "**2008 ERI Letter**"), an Agreement of Sale and Assignment for each Limited Partner to execute if he/she decided to sell his/her LP Units (the "**2008 Sale Agreement**"), and a 12-page Offer To Purchase For Cash 5 Units of Hotel Danville for $15,000.00 per LP Unit (the "**2008 ERI Offer**" and, together with the 2008 ERI Letter and the 2008 Sale Agreement, the "**2008 Offer Package**"). The 2008 Offer Package is attached as __**Exhibit E**__ to this Complaint.

212.    On July 15, 2008, ERI was the manager of the LLC that is the manager of Milton Fund.

213.    At the time Milton Fund sent the 2008 ERI Letter, $15,000.00 represented just a small fraction of the fair market value of one LP Unit.

214.    At the time Milton Fund sent the 2008 ERI Letter, Defendants HKAllen, ERI, Milton Fund and Burnes knew that $15,000.00 represented just a small fraction of the fair market value of one LP Unit.  Defendants HKAllen, ERI, Milton Fund and Burnes also knew that, in the four immediately preceding years – 2004, 2005, 2006 and 2007 – the Limited Partners had to pay tax on Partnership income but received no cash distributions from the Partnership.  Upon information and belief, Defendants ERI and Milton Fund were familiar with the 2005 Burnes Letter and knew that Burnes had mailed it to all of the Limited Partners for the purpose of conditioning the Limited Partners to sell their LP Units so that HKAllen and other Collaborators

could profit at the expense of the Limited Partners. Upon information and belief, ERI and
Milton Fund also knew that neither HKAllen nor any of its affiliates had explained to the Limited
Partners: (a) the real reasons why the Partnership had not made cash distributions in 2004, 2005,
2006 or 2007; (b) the real likelihood that the Partnership would not make cash distributions in
future years; or (c) the fact that the Limited Partners could expect to receive income in 2014 and
beyond that would dwarf any outlays they might make in the years before 2014.

215.    As in the previous letters, Milton Fund, in the 2008 Offer Package: (a) took full
advantage of the informational asymmetry that HKAllen and other HK Collaborators fostered to
further the Conspiracy; and (b) stressed and explained at great length the tax liabilities associated
with holding LP Units.

216.    The 2008 ERI Letter concluded as follows regarding the tax liabilities associated
with holding LP Units: "the Purchaser expects that this trend of no distributions and
progressively increasing annual taxable income to continue through mortgage maturity. Under
this scenario, it is likely that limited partners' annual net tax liability will increase in the future. By
selling your units at this time, you will avoid the ongoing tax liability associated with the taxable
income being generated by the Partnership."

217.    Yet Milton Fund, in its 2008 Offer Package, again: (a) made no effort to explain
or quantify the benefits of holding LP Units; and (b) failed to disclose the fact that Milton Fund
and other ERI Collaborators were working together with HKAllen and other HK Collaborators
to fleece all of the Independent Limited Partners by executing the Conspiracy.

218.    Like the offers from 2006, March 2007 and September 20007, the first paragraph
of the 2008 ERI Offer stressed the Milton Fund's separation from the Collaborators: "neither
Milton Fund nor Equity Resource Investments, LLC, the manager of Milton Fund's general
partner, is an affiliate of the Partnership or the general partner of the Partnership."

219.   Also like the previous offers, the last page of the 2008 ERI Offer contained a paragraph whose heading was "Past Contact and Negotiations with the General Partner."  But the paragraph under that heading had changed again: it said nothing about HKAllen's option to purchase LP Units. It disclosed nothing at all about any option.

220.   The fact that the 2008 ERI Letter and the 2008 ERI Offer contained cautionary statements and disclaimers made the offer appear to the Limited Partners to be a legitimate offer from a sophisticated buyer who knew and understood the legal implications of circulating offers of this kind.  The 2008 Offer Package did not give the Limited Partners any reason to suspect that HKAllen had breached its duties to the Limited Partners.

221.   On or about July 29, 2008, Milton Fund mailed to the Independent Limited Partners of the Partnership a reminder of its 2008 ERI Offer to purchase LP Units for $15,000.00 per LP Unit (the "**2008 ERI Reminder**"), along with another Agreement of Sale and Assignment whose text was identical to that of the 2008 Sale Agreement; and a formal Offer To Purchase For Cash 5 Units of Hotel Danville Company for $15,000.00 per LP Unit.

222.   On or about August 12, 2008, after receiving the 2008 Offer Package and the 2008 ERI Reminder, Irving and Regina Richards, as co-trustees of the Richards Family Trust, signed the 2008 Sale Agreement (the "**Richards Assignment**") by which the Richards Family Trust sold its 0.5 LP Unit to Milton Fund.

223.   Irving Richards was 65 years old when he received the 2008 ERI Reminder, and when he signed the Richards Assignment. Defendants knew or should have known that Irving Richards was at least 65 years of age when he received the 2008 ERI Reminder, and when he signed the Richards Assignment.

224.     On or about August 12, 2008, Dagbjartsson, in his capacity as Manager of ERI, which was the sole member of ERF Manager LLC, which was Manager of Milton Fund, signed the Richards Assignment on behalf of Milton Fund, as assignee.

225.     On August 12, 2008, Burnes signed the General Partner Consent by which HKAllen, with knowledge of the terms and price of the sale from the Richards Family Trust to Milton Fund, made the wholly discretionary decision expressly to approve the sale from the Richards Family Trust to Milton Fund and admitted Milton Fund to the Partnership as a Substitute Limited Partner.

226.     Upon information and belief, the Richards Assignment, and the participation in it by ERI, Milton Fund, Dagbjartsson, HKAllen and Burnes, were all part of the Conspiracy.

227.     Milton Fund paid the Richards Family Trust $7,500.00 in exchange for the Trust's 0.5 LP Unit.

228.     At the time the Richards Family Trust transferred its 0.5 LP Unit to Milton Fund, $7,500.00 represented just a small fraction of the fair market value of the Trust's 0.5 LP Unit.

229.     At the time the Richards Family Trust transferred its 0.5 LP Unit to Milton Fund, Defendants HKAllen, ERI, Milton Fund and Burnes knew that $7,500.00 represented just a small fraction of the fair market value of the Trust's 0.5 LP Unit.

230.     HKAllen knowingly, intentionally, and with malice: (i) purposefully misled all of the Limited Partners for the purpose of conditioning them to accept Milton Funds' offers to buy their LP Units; (ii) conspired with HallKeen LLC and Burnes to help them to mislead all of the Limited Partners for the purpose of conditioning them to accept Milton Funds' offers to buy their LP Units; and (iii) made the wholly discretionary decision to approve the sale of LP Units by the Richards Family Trust to Milton Fund and the admission of Milton Fund to the Partnership with the knowledge that the sale from the Richards Family Trust would cause HKAllen to profit

at the Richards Family Trust's expense, and also that the terms of that sale were materially unfair to the Richards Family Trust. Thus, HKAllen breached its fiduciary duty to the Richards Family Trust. And Milton Fund aided and abetted every one of those breaches of fiduciary duty, because, among other actions, Milton Fund solicited and documented the Richards Assignment, asked HKAllen to approve the Richards Assignment, and then completed the Richards Assignment by paying the Richards Family Trust – all with the knowledge that its actions enabled HKAllen to breach its fiduciary duties to the Richards Family Trust.

231.    Had HKAllen fulfilled its obligation as the Richards Family Trust's fiduciary to show complete good faith and fairness to the Richards Family Trust, the Richards Family Trust would not have sold its 0.5 LP Unit for only $7,500.00.

232.    Irving and Regina Richards, and the Richards Family Trust, had no knowledge, nor any reason to suspect, that HKAllen, Burnes, or any of the other HK Collaborators would act in a manner contrary to the Limited Partners' best interests or would misrepresent the value of the LP Units. Irving and Regina Richards, and the Richards Family Trust, had no reason to suspect that the terms of the Richards Assignment were substantially unfair and not in their financial interests. They also had no reason to suspect that HKAllen breached its fiduciary duty to them when it approved the Richards Assignment.

233.    Burnes, HKM, HK Allen Inc., Milton Fund, Dagbjartsson and at least one affiliate of Milton Fund aided and abetted HKAllen's breach of the fiduciary duty it owed to the Richards Family Trust.

234.    The Richards Family Trust discovered only very recently – in 2015 – the following: (i) the failure of HKAllen to fulfill its obligation as the Richards Family Trust's fiduciary to show complete good faith and fairness to the Richards Family Trust in connection with the presentation, execution and approval of the Richards Assignment; and (ii) that Burnes,

HKM, HK Allen Inc., Milton Fund, Dagbjartsson and at least one affiliate of Milton Fund

materially assisted HKAllen's scheme to defraud the Richards Family Trust and the other Limited

Partners.  The Richards Family Trust discovered these facts as a result of one Limited Partner's

investigation of a March 2015 Consent Request document that HKM sent to the Limited

Partners on behalf of HKAllen.

### Concord Fund Mailed Offer to Buy LP Units for $35,000 Each

235.    On or about April 19, 2012, ERI mailed to the Limited Partners an offer by

Equity Resource Concord Fund LLC ("**Concord Fund**") to pay $35,000.00 for each LP Unit.

The mailing contained a two-page letter (the "**2012 ERI Letter**"), an Agreement of Sale and

Assignment for each Limited Partner to execute if he/she decided to sell his/her LP Units (the

"**2012 Sale Agreement**"), and a 12-page Offer To Purchase For Cash 5 Units of Hotel Danville

for $35,000.00 per LP Unit (the "**2012 ERI Offer**" and together with the 2012 ERI Letter and

2012 Sale Agreement, the "**2012 Offer Package**"). The 2012 Offer Package is attached as

**<u>Exhibit F</u>** to this Complaint.

236.    On April 19, 2012, Dagbjartsson controlled Concord Fund. ERF Fund 2011 was

the manager of Concord Fund. Dagbjartsson was the managing member of ERF Fund 2011.

237.    At the time Concord Fund sent the 2012 ERI Letter, $35,000.00 represented just

a small fraction of the fair market value of one LP Unit.

238.    At the time Concord Fund sent the 2012 ERI Letter, Defendants HKAllen, ERI,

Concord Fund, Belmont Fund and Burnes knew that $35,000.00 represented just a small fraction

of the fair market value of one LP Unit. Defendants HKAllen, ERI, Concord Fund, Belmont

Fund and Burnes knew this because they knew that, in less than two years, the Partnership would

earn sufficient profits to pay over $33,000 <u>each year</u> in profit distributions to an owner of one LP

Unit. Defendants HKAllen, ERI, Concord Fund, Belmont Fund and Burnes also knew that, in

each of the three immediately preceding years – 2009, 2010 and 2011 – the Partnership allocated

to the Limited Partners more than $15,000 of taxable income per LP Unit but distributed less

than $1000 per LP Unit. Upon information and belief, Defendants HKAllen, ERI, Concord

Fund, Belmont Fund and Burnes were familiar with the 2005 Burnes Letter and knew that

Burnes had mailed it to all of the Limited Partners for the purpose of conditioning the Limited

Partners to sell their LP Units so that HKAllen and other Collaborators could profit at the

expense of the Limited Partners. Upon information and belief, HKAllen, ERI, Concord Fund,

Belmont Fund and Burnes also knew that neither HKAllen nor any of its affiliates had explained

to the Limited Partners: (a) the real reasons why the Partnership had not made cash distributions

in 2004-2008 or in 2009-2011; (b) the real likelihood that the Partnership would not make cash

distributions in future years; or (c) the fact that, beginning in early 2014, a Limited Partner who

owned one LP Unit could expect to receive more than $33,000 per year from the Partnership.

     239.    Just as Newton Fund and Milton Fund had done in their previous offers,

Concord Fund, in the 2012 Offer Package: (a) took full advantage of the informational

asymmetry that HKAllen and other HK Collaborators fostered to advance the Conspiracy; and

(b) highlighted the tax liabilities associated with holding LP Units. The 2012 ERI Letter stated

that an owner of one LP Unit was allocated $18,755 of taxable income in 2011, but received no

cash distributions, requiring it to pay as much as $6,564 in federal taxes. Unlike the 2006 ERI

Letter, March 2007 ERI Letter, September 2007 ERI Letter and the 2008 ERI Letter (collectively,

the "**Previous Letters**"), the 2012 ERI Letter did not predict that this situation would continue

until the mortgage matures. But that whiff of candor betrays a material lie by omission. Each of

the Previous Letters stated on its first page that the Partnership's mortgage matures in 2014, and

that its Section 8 contract expires in 2014. The year 2014 was mentioned at least twice on the first

page of each of the Previous Letters. But 2014 is nowhere mentioned in the 2012 ERI Letter or the 2012 Offer Package. The second paragraph of the 2012 ERI Letter is nearly identical to that of the 2008 ERI Letter. The only changes, apart from the updated mortgage balance, are: (1) the deletion of the phrase, "and matures in 2014" from the sentence describing the mortgage loan; (2) the deletion of the sentence, "The Section 8 contract expires in 2014"; and (3) the deletion of the last sentence of the paragraph, which predicted a continuation of current operations absent sale or refinancing.

240.    The references to the 2014 events remained accurate in 2012, so the motivation to delete them could not have been a desire to ensure accuracy. Upon information and belief, the ERI Collaborators found it useful to mention the events scheduled for 2014 in the Previous Letters. When those letters were sent, 2014 seemed far away, and the ERI Collaborators believed that citing that date helped them to convince Limited Partners to sell. But in April 2012, the ERI Collaborators believed that mentioning the events scheduled for 2014 would have the opposite effect: it would prevent Limited Partners from selling. Concord Fund surgically removed material facts because those facts would, if disclosed, hinder Concord Fund's efforts to carry out the Conspiracy.

241.    Also as Newton Fund and Milton Fund had done in their previous offers, Concord Fund, in the 2012 Offer Package: (a) made no effort to explain or quantify the benefits of holding LP Units; and (b) failed to disclose the fact that Concord Fund and other ERI Collaborators were working together with HKAllen and other HK Collaborators to fleece all of the Independent Limited Partners by executing the Conspiracy.

242.    The last page of the 2012 ERI Offer contained a paragraph whose heading was "Past Contact with the General Partner."  As with the March 2007 ERI Offer, the September 2007 ERI Offer and the 2008 ERI Offer, that paragraph is different from any previous version in

the Previous Letters. The paragraph was closely modeled on the paragraph from the March 2007 ERI Offer, with one important difference: the paragraph in the 2012 ERI Letter did not say that HKAllen had an option to buy LP Units. It said that Concord Fund might give such an option to the general partner if the general partner requested such a purchase.

243.    The fact that the 2012 ERI Letter and the 2012 ERI Offer contained cautionary statements and disclaimers made the offer appear to the Limited Partners to be a legitimate offer from a sophisticated buyer who knew and understood the legal implications of circulating offers of this kind.  The 2012 Offer Package did not give the Limited Partners any reason to suspect that HKAllen had breached its duties to the Limited Partners.

### *Burnes Sent Decoy Letter to Limited Partners Advising Against Selling LP Units to Third Parties; Real Purpose Was to Ensure Success of Phase Two*

244.    In February 2013, Burnes sent a letter (the "**2013 Burnes Letter**") to the Limited Partners warning generally about third-party solicitations sent to Limited Partners to purchase LP Units.  Despite the facts that: (a) ERI Collaborators had by that time purchased 6.25 LP Units; (b) Burnes, on behalf of HKAllen, had signed consent forms expressly approving every one of those purchases with full knowledge of their terms; and (c) the ERI Collaborators were the only parties who had solicited the Limited Partners to purchase their LP Units; Burnes' letter did not mention any of the ERI Collaborators by name or even acknowledge that any of the ERI Collaborators had purchased any LP Units. The 2013 Burnes Letter is attached as **Exhibit G** to this Complaint.

245.    Upon information and belief, this letter was not intended to dissuade the Limited Partners from selling to the ERI Collaborators. Rather, it was intended to diminish any possibility that the Limited Partners might sell LP Units to a third party who was not an ERI Collaborator,

i.e., one without a pre-existing agreement with HKAllen to cooperate to execute the Conspiracy. In other words, Burnes wanted to make sure that, if the Limited Partners sold their LP Units, they sold them to a buyer who was already committed to help execute Phase One and Phase Two. Burnes knew the Collaborators had accumulated almost enough ownership of the Partnership to proceed to Phase Two. He wanted the Collaborators to acquire another LP Unit or so, and then proceed to Phase Two. He did not want a stranger to become a Limited Partner, since a stranger might make it hard for the Collaborators to complete Phase Two.

### _Belmont Fund Bought LP Unit from Weide Family Trust; HKAllen Knowingly Approved Improper Sale_

246.     Brian and Roberta Weide received the 2012 Offer Package in or around late April 2012.

247.     On or about March 25, 2013, Mr. Phil Darby of ERI ("**Darby**") sent to Roberta Weide, as co-trustee of the Weide Family Trust, an email with an attachment containing an unexecuted Agreement of Sale and Assignment dated March 25, 2013 (the "**2013 Sale Agreement**"). But for different dates, the text of the 2013 Sale Agreement was identical to the text of the 2012 Sale Agreement. In July 2013, Darby confirmed to Ms. Weide the continued validity of the offer to purchase LP Units implicit in the March 2013 Assignment Form.

248.     On September 27, 2013, Brian and Roberta Weide, as co-trustees of the Weide Family Trust, signed the March 2013 Assignment Form (as signed, the "**Weide Assignment**") by which the Weide Family Trust agreed to sell its 1.0 LP Unit to Concord Fund. At that time and now, the Weide Family Trust had only one beneficiary: the mother of Brian Weide, a widow in her 90s. Defendants knew or should have known that the beneficiary of the Weide Family Trust was at least 65 years of age when the Trust's trustees received the 2012 Offer Package, and when they signed the Weide Assignment.

249.    On or about October 7, 2013, Dagbjartsson, in his capacity as Managing Member of ERF Fund 2011 GP LLC, which was the Manager of Concord Fund, signed the Weide Assignment on behalf of Concord Fund, as assignee.

250.    Also on or about October 7, 2013, and immediately after signing the Weide Assignment on behalf of Concord Fund, Dagbjartsson, in his capacity as the Managing Member of ERF Fund 2013 GP LLC, which was the Manager of Belmont Fund: (i) caused a notation to be added to the Weide Assignment by which Concord Fund assigned to Belmont Fund the right to purchase the LP Unit under the Weide Assignment; and (ii) signed the Weide Assignment on behalf of Belmont Fund, as assignee.

251.    On October 28, 2013, Burnes signed the General Partner Consent by which the Partnership's "General Partner(s)," with knowledge of the terms and price of the sale from the Weide Family Trust to Belmont Fund, made the wholly discretionary decision expressly to approve the sale from the Weide Family Trust to Belmont Fund and admitted Belmont Fund to the Partnership as a Substitute Limited Partner.

252.    Upon information and belief, the Weide Assignment, and the participation in each by Concord Fund, Belmont Fund, ERF Fund 2011 GP LLC, ERF Fund 2013 GP LLC, Dagbjartsson, HKAllen and Burnes, were all part of the Conspiracy.

253.    By check dated November 11, 2013, Belmont Fund paid the Weide Family Trust $35,000 in exchange for the Weide Family Trust's 1.0 LP Unit. Dagbjartsson signed the check on behalf of Belmont Fund.

254.    When Burnes signed the General Partner Consent to approve the transfer from the Weide Family Trust to Belmont Fund and to admit Belmont Fund to the Partnership as a Substitute Limited Partner, the Partnership was just three months away from fully repaying its primary mortgage loan, after which repayment the Partnership would own the Property with no

debt, and the Partnership began to earn sufficient profits to enable it to distribute <u>annual</u> dividends of more than $33,000 to the Weide Family Trust.

255.    HKAllen had actual knowledge of the facts alleged in the immediately preceding Paragraph, but did not disclose this information to the Weide Family Trust.

256.    At the time the Weide Family Trust transferred its 1.0 LP Unit to Belmont Fund, $35,000 represented just a small fraction of the fair market value of the Weide Family Trust's 1.0 LP Unit.

257.    At the time the Weide Family Trust transferred its 1.0 LP Unit to Belmont Fund, Defendants HKAllen, ERI, Concord Fund, Belmont Fund and Burnes knew that $35,000 represented just a small fraction of the fair market value of the Weide Family Trust's 1.0 LP Unit.

258.    At the time Burnes signed the General Partner Consent by which the Partnership's "General Partner(s)" consented to the Weide Assignment and admitted Belmont Fund to the Partnership as a Substitute Limited Partner, Defendants HKAllen, ERI, Concord Fund, Belmont Fund and Burnes knew that $35,000 represented just a small fraction of the fair market value of the Weide Family Trust's 1.0 LP Unit.

259.    HKAllen knowingly, intentionally, and with malice: (i) purposefully misled all of the Limited Partners for the purpose of conditioning them to accept Concord Funds' offers to buy their LP Units; (ii) conspired with HallKeen LLC and Burnes to help them to mislead all of the Limited Partners for the purpose of conditioning them to accept Concord Funds' offers to buy their LP Units; and (iii) made the wholly discretionary decision to approve the sale of LP Units by the Weide Family Trust to Concord Fund (as assigned to Belmont Fund) and the admission of Belmont Fund to the Partnership with the knowledge that the sale from the Weide Family Trust would cause HKAllen to profit at the Weide Family Trust's expense, and also that the terms of that sale were materially unfair to the Weide Family Trust. Thus, HKAllen breached

its fiduciary duty to the Weide Family Trust. And Concord Fund and Belmont Fund aided and abetted every one of those breaches of fiduciary duty, because, among other actions, Concord Fund solicited and documented the Weide Assignment, and Belmont Fund asked HKAllen to approve the Weide Assignment, and then completed the Weide Assignment by paying the Weide Family Trust – in all cases with the knowledge that Concord Fund's and Belmont Fund's respective actions enabled HKAllen to breach its fiduciary duties to the Weide Family Trust.

260.    Had HKAllen fulfilled its obligation as the Weide Family Trust's fiduciary to show complete good faith and fairness to the Weide Family Trust, the Weide Family Trust would not have sold its 1.0 LP Unit for merely $35,000.

261.    Brian and Roberta Weide, and the Weide Family Trust, had no knowledge, nor any reason to suspect, that HKAllen, Burnes or any of the other HK Collaborators would act in a manner contrary to the Limited Partners' best interests or would misrepresent the value of the LP Units.  Nor did they have any reason to suspect that their understanding regarding the fairness of the transaction, which they had reached in reliance on their fiduciary's representations, was inaccurate.  As a consequence, Brian and Roberta Weide, and the Weide Family Trust, had no reason to suspect that the terms of the Weide Assignment were substantially unfair and not in their financial interests.  In fact, the 2013 Burnes Letter gave them the opposite of such a suspicion; it gave them an affirmative reason to believe that HKAllen would approve its sale to Concord Fund only if HKAllen believed the sale to be in the best interest of Brian and Roberta Weide, and the Weide Family Trust.

262.    Brian and Roberta Weide, and the Weide Family Trust discovered only very recently – in 2015 – the following: (i) that HKAllen breached its fiduciary duty by agreeing to participate in the Conspiracy and by approving the Weide Family Trust's sale of its LP Units to Concord Fund (as assigned to Belmont Fund) even though HKAllen knew it would, from that

sale, profit at the expense of the Weide Family Trust; and (ii) that Burnes, HKM, HK Allen Inc.,

Concord Fund, Belmont Fund, Dagbjartsson and at least one affiliate of Concord Fund and

Belmont Fund materially assisted HKAllen's breaches of its fiduciary duties to the Weide Family

Trust. Brian and Roberta Weide, and the Weide Family Trust discovered these facts as a result of

one Limited Partner's investigation of a March 2015 Consent Request document that HKM sent

to the Limited Partners on behalf of HKAllen.


### *Allen and Myerson Assigned 99% of Their LP Units to Affiliate of HKAllen*

263.    On July 1, 2014, each of Allen and a trust of which Myerson and his wife were

both trustees ("**Myerson Trust**") assigned to HKN Allen 99% of his/its LP Units. The

assignments by Allen to HKN Allen and by the Myerson Trust to HKN Allen were both

documented in a single document (the "**Allen & Myerson Assignment**"). Allen signed the Allen

& Myerson Assignment on his own behalf. Morton Myerson signed the Allen & Myerson

Assignment on behalf of the Myerson Trust. Burnes signed the Allen & Myerson Assignment

twice: First, as Manager of the assignee, HKN Allen; second, as President of HK Allen Inc.,

which was then the sole general partner of HKAllen, to evidence HKAllen's express approval of

the transfer from Allen to HKN Allen and from the Myerson Trust to HKN Allen. HKN Allen

was and is an affiliate of HKAllen. Upon information and belief, the Allen & Myerson

Assignment was part of Phase One of the Conspiracy.


### *HKAllen and its Co-Conspirators Executed Phase Two of the Conspiracy: HKAllen and HKM Fraudulently Obtained "Consent of the Investor Limited Partners" to the Sale and Exchange Transaction*

264.    On or about March 26, 2015, HKM, acting on behalf of HKAllen, sent to all the

Limited Partners a document dated March 26, 2015 and entitled, "Consent Request for Hotel

Danville Company: Solicitation by General Partner of Limited Partner Consent" (the "**Consent Request**"). The Consent Request was printed on HKM letterhead and asked the Limited Partners to consent to the so-called Sale and Exchange. It asked the Limited Partners to return a Limited Partner Consent to Chris Pavoni, at HKM. The Consent Request is attached as **Exhibit H** to this Complaint.

265.    The Consent Request falsely described the Sale and Exchange as a transaction that was beneficial to and in the best interest of the Limited Partners.

266.    The steps of the Sale and Exchange, which was completed on September 10, 2015, are as follows:

a.    The Partnership, which owned the Property free of any debt, contributed the Property to a newly formed Massachusetts limited liability company called HKN Danville House LLC ("**New Owner**") in exchange for a 99.99% membership interest in New Owner. The Consent Request described New Owner as "an affiliate of HKAllen." The managing member of the New Owner, HKN Manager LLC ("**Managing Member**"), is an affiliate of HKAllen and received a 0.01% membership interest in New Owner for free; it contributed no money, and it promised to provide no services that HKAllen was not already required and paid to provide. The same individuals who currently control HKAllen also have full control over New Owner and Managing Member. Transferring the Property to New Owner reduced the degree to which the Limited Partners can influence the Property's management, operations and disposition.

b.    New Owner borrowed approximately $6.1 million at an interest rate of approximately 3.57% that is fixed for the entire 35-year term of the loan, and the loan ("**New Loan**") is secured by the Property and guaranteed by the U.S. Department of Housing and Urban Development ("**HUD**").

c.       Since there was no outstanding debt on the Property before the Sale and Exchange, most of the loan proceeds were available for immediate distribution. Approximately $5.5 million of the loan proceeds were distributed.

d.       New Owner promised to pay the Partnership $7.46 million, which amount the Consent Request called the "Sale Price Equivalent." The "Sale Price Equivalent" is, according to the Consent Request, "equal to (a) $7.70 million appraised value [of the Property], less (b) approximately $243,000 to otherwise pay standard broker costs, closing and transaction costs (after applying $65k of available reserves) in connection with sale of the Property to the New Owner." Upon information and belief, there were no actual brokerage costs in the Sale and Exchange. Further, the Consent Release did not specify the actual closing or transaction costs associated with the Sale and Exchange.

e.       New Owner promised to pay this "Sale Price Equivalent" to the Partnership in two components: (i) approximately $5.5 million of the loan proceeds was paid to the Partnership upon closing of the New Loan – from the proceeds of the New Loan; and (ii) the balance is supposed to be paid to the Partnership from New Owner's cash flow as a so-called "Priority Return" until the full amount of the "Sale Price Equivalent" is paid to the Partnership. That is, now that New Owner has paid $5.5 million to the Partnership when the New Loan closed, the New Owner will pay 100% of its cash flow to the Partnership until New Owner pays the Partnership, in the aggregate, $7.46 million. The expectation is that New Owner will pay the full $7.46 million to the Partnership within 6-7 years after the closing of the New Loan. According to the Consent Request, an owner of one LP Unit was expected to receive a total of $224,000 from the Sale and Exchange: $184,000 at closing and $40,000 over the next six to seven years.

     f.     HKAllen received approximately $1.8 million of the $5.5 million paid to the Partnership at the time the New Loan closed.

     g.     HKAllen will receive Fifty Percent (50%) of the Priority Return that New Owner pays to the Partnership.

     h.     The Consent Request described payments to the Partnership after the Priority Return is fully paid as follows: "In addition, after the Sale Price Equivalent has been paid in full, the Partnership will continue to have a 50% interest in all cash flow and capital proceeds generated by the Property, thus allowing the Partnership to receive the continued benefit of the Property's strong cash flow and long term appreciation."

     i.     After the New Owner pays a total of $7.46 million to the Partnership, Managing Member, which is an affiliate of HKAllen, will take Fifty Percent (50%) of all cash flows from operations and all capital proceeds from the Property. New Owner will pay the other Fifty Percent (50%) to the Partnership.  Pursuant to the Partnership Agreement, the Partnership will pay HKAllen One Percent (1%) of the operational cash flows that the Partnership receives and Fifty Percent (50%) of the capital proceeds that the Partnership receives.

267.    The Consent Request contained numerous material omissions and material misrepresentations about the Sale and Exchange:

     a.     The Consent Request did not openly acknowledge that the Sale and Exchange was a self-dealing transaction with a glaring conflict of interest between HKAllen and the Limited Partners.  Neither the phrase "conflict of interest" nor even the term "conflict" appeared even once in the Consent Request.

     b.     The Consent Request contained no independent analysis to address the fairness of the Sale and Exchange – and HKAllen has never provided such an analysis to the Limited Partners.

c.      By calling the payment to the Partnership the "Sale Price Equivalent," and by naming the transaction the "Sale and Exchange," HKAllen misled the Limited Partners to believe that there would be a true sale of the Property, or at least its economic equivalent.  In fact, there was not.  There was a financing (not a refinancing because there was no outstanding loan to repay with the proceeds of the New Loan), which was the New Loan.  After that, there was a complicated reshuffling of the distributions of cash flows and capital proceeds that was designed to convince the Limited Partners that there was a real sale.  Yet, the only party in the Sale and Exchange who could possibly have been a legitimate buyer was putting nothing of value into the deal and was taking no risk, but inexplicably emerged as the recipient of half of all cash flows produced by the Property.  Further, all the money that constituted the "Sale Price Equivalent" would come from either: (i) proceeds from financing the Property, which the Partnership owned free of any debt; or (ii) the Property's rental income.  Calling the transaction a "Sale and Exchange" lulled the Limited Partners into believing that, if they received the amount they would receive in a true sale to a third party, then anything they received above that amount would be a bonus.  The truth is that there was no bona fide sale in the Sale and Exchange – and that continuing to operate the Property with no debt would have been, by a substantial margin, the obvious way to maximize the net present value of each LP Unit.  HKAllen knew or should have known this, but chose deliberately not to mention to the Limited Partners the obvious option of continuing to operate the Property without any transaction at all.  HKAllen made this choice because HKAllen knew: (i) that it would profit substantially from the Sale and Exchange, and (ii) that every dollar HKAllen and its affiliates gained in the Sale and Exchange was a dollar that the Limited Partners would otherwise have retained for themselves.

d.      The Consent Request did not disclose to the Limited Partners that, if the Sale and Exchange were to be completed, then (i) neither the New Owner nor the Managing

Member would owe fiduciary duties to the Limited Partners or to the Partnership, and (ii) the limited, but meaningful ability of the Limited Partners to influence the operations and disposition of the Property by participating in governance of the Partnership would be eliminated. By contrast, if the Sale and Exchange were not approved, then (i) HKAllen would continue to owe fiduciary duties to each Limited Partner and to the Partnership, and (ii) the Limited Partners would continue to enjoy limited, but meaningful rights to influence the Partnership's governance and operations.

e.     By defining the $7.46 million payment from New Owner to the Partnership as the "Sale Price Equivalent," and by comparing the Sale and Exchange to only one alternative scenario – a "fee simple sale of the Property to a third party purchaser" – HKAllen materially misled the Limited Partners to believe that Sale Price Equivalent is the net amount that the Partnership would receive if it sold the Property to a third party buyer for fair market value. In fact, the fair market value of the Property was and is substantially greater than $7.70 million. HKAllen achieved this deception by implying that the opinion of the Property's value provided in the Novogradac Appraisal is the same as the fair market value of the Property at the time the Consent Request was distributed to the Limited Partners.  In fact, the Novogradac Appraisal did not purport to provide the fair market value of the Property in its current condition as a Section 8 property whose Section 8 rental subsidy contract was renewed in 2014 and expires in 2034. Instead, as required by applicable HUD regulations, the Novogradac Appraisal provided an opinion of value that assumes several facts that do not accurately describe the Property, including, notably, the assumption that <u>no</u> Section 8 rent restrictions are in place.  The counterfactual assumption that no Section 8 rent restrictions are in place materially reduced the Novogradac Appraisal's determination of value.  Without Section 8 rent restrictions, the Novogradac Appraisal concluded that the Property's value is $7.7 million.  If the Novogradac Appraisal had

assumed that Section 8 rent restrictions were in place, the Novogradac Appraisal would have concluded that the Property's fair market value was at least $10 million.  Moreover, the Consent Request provided no discussion or even any mention of at least two obvious alternatives to the Sale and Exchange: holding the Property as-is and operating it profitably without debt; or executing an honest financing <u>without</u> giving half of the Property's future cash flows and half of the Limited Partners' share of capital appreciation to an affiliate of HKAllen for literally nothing in return.

        f.      In the Consent Request, HKAllen falsely implied that payment by the New Owner to the Partnership of 50% of all cash flows and capital proceeds (after payment of the Priority Return) is either a bonus to the Limited Partners or a continuation of the same cash flows that the Limited Partners already receive.  This excerpt from the "Summary" section of the Consent Request illustrates the point:

> As a practical matter, the HUD Refinancing Closing Distribution to a Limited Partner is projected to be approximately the same as the after-tax results of a sale at the $7.70 million appraised value to that Limited Partner, assuming the Limited Partner was admitted to the Partnership in the original syndication and has used all of his/her losses. **Future cash flow**, while subject to annual taxation, **would add to these benefits**, deferring exit taxes for potentially many years. (Emphasis added.)

HKAllen's false implication helped HKAllen to mislead the Limited Partners into believing that the economic terms of the Sale and Exchange were either generous to the Limited Partners, or at least completely fair to the Limited Partners.  In fact, however, the Sale and Exchange was demonstrably unfair to the Limited Partners because it improperly and without consideration diverted to an HKAllen affiliate 50% of the cash flows and capital proceeds that the Partnership was otherwise entitled to receive after the "Sale Price Equivalent" is paid, and also improperly paid 50% of the so-called Priority Return to HKAllen (as discussed in Paragraphs 267(m) and (n) below). The net result for the Limited Partners is that, since the proceeds of the New Loan were

distributed when the New Loan closed, HKAllen and its affiliate have been taking and will continue to take from the Limited Partners half of the money that the Limited Partners were and are entitled to receive. The Limited Partners are, under the Partnership Agreement, entitled to receive 98% of cash flows from the Property's operations, but they will receive only 49% of those cash flows now that the Sale and Exchange is completed. Under the Partnership Agreement, the Limited Partners are entitled to receive 50% of capital proceeds after certain thresholds are met, and the general partner receives the other 50%. Now that the Sale and Exchange is completed, the Limited Partners will receive only 25% of the proceeds from future capital transactions, while HKAllen and its affiliate will receive 75%.

g.      The HKAllen affiliate who takes 50% of the cash flows that should be paid to the Partnership is the Managing Member, who has only a 0.01% membership interest in New Owner. HKAllen and Managing Member invested no money in the Sale and Exchange, and HKAllen and Managing Member committed to provide no services that HKAllen was not already obligated and compensated under the Partnership Agreement to provide. All said, <u>the Sale and Exchange was nothing more than a complicated ruse designed to hide an outright theft by HKAllen and its affiliate of half of the cash flows that rightfully belong to the Limited Partners</u>.

h.      The Consent Request contained no clear acknowledgement of the fact that Managing Member, who is an affiliate of HKAllen, has paid and will pay no consideration whatsoever in exchange for obtaining a right to receive 50% of the Property's future cash flows and capital proceeds.

i.      The Consent Request contained no disclosure, discussion or analysis of the value of one LP Unit in the absence of a new transaction, where the Partnership simply continues to operate the Property with no debt and produces substantial profits every year.

j.      The Consent Request did not explain that HKAllen would and did receive a distribution of approximately $1.8 million shortly after the closing of the Sale and Exchange, but would receive no such distribution if the Partnership continued to operate the Property without any debt.

k.      The Consent Request did not explain that the $1.8 million distribution to HKAllen reduced the value of the LP Units.  Operating the Property with no debt is substantially more valuable to an owner of one LP Unit than operating pursuant to the Sale and Exchange, in part because there would be no $1.8 million distribution to HKAllen if HKAllen continued to operate the Property with no debt.

l.      If the Property were operated under the Partnership Agreement with no debt, it would have been able to distribute at least $675,000 to the partners in 2015.  If the Partnership distributed $675,000 of operating revenues to its partners, the Limited Partners as a group would have received 98% of that (or $661,500), and an owner of one LP Unit would have received $33,075.  Therefore, simply operating the Property without any debt would have provided over $33,000 of _annual_ income to every owner of one LP Unit, and the net present value of the cash flows payable to an owner of one LP Unit is at least $780,000.

m.      The Consent Request contained no discussion or analysis of the amount of money that HKAllen and its affiliates would and did receive from the Sale and Exchange. The Consent Request contained no clear statement that HKAllen will receive half of the Priority Return payments made by New Owner to the Partnership.  However, this is precisely what is happening now that the Sale and Exchange is complete, because the Consent Request stated that, "the Closing Distribution and the Priority Return will be distributed by the Partnership as capital proceeds in accordance with the priorities defined in 10.2(C) of the Partnership Agreement."

n.      The above-referenced statement that the Priority Return will be treated as capital proceeds constitutes a violation of the Partnership Agreement.  Section 10.2(C) of the Partnership Agreement provides that 50% of capital proceeds are paid to the Limited Partners after certain thresholds are met.  But the Priority Return monies do not come from any capital transaction; they come from the rental income from the Property's *operations*, and section 10.2(A) of the Partnership Agreement requires that 98% of cash flows from *operational* income be paid to the Limited Partners.  Presumably, HKAllen would contend that the "Sale Price Equivalent" constitutes proceeds of a capital transaction, but that would be improper because there is no legitimate sale or exchange in the Sale and Exchange.

o.      The Consent Request stated that HKAllen and its affiliates will waive certain 'Incentive Management Fees,' and implied that this waiver is of real value to the Limited Partners.  In fact, the waiver of the Incentive Management Fee has no value at all to the Limited Partners.  Now that the Sale and Exchange is complete, the formula in section XI(B) of the Partnership Agreement that determines the amount of the Incentive Management Fee can never produce a positive value.

p.      When the Sale and Exchange was complete, each of Hall Keen Investments, the ERI Collaborators and their respective affiliates, (such parties collectively, and together with HKAllen, Carlen and Franklin 81 Associates, the "**Collaborating Limited Partners**") realized extraordinarily high returns on the LP Units it purchased.  From 2006 to 2013, the ERI Collaborators paid a total of $88,750 to purchase 7.25 LP Units.  By 2015, even after the Sale and Exchange reduced the value of each of those LP Units by at least $480,000.00, each LP Unit was still worth approximately $300,000.  That means that the ERI Collaborators investment of $88,750 grew to more than $2,175,000.  That is *more than 24 times* the ERI Collaborators' original investment in fewer than ten years.  Hall Keen Investments and its affiliate,

HKAllen, did even better than that with the two LP Units that Hall Keen Investments bought from Hamill and McKinney. HKAllen and its affiliates kept for themselves 100% of the value of each LP Unit even after the Sale and Exchange, so the two LP Units for which Hall Keen Investments paid only $200 produced at least $1,560,000 for HKAllen and its affiliates. *That is 7,800 times the original investment of $200.* HKAllen and the ERI Collaborators knew that the Collaborating Limited Partners would realize such enormous profits upon the completion of the Sale and Exchange.

q.    HKAllen knew when it sent the Consent Request to the Limited Partners that none of the Collaborating Limited Partners would disapprove the Sale and Exchange – because the Collaborating Limited Partners had long ago agreed to support Phase Two, and because the Collaborating Limited Partners would reap such enormous returns from the Sale and Exchange. As a result, HKAllen knew that, under the terms of the Partnership Agreement, all 15 Independent Limited Partners who owned at least 0.5 LP Units and three of the four Independent Limited Partners who owned less than 0.5 LP Units would have to *affirmatively oppose* the Sale and Exchange for HKAllen not to obtain the "Consent of the Limited Partners" that is technically required under the Partnership Agreement for approval of the Sale and Exchange.

r.    HKAllen knew when it sent the Consent Request to the Limited Partners that there was no chance that those 18 of 19 Independent Limited Partners would affirmatively oppose the Sale and Exchange, especially since, as described below, the Limited Partner Consent form it sent to the Limited Partners had no place on it for a Limited Partner to record a "no" vote. Therefore, HKAllen was certain when it sent the Consent Request to the Limited Partners that it would obtain the "Consent of the Investor Limited Partners" (as defined in the Partnership Agreement) necessary to approve the Sale and Exchange – even though HKAllen also knew that the Sale and Exchange was grossly unfair to the Independent Limited Partners.

78

s.      The Consent Request did not disclose the fact that, since January 1, 2001, the Collaborating Limited Partners have acquired 9.75 of the 20 LP Units in the Partnership, or fully 48.75% of the Partnership.

t.      HKAllen's failure expressly to disclose to the Limited Partners the current ownership of the LP Units before seeking the Limited Partners' approval of the Sale and Exchange misled the Limited Partners to conclude that the ownership of LP Units was as described in the last disclosure of such information by HKAllen – and, in so doing, misled the Limited Partners to believe that the election process initiated by the Consent Request was as fair as such a process could be under the Partnership Agreement.

u.      The last time before the Consent Request that HKAllen disclosed Partnership ownership information to the Limited Partners was on or around January 1, 2001, the date on which Amendment Two was executed.  The Schedule A attached to Amendment Two indicated that the general partner owned 0.5 LP Units (Allen and Myerson each owned 0.25 LP Units, which they wrongfully acquired from Pfeiffer), and it did not list any of the Collaborating Limited Partners as Limited Partners.

v.      HKAllen knowingly and intentionally failed to disclose to the Limited Partners in clear, comprehensible terms the current ownership of LP Units to help ensure that HKAllen would obtain "Consent of the Limited Partners" (as defined in the Partnership Agreement) to the Sale and Exchange despite the fact that HKAllen knew that the Sale and Exchange was and is fundamentally unfair to all of the Limited Partners other than Allen, Myerson and the Collaborating Limited Partners.

w.      The Consent Request did not ask each Limited Partner to consider the Sale and Exchange and then to send by writing their approval or disapproval.  Instead, the Consent Request asked the Limited Partners to approve the Sale and Exchange.  The Limited

Partner Consent form that appeared on page 8 of the Consent Request was designed for a Limited Partner to sign it to express <u>only</u> his or her consent to the Sale and Exchange.  The form did not contemplate the possibility that a Limited Partner might <u>not</u> consent to the Sale and Exchange, and there was no place on the form for a Limited Partner to express his or her opposition to the Sale and Exchange.  Particularly when coupled with HKAllen's failure to disclose the current ownership of the Partnership (as described above) and HKAllen's failure to disclose that it had collaborated with the ERI Collaborators to acquire LP Units and to share the profits from those acquisitions, HKAllen's deliberate design of the Limited Partner Consent form constituted a knowing, intentional and malicious attempt to mislead the Limited Partners to help ensure that the Sale and Exchange was approved so that HKAllen and the ERI Collaborators could profit at the expense of the Limited Partners.

       x.      HKAllen has never disclosed to the Limited Partners its dealings and agreement(s) with ERI or with any affiliates of ERI – not in the Consent Request or in any other document.

268.     One day after the deadline for replies to the Consent Request, HKM, on behalf of HKAllen, sent to all the Limited Partners a document dated April 28, 2015 and entitled, "Sale and Exchange Update for Hotel Danville Company" ("**Update Number One**").  Update Number One was printed on HKM letterhead. Update Number One is attached as **<u>Exhibit I</u>** to this Complaint.

269.     Update Number One announced that the Sale and Exchange was formally approved.  It did not disclose how many Limited Partners affirmatively consented to the Sale and Exchange, and it did not disclose that the Collaborating Limited Partners collectively owned 9.75 of the Partnership's 20 LP Units.

270.    Update Number One acknowledged that "several Limited Partners" communicated questions and comments to HKAllen about the Sale and Exchange, and that one of the two Limited Partners who dissented was among those who sent such questions and comments. "As a result of these discussions" with several Limited Partners, HKAllen announced a modification to the terms of the Sale and Exchange: "Specifically, a 7.0% annual priority rate will be added with regard to the unpaid portion of the Priority Return. To the extent unpaid, the Priority Return will accrue interest at a rate of 7.0%, compounded annually."

271.    This modification did not cure any of the serious inequities and other flaws in the Sale and Exchange. Instead, it constituted a knowing, intentional and malicious attempt to mislead the Independent Limited Partners who had not dissented to the Sale Exchange to believe that HKAllen was acting in good faith and in the best interest of the Independent Limited Partners by listening to feedback from Independent Limited Partners and by implementing a remedy that benefits the Independent Limited Partners.

272.    The 'Summary' section of Update Number One echoed the Consent Request's grossly misleading description of the Sale and Exchange – but this time shifted its characterization of future cash flows from a sort of bonus to simply a continuation of the same cash flows the Partnership is entitled to receive before the Sale and Exchange. The relevant language appears below:

> After payment of the Priority Return (the installment note equivalent) and all accrued 7% priority, the Partnership will continue to be entitled to receive 50% of cash flow from Property operations, and 50% of proceeds from a future sale or refinancing, and those funds will be distributed among the Partners of the Partnership in accordance with the applicable provisions of the Partnership Agreement, with the exception that the Incentive Management Fee will no longer be charged by or paid to the General Partner after the closing.

273.    In fact, the Sale and Exchange reduces by 50% the Limited Partners' right to receive cash flow and proceeds from capital transactions, and it does this without compensating

the Limited Partners in any way.

*Doubling Down on its Misconduct, HKAllen Deliberately Mischaracterized Plaintiffs' Concerns, Accused Plaintiffs of Harboring Impure Motivations, and Then Proceeded to Complete the Sale and Exchange, Thereby Harming all Plaintiffs Who Remain Limited Partners*

274.    On or about May 11, 2015, HKM, on behalf of HKAllen, sent to all the Limited Partners a document dated May 11, 2015 and entitled, "Sale and Exchange 2nd Update for Hotel Danville Company" ("**Update Number Two**"). Update Number Two is attached as **Exhibit J** to this Complaint.

275.    Update Number Two dealt with one topic: the objections to the Sale and Exchange communicated to HKAllen by two of the Plaintiffs. In Update Number Two, HKAllen notified the Limited Partners that, "In addition to opposing the transaction proposed in the Limited Partner Consent, the Dissenters, through counsel, have now made serious allegations against HKAllen and have threatened litigation."

276.    However, HKAllen grossly mischaracterized the substance of the Dissenters' concerns, and then attempted to bolster the rationale for the Sale and Exchange by employing still more mischaracterizations.

277.    HKAllen's assertion that the Dissenters believe that HKAllen "should not be able to pull its equity out of the Partnership on the same terms as the Limited Partners" was a false and misleading attempt to portray the Dissenters as unreasonable and punitive.  First, HKAllen could not reasonably have concluded from the concerns expressed to HKAllen on behalf of the Dissenters that the Dissenters held that belief.  Second, HKAllen's implication that it should be able to pull its equity out of the Partnership falsely suggests that it had in fact invested substantial equity into the Partnership.  It had not.  The general partners invested only $100 into the

Partnership in 1982, and they have received substantial fees and other payments for their services every year since then.  By contrast, the Limited Partners invested more than $2.5 million in 1982. Notably, HKAllen fails again in Update Number Two to evaluate the economics of no transaction at all, even when it purports to respond to the Dissenters' apparent position that, "the Partnership's property should not be conveyed."

278.     Still worse, in Update Number Two, HKAllen misleadingly characterized the Dissenters as spoilers, and stated that it will cancel the Sale and Exchange and, instead, proceed with a third party sale if the Dissenters "continue to cause delay by resisting the proposal outlined in the Limited Partner Consent."  Even though continuing to operate the Property with no debt would be significantly more lucrative for each Limited Partner than either the Sale and Exchange or a third party sale, HKAllen did not even acknowledge the existence of this obvious alternative. One reason for HKAllen's failure to consider this 'no transaction' alternative is that it would not provide an immediate seven-figure payment to HKAllen ($1.8 million), while the Sale and Exchange or a third party sale would – and did.

279.     On or about May 18, 2015, HKM, on behalf of HKAllen, sent to all the Limited Partners a document dated May 18, 2015, and entitled, "Sale and Exchange 3rd Update for Hotel Danville Company" ("**Update Number Three**"). Update Number Three is attached as **Exhibit K** to this Complaint.

280.     Update Number Three announced that HKAllen had received "no new information from the dissenting parties," and that it was proceeding to lock interest rates "as quickly as possible" on the loan that was part of the Sale and Exchange, "while attempting to address the concerns of the Dissenters or, if not possible, finding a path forward that minimizes the delay and expense associated with their objections."

281.    Attached to Update Number Three was a near-final draft of the limited liability company operating agreement of New Owner ("**New Owner LLC Agreement**").  Attached as Exhibit B to the New Owner LLC Agreement was a complete copy of the Partnership Agreement, with all amendments through May 11, 2015.

282.    In Update Number Three, HKAllen for the first time provided information from which an Independent Limited Partner could deduce that HKAllen, its affiliates, and ERI and its affiliates, collectively owned 48.75% of the Partnership's LP Units before seeking consent to the Sale and Exchange.  They acquired a total of 9.75 of the Partnership's 20 LP Units in 14 separate transactions.  Update Number Three was a two-page memo followed by 167 pages of exhibits and attachments, and the Schedule A from which one can deduce current ownership information appeared on the last four pages of the 167 pages of exhibits and attachments.  Because this ownership information was buried at the end of 167 pages of exhibits and attachments, and because no mention whatsoever of it was made in the two-page memo that constitutes the primary document of Update Number Three, HKAllen knew that there was very little likelihood that most, or even any, of the Independent Limited Partners would see it, much less appreciate its import.

283.    HKAllen's failure to disclose each of these transactions to all of the Limited Partners was not only material and misleading, but was also a violation of the Partnership Agreement.  Section 8.3 of the Partnership Agreement requires HKAllen, as general partner, to amend Schedule A to the Partnership Agreement and to file with the Commonwealth of Virginia an amendment to the Partnership's Certificate of Limited Partnership each time a Substitute Limited Partner is admitted to the Partnership.  Myerson and Allen waited nearly ten years before disclosing their ownership of the 0.5 LP Units that Pfeiffer used to own.  In 2001, 2006, 2007, 2008 and 2013, HKAllen approved thirteen transfers of LP Units and admitted six Substitute

Limited Partners to the Partnership. But HKAllen failed to disclose any of these transfers or Substitute Limited Partners to the Independent Limited Partners until weeks <u>after</u> the deadline for response to the Consent Request had passed. And even then, it did not disclose the facts effectively, but rather buried the facts on the last four pages of 167 pages of attachments to its two-page memorandum in an attempt to prevent the Limited Partners from noticing them.

284.    On or about May 22, 2015, HKM, on behalf of HKAllen, sent to all the Limited Partners a letter on HKM letterhead, dated May 22, 2015 and with the subject line, "Hotel Danville Company – Confirmation of Consent for Sale and Exchange" (the "**Confirmation of Consent**").

285.    The Confirmation of Consent announced a highly atypical mechanism - a "straw poll" through which HKAllen sought to reconfirm the original approval of the Sale and Exchange.

286.    Once again, the Confirmation of Consent contained numerous material omissions and misrepresentations, some of which are described below.

287.    In the Confirmation of Consent, HKAllen falsely stated, "To our disappointment, the Dissenters … have not engaged us substantively on their specific concerns within the proposed Sale and Exchange." In fact, the Dissenters shared with HKAllen detailed explanations of their concerns about the Sale and Exchange, which concerns were, in large part, the same as those set forth in this Complaint. HKAllen knowingly, intentionally and with malice made this false statement to the Limited Partners in its attempt to bolster the Sale and Exchange by discrediting the opponents of the Sale and Exchange.

288.    In the Confirmation of Consent, HKAllen made what may be its strongest express endorsement of the Sale and Exchange, which HKAllen knew was grossly unfair to the Independent Limited Partners: "Toward that end, the general partner strongly believes that the

Sale and Exchange proposal submitted to you on March 26, 2015 and approved by 95% of the limited partners is still the best way to proceed." In its attempt to portray the Sale and Exchange as having strong support and to portray the dissenters as a marginal and unreasonable minority, HKAllen overstated the degree to which the Limited Partners affirmatively supported the Sale and Exchange. In truth, 95% of the owners of LP Units did not sign and return the Consent Request to indicate their consent to the deal. At least a few Limited Partners did not respond at all to the Consent Request. HKAllen, in its zeal to shore-up support for the deal it sold through deception and material omission, took the liberty of interpreting a non-response to the Consent Request as an "approval" of the Sale and Exchange. The actual percentage of Limited Partners who affirmatively approved the Sale and Exchange is substantially lower than 95%, and that number would be even lower had HKAllen described the transaction honestly.

289.    Nonetheless, each of the ERI Collaborators and HK Collaborators who had the right to respond to the Consent Request either sent an affirmative response approving the Sale and Exchange or did not respond at all, which non-response was deemed under the Partnership Agreement to be consent.

290.    Upon information and belief, each ERI Collaborator who voted its LP Units to approve the Sale and Exchange, or who did not vote at all, knowingly consented to a transaction that reduced the value of its own LP Units by over 60%. Upon information and belief, these ERI Collaborators knowingly allowed the HK Collaborators to take most of the value of their LP Units because: (i) it was a condition of the agreement they made with HKAllen and others of the HK Collaborators to join forces to execute both Phase One and Phase Two of the Conspiracy; and (ii) it allowed them to receive $2.175 million for the LP Units they bought for only $88,000 just two to nine years earlier.

291.    The ERI Collaborators who consented to the Sale and Exchange knew: (i) that HKAllen owed fiduciary duties to the Independent Limited Partners; (ii) that by proposing the Sale and Exchange in the manner it did, HKAllen had breached the fiduciary duties it owed to the Independent Limited Partners; and (iii) that completion of the Sale and Exchange would cause HKAllen and its affiliates to profit at the expense of the Independent Limited Partners, and would therefore constitute another breach by HKAllen of the fiduciary duties HKAllen owed to every Independent Limited Partner.

292.    The ERI Collaborators who consented to the Sale and Exchange knew: (i) that their own commitment to HKAllen to support Phase Two, made long before the Consent Request was mailed to the Limited Partners, substantially induced HKAllen to propose, promote and execute the Sale and Exchange; and (ii) that, by consenting to the Sale and Exchange, they materially contributed to and aided the efforts of HKAllen and its affiliates to complete the Sale and Exchange.

293.    Because those ERI Collaborators who consented to the Sale and Exchange did so with the knowledge described in the two immediately preceding Paragraphs, they aided and abetted HKAllen's breaches of the fiduciary duties it owed to the Independent Limited Partners.

294.    On or about September 10, 2015, HKAllen completed the Sale and Exchange. HKAllen did not send any updates or other written communications to the Limited Partners after it sent the Confirmation of Consent and before it completed the Sale and Exchange.

295.    On or about September 15, 2015, HKM, on behalf of HKAllen, sent a "Distribution Transmittal for Hotel Danville Company" to each of the Holder LPs (the "**Closing Memo**").  The Closing Memo is attached as **Exhibit L** to this Complaint. Included with the Closing Memo was a check for each Limited Partner in the amount of  $186,978.37 per LP Unit. The Closing Memo explained that $164,870.83 of the amount paid by check was the

"Closing Distribution" from the Sale and Exchange. The other $22,207.54 was a distribution of 2015 cash flow. The Closing Memo also stated that the unpaid Priority Return is "about $51,414" per LP Unit. The Closing Memo did not state explicitly the unavoidable conclusion to be drawn from the figures set forth above: that the total amount each owner of one LP Unit would receive from the Sale and Exchange was $8,000 lower than the $224,000 amount stated in the Consent Request – nor did it explain what caused the reduction.

296.    Burnes signed every major document involved in the closing of the Sale and Exchange. These include: (1) the deed by which the Partnership transferred the Property to HKN Danville House LLC; (2) the Regulatory Agreement between HUD and HKN Danville House LLC; (3) the Note in favor of lender Prudential Huntoon Paige Associates, LLC; (4) the Deed of Trust in favor of that same lender; (5) the limited liability company operating agreement of HKN Manager LLC; (6) the limited liability company operating agreement of HKN Danville House LLC; and (7) the resolutions by which each of HKN Danville House and HKN Manager LLC approved execution of the loan documents. Apart from those who signed for the lender and for HUD, Burnes is the only person who signed these documents. He signed on behalf of every HK Collaborator who had to sign any of these documents.

297.    The limited liability operating agreement of HKN Danville House LLC provides that, after the Priority Return is paid to the Partnership (where HKAllen will pay itself half of the Priority Return), 50% of all distributions from the Property will be paid to HKN Allen. This is a change from what the Consent Request described. The HK Collaborators decided to divert the cash flows they stole to HKN Allen and not to HKN Manager LLC. One result of this is that, even if HKN Manager LLC is removed from its position as Manager of HKN Danville House LLC, HKN Allen will remain a Class B Member, and will remain technically entitled to receive half of the profits the Property generates.

298.     Because HKAllen completed the Sale and Exchange, the net present value of one LP Unit fell from at least $780,000 to approximately $300,000.00, causing every Holder LP to lose $480,000 for each LP Unit owned.  But the result was different for the ERI Collaborators who purchased LP Units for as little as $5000 per LP Unit: to them, a net present value of $300,000 represents a return of 5900% on the LP Units they owned for only two to nine years.

299.     On or about September 30, 2016, HKM, on behalf of HKAllen, sent a "Distribution Transmittal for Hotel Danville Company" to each of the Holder LPs (the "**September 2016 Cash Flow Memo**").  The September 2016 Cash Flow Memo announces to each Holder LP "a check representing your portion of the 2016 mid-year available cash flow distribution minus the 2015 Virginia Tax Liability the partnership has paid on your behalf." Enclosed with the September 2016 Cash Flow Memo was a check for each Holder LP in the amount of approximately $300 per LP Unit. The amount of the distribution paid to each Holder LP was substantially smaller than it should have been on account of the completion, by fraudulent means, of the Sale and Exchange. Had the Collaborators not completed the Sale and Exchange, each Holder LP owning one LP Unit should have received a cash distribution of at least $16,500 for the first six months of 2016. Because the September 2016 Cash Flow Memo falsely implied to each Holder LP that the Partnership has paid the correct amount to each Holder LP, the September 2016 Cash Flow Memo perpetuated and reaffirmed the many misrepresentations already made to the Holder LPs about the Sale and Exchange.

## FIRST CAUSE OF ACTION

### 18 U.S.C. § 1964(c) Based on Violation of 18 U.S.C. § 1962(c)

(Holder LPs Against Defendants HKAllen and Burnes)

300.     Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

301.     The HK Collaborators and the ERI Collaborators, collectively, constitute an enterprise engaged in and whose activities affect interstate commerce (the "**RICO Enterprise**"). Each of HKAllen and Burnes is a member of and is associated with the RICO Enterprise. As set forth above, the HK Collaborators and the ERI Collaborators all agreed to work together to execute the Conspiracy.

302.     HKAllen and Burnes (collectively, the "**RICO Defendants**") knowingly agreed to and did conduct and participate in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity and for the unlawful purposes of: (a) intentionally supporting the successful execution of Phase One so that the RICO Enterprise could complete the Conspiracy by proceeding to execute Phase Two; and (b) intentionally implementing Phase Two of the Conspiracy, by which the RICO Enterprise would and did steal more than 60% of the value of every Holder LP's interest in the Partnership.

303.     As general partner of the Partnership, HKAllen controlled the Partnership's affairs. As alleged above, at some time in or before February 2005, HKAllen agreed with at least one ERI Collaborator to pursue the Conspiracy. From that time until the present, HKAllen has generally orchestrated at least a substantial portion of the RICO Enterprise's execution of the Conspiracy.

304.     At all relevant times alleged herein, Burnes has controlled, directed and/or acted on behalf not only of HKAllen, but also HK Allen Inc., HKN Allen, HKN Manager LLC, HKN

Danville House LLC, Hall Keen Investments LLC, HallKeen LLC and HKM. As a result, Burnes

has managed, controlled and directed the RICO Enterprise by controlling and directing the

participation in the Conspiracy of nearly all of the HK Collaborators, and by acting on behalf of

those HK Collaborators as they acted in furtherance of the Conspiracy.

305.    The RICO Defendants directly supported the successful execution of Phase One

– and indirectly supported the successful execution of Phase Two – by misrepresenting the

financial health of the Partnership to condition the Independent Limited Partners to sell their LP

Units to an ERI Collaborator. The RICO Defendants supported the successful execution of

Phase Two by misrepresenting the true nature of the Sale and Exchange and its economic impact

on the Holder LPs. In all cases, the RICO Defendants communicated their misrepresentations in

documents that they mailed from Massachusetts to Holder LPs in at least six other states:

California, Washington, Kansas, Maryland, Delaware and North Carolina. These documents

include:

a.    The 2005 Burnes Letter, dated February 15, 2005, signed by Burnes and

printed on HallKeen LLC letterhead, which falsely described the Partnership's financial condition

as "discouraging" and "perilous," and suggested that the Partnership's ability to cover its

expenses and mortgage payments was "bleak." Its purpose was to condition the Independent

Limited Partners to accept the ERI Collaborators' forthcoming offers to buy LP Units for

abusively low prices, which offers Burnes knew the ERI Collaborators would send to the

Independent Limited Partners in furtherance of the Conspiracy;

b.    The 2013 Burnes Letter, dated February 13, 2013, signed by Burnes and

printed on HKM letterhead, which was intended not to protect Limited Partners from third

parties who might offer to buy their LP Units for low-ball prices, but to diminish any possibility

that one or more Independent Limited Partners might jeopardize the success of Phase Two by selling LP Units to a third party who is not an ERI Collaborator;

      c.     The March 26, 2015, Consent Request, from HKAllen and printed on HKM letterhead, which contained a litany of material misrepresentations and material omissions, all intended to cause the Holder LPs to consent to the Sale and Exchange even though doing so would reduce the value of their LP Units by more than 60%;

      d.     Update Number One, from HKAllen, printed on HKM letterhead and dated April 28, 2015, which announced the formal approval of the Sale and Exchange, restated the core misrepresentations about the Sale and Exchange that were in the Consent Request, and misled the Holder LPs into believing that the modification to the Sale and Exchange it announced would fully address the concerns that the dissenting Limited Partners had communicated to HKAllen, when in fact the modification had essentially no material effect on the transaction and addressed none of the concerns of the dissenting Limited Partners;

      e.     Update Number Two, from HKAllen and dated May 11, 2015, which grossly misrepresented the concerns raised by the dissenting Limited Partners, mischaracterized the dissenting Limited Partners as spoilers, and threatened to replace the Sale and Exchange with yet another transaction from which HKAllen would improperly profit at the expense of the Holder LPs;

      f.     Update Number Three, from HKAllen and dated May 18, 2015, which reported that HKAllen continued to work to complete the Sale and Exchange as quickly as possible, and also continued to misrepresent the dissenting Limited Partners as spoilers whose concerns caused delay and additional expense to the Partnership, when in fact HKAllen and the Collaborators were in the process of stealing millions of dollars from the Holder LPs. Update Number Three also contained, buried in the last four pages of 167 pages of exhibits and

attachments, information from which a Limited Partner could for the first time deduce that the

process by which the Sale and Exchange was approved was a sham;

   g. The Confirmation of Consent, from Burnes in his capacity as President of

HKM and dated May 22, 2015, which announced a highly atypical "straw poll" to reconfirm the

earlier approval of the Sale and Exchange, falsely stated that the dissenting Limited Partners

"have not engaged us substantively on their specific concerns within the proposed Sale and

Exchange," improperly suggested that the dissenting Limited Partners "do not understand the

role of a general partner in a partnership such as this one," and, in flagrant breach of its fiduciary

obligations to the Limited Partners, falsely stated that the Sale and Exchange is "what is best for

the limited partners in Danville House;"

   h. The Closing Memo, from HKAllen, printed on HKM letterhead and

dated September 15, 2015, which announced the completion of the Sale and Exchange, stated

that the distributions were "substantially in conformance with the closing benefits projected in

the Consent Request" but provided no explanation whatsoever for the reduction in those

distributions from the numbers provided earlier, and continued to misrepresent the Sale and

Exchange as an above-board transaction and "an excellent result for the partners of the Hotel

Danville Company;" and

   i. The September 2016 Cash Flow Memo, from HKAllen and printed on

HKM letterhead, which announced to each Holder LP "a check representing your portion of the

2016 mid-year available cash flow distribution minus the 2015 Virginia Tax Liability the

partnership has paid on your behalf" and falsely implied to each Holder LP that the amount of

the check was the full amount that the Holder LP was entitled to receive. In fact, the amount of

this distribution to each Holder LP was substantially smaller than it should have been – because

the Collaborators completed the Sale and Exchange by fraudulent and other improper means, all as set forth in this Complaint.

306.    Pursuant to and in furtherance of their intentional and fraudulent scheme to defraud each of the Holder LPs by supporting the successful execution of Phase One and Phase Two of the Conspiracy, the RICO Defendants committed at least 90 related acts of mail fraud, as listed below:

a.    By mailing the 2005 Burnes Letter from Massachusetts to each of the ten Holder LPs at their addresses in California, Washington, Kansas, Maryland, Delaware and North Carolina, Burnes committed ten acts of mail fraud in violation of 18 U.S.C. § 1341;

b.    by mailing the 2013 Burnes Letter from Massachusetts to each of the ten Holder LPs at their addresses in California, Washington, Kansas, Maryland, Delaware and North Carolina, Burnes committed ten acts of mail fraud in violation of 18 U.S.C. § 1341;

c.    by mailing the Consent Request from Massachusetts to each of the ten Holder LPs at their addresses in California, Washington, Kansas, Maryland, Delaware and North Carolina, HKAllen committed ten acts of mail fraud in violation of 18 U.S.C. § 1341;

d.    by mailing Update Number One from Massachusetts to each of the ten Holder LPs at their addresses in California, Washington, Kansas, Maryland, Delaware and North Carolina, HKAllen committed ten acts of mail fraud in violation of 18 U.S.C. § 1341;

e.    by mailing Update Number Two from Massachusetts to each of the ten Holder LPs at their addresses in California, Washington, Kansas, Maryland, Delaware and North Carolina, HKAllen committed ten acts of mail fraud in violation of 18 U.S.C. § 1341;

f.    by mailing Update Number Three from Massachusetts to each of the ten Holder LPs at their addresses in California, Washington, Kansas, Maryland, Delaware and North Carolina, HKAllen committed ten acts of mail fraud in violation of 18 U.S.C. § 1341;

g.      by mailing the Confirmation of Consent from Massachusetts to each of the ten Holder LPs at their addresses in California, Washington, Kansas, Maryland, Delaware and North Carolina, Burnes committed ten acts of mail fraud in violation of 18 U.S.C. § 1341;

h.      by mailing the Closing Memo from Massachusetts to each of the ten Holder LPs at their addresses in California, Washington, Kansas, Maryland, Delaware and North Carolina, HKAllen committed ten acts of mail fraud in violation of 18 U.S.C. § 1341; and

i.      by mailing the September 2016 Cash Flow Memo from Massachusetts from Massachusetts to each of the ten Holder LPs at their addresses in California, Washington, Kansas, Maryland, Delaware and North Carolina, HKAllen committed ten acts of mail fraud in violation of 18 U.S.C. § 1341.

307.    The predicate acts listed in Paragraph 306 above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5). The RICO Defendants committed this series of related predicate acts over a period of more than eleven years, thus easily satisfying the requirements for closed-end continuity. Moreover, and in the alternative, the related predicate acts set forth above constitute a portion of an open-ended pattern of racketeering. This is because the Partnership continues to exist, and HKAllen will continue for the foreseeable future to send cash distributions to the Holder LPs in amounts that are substantially smaller than the Holder LPs are entitled to receive while representing that the payments are correct. In fact, apart from this continued pattern of racketeering that will accompany the operation of the Property by Burnes (through the entities that he controls), there are two other scenarios where the RICO Defendants can be expected to short-change the Holder LPs substantially in the coming years while representing, explicitly or implicitly, that they are acting in those Holder LPs' best interests.

a. The first scenario is a sale of the Property after September 10, 2017, but before December 31, 2030. In that scenario, the RICO Defendants and the Collaborators in the RICO Enterprise will wrongfully take half of the proceeds that should be paid to the Holder LPs.

b. The second scenario is that the Property is not sold before December 31, 2030. The Partnership Agreement provides that: (i) the Partnership terminates on December 31, 2030; and (ii) "all the Investor Limited Partners must give their consent in writing to any amendment" that would amend that termination date. Accordingly, if the RICO Enterprise does not cause the Property to be sold before December 31, 2030, then HKAllen will have to liquidate the Partnership by December 31, 2030. Given HKAllen's habitual violations of its duties to the Holder LPs, there is every reason to believe that HKAllen will conduct the liquidation in such a way that HKAllen and its affiliates wrongfully take yet another substantial portion of what remains of the Holder LPs' equity interest in the Partnership and its assets.

308. As set forth above, HKAllen and Burnes have directly and indirectly conducted and participated in the conduct of the RICO Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

309. The direct and proximate result of the HKAllen's and Burnes' racketeering activities and violations of 18 U.S.C. § 1962(c) was the diminution of the value of the 5.67 LP Units owned, in the aggregate, by the Holder LPs. The diminution was at least $480,000 per LP Unit – or over $2.72 million for all the Holder LPs as a group.

## SECOND CAUSE OF ACTION

### 18 U.S.C. § 1964(c) Based on Violation of 18 U.S.C. § 1962(d)

(Holder LPs Against Defendants HKM, HallKeen LLC, HK Allen Inc. and Dagbjartsson)

310.    Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

311.    As set forth above, each of HKM, HallKeen LLC, HK Allen Inc. and Dagbjartsson (collectively, the "**RICO Co-Conspirators**") knowingly and intentionally agreed and conspired to violate 18 U.S.C. § 1962(c) by adopting the RICO Enterprise's goal of executing the Conspiracy, and acting in furtherance of the violations of 18 U.S.C. § 1962(c) described in the First Cause of Action. Specifically:

a.    HKM acted in furtherance of the violations of 18 U.S.C. § 1962(c) described in the First Cause of Action by: (i) allowing each of the Consent Request, Update Number One, the Confirmation of Consent, the Closing Memo and the September 2016 Cash Flow Memo to be printed on HKM letterhead; (ii) allowing its contact information and that of two of its employees to appear in each of documents listed in clause (i) above as well as Update Number Two and Updated Number Three; and (iii) mailing to the Independent Limited Partners LPs, on behalf of HKAllen, each of the Consent Request, Update Number One, Update Number Two, Update Number  Three, the Confirmation of Consent, the Closing Memo and the September 2016 Cash Flow Memo about the Sale and Exchange.

b.    HallKeen LLC acted in furtherance of the violations of 18 U.S.C. § 1962(c) described in the First Cause of Action by: (i) allowing each of the 2005 Burnes Letter and the 2013 Burnes Letter to be printed on HallKeen LLC letterhead; and (ii) mailing to the Independent Limited Partners LPs each of the 2005 Burnes Letter and the 2013 Burnes Letter.

c.      HK Allen Inc. and HKN Allen are the two general partners of HKAllen. In that capacity, HK Allen Inc. and HKN Allen have caused HKAllen to commit six of the predicate acts (constituting at least 60 counts of mail fraud) set forth in the First Cause of Action.

d.      Dagbjartsson, by virtue of his direct or indirect control of all of the ERI Collaborators, generally orchestrated the participation of the ERI Collaborators in the Conspiracy, which participation included, without limitation: (1) personally signing every agreement by which an ERI Collaborator purchased LP Units from a Seller LP, thus substantially contributing to the completion of Phase One, which completion was an essential component of Phase Two; (2) promising to HKAllen long before 2015 that the ERI Collaborators would support Phase Two; and (3) causing Newton Fund, Milton Fund and Belmont Fund to consent to the Sale and Exchange after HKAllen distributed the Consent Request. The promise to HKAllen to support Phase Two substantially induced HKAllen to solicit support for the Sale and Exchange, which solicitation included seven violations of 18 U.S.C. § 1962(c) as set forth in the First Cause of Action (six by HKAllen and one – the Confirmation of Consent – by Burnes). Causing Newton Fund, Milton Fund and Belmont Fund to consent to the Sale and Exchange facilitated at least six of the predicate acts described in the First Cause of Action (Update Number One and every predicate act after that). One example: consent from Newton Fund, Milton Fund and Belmont Fund substantially enabled Burnes to state in the Confirmation of Consent that the Sale and Exchange had been "approved by 95% of the limited partners." Apart from being misleading, as described above, that statement was a crucial component of Burnes' effort to push the Sale and Exchange quickly to completion by discrediting the dissenting Limited Partners in the eyes of the other Holder LPs, by depicting them not only as unreasonable and ignorant of the proper role of a general partner, but also a very small minority. One likely reason for Burnes' hurry: if the Sale and Exchange did not close in 2015, then HKAllen would have to distribute to the Limited

Partners more than $30,000 of income per LP Unit for 2015; Burnes knew the Limited Partners may not so readily consent to the Sale and Exchange after they knew the income they would earn if the Partnership chose to complete no transaction at all.

312.    The conduct described in the immediately preceding Paragraph 311 constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c), in violation of 18 U.S.C. § 1962(d).

313.    As direct and proximate result of the Conspiracy that was joined, facilitated and promoted by the RICO Co-Conspirators, which Conspiracy included the pattern of racketeering activities in violation of 18 U.S.C. § 1962(c) set forth in the First Cause of Action, Holder LPs have suffered a dramatic diminution in the value of LP Units they hold. In the aggregate, the Holder LPs own 5.67 LP Units. The diminution was at least $480,000 per LP Unit – or over $2.72 million for all the Holder LPs as a group.

### THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty

(All Plaintiffs Against Defendants Allen and HKAllen)

314.    Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

315.    During the periods of time alleged herein, there existed between Plaintiffs and Defendants Allen and HKAllen, a fiduciary and/or confidential relationship upon which Plaintiffs justifiably relied to their detriment.

a.    Allen owed a fiduciary duty from the creation of the Partnership to approximately January 1, 2001, to all Plaintiffs, because Allen was then a General Partner of the Partnership.

b.       HKAllen has owed a fiduciary duty from approximately January 1, 2001, to the present, and still owes a fiduciary duty to all Plaintiffs who remain Limited Partners, because HKAllen has been a General Partner of the Partnership since approximately January 1, 2001.

316.     Pursuant to said fiduciary duties, Defendants Allen and HKAllen owed the utmost good faith and fairness to Plaintiffs in all matters pertaining to such Defendants' conduct with respect to Plaintiffs' property and investment in the Partnership.  Such Defendants furthermore had a duty to disclose all material facts pertaining to such investments and such Defendants' personal interests and benefits accruing from any action or potential action involving said investments, including transfers of interests and sales of same.  Moreover, these fiduciary duties included a duty to disclose all material information, including information relevant to operation and ownership of the Partnership, information relevant to each Limited Partner's rights under the Partnership Agreement, and other information as designated by the Partnership Agreement.  For example, per the Partnership Agreement, Defendant Allen had an express obligation to disclose to the Limited Partners their option to purchase the interest of a defaulting limited partner, where the general partners had not exercised their option to purchase the defaulting partner's interest within thirty days after the default.

317.     Defendants Allen and HKAllen accepted the reliance of Plaintiffs on their fiduciary and confidential relationships.

318.     Defendants Allen and HKAllen breached their aforesaid duties as alleged herein, and in so doing gained an advantage over Plaintiffs in matters relating to the management and control of their Partnership-related assets.

319.     In particular and without limiting the generality of the foregoing, Defendants Allen and HKAllen breached their fiduciary duties by each of the following:

a.      Defendant Allen violated and breached his fiduciary duties to all of the Plaintiffs by failing to disclose that Pfeiffer had defaulted on his obligations under the Partnership Agreement and that the general partners had not exercised their option to purchase his interest within thirty days of such default.  By purchasing half of Pfeiffer's interest for himself and by permitting Myerson to purchase the other half, Defendant Allen violated the fiduciary duty he owed to all Plaintiffs, because the Partnership Agreement required him to present that opportunity to all of the Plaintiffs and the rest of the Limited Partners.  Allen wrongfully usurped an opportunity that rightfully belonged to the Limited Partners, and Plaintiffs have suffered harm equal to the investment gains they would have realized had the opportunity been presented to them.

b.      Defendant HKAllen breached its fiduciary duty to each of Plaintiffs Hamill and McKinney by participating with Burnes, HK Allen Inc., and Hall Keen Investments to induce each of Plaintiffs Hamill and McKinney by means of fraudulent misrepresentation and material omission to sell one LP Unit to Hall Keen Investments for the token sum of $100.00, by helping to arrange those sales, and by expressly approving each of these sales with the knowledge that the sales were adverse to the interests of each of Hamill and McKinney. HKAllen knew that the price paid for each LP Unit – $100 – was a small fraction of one LP Unit's true value at the time, and HKAllen knew that it and/or one or more of its affiliates would profit from the sales at the expense of Hamill and McKinney. The magnitude of this ill-gotten gain is extraordinary. Each LP Unit improperly acquired from Hamill and McKinney for $100 was worth at least $780,000 until, upon completing the Sale and Exchange, Defendants wrongfully stole at least $480,000 of that value.

c.      Defendant HKAllen breached its fiduciary duty to all Plaintiffs other than Hamill and McKinney by orchestrating, promoting and participating in the entire Conspiracy, which participation included, without limitation, the following three primary activities:

i.      First, HKAllen allowed and/or directed its affiliate, HKM, to mismanage the Partnership such that certain expenses including, without limitation, salaries and wages were overpaid to the extent that the Partnership paid higher operating expenses than it should have paid. This overpayment (i) was never disclosed to the Limited Partners, (ii) devolved directly or indirectly to the benefit of HKAllen and/or its affiliates, (iii) harmed the Limited Partners by reducing – sometimes to zero – the cash distributions the Partnership paid to the Limited Partners; (iv) contributed to Phase One of the Conspiracy by making the Partnership's finances appear less healthy than they were and by causing the Partnership to be unable to distribute cash dividends to the Limited Partners in several years, both of which lent credence to the Collaborators' many misrepresentations of the Partnership's financial condition and the liabilities of continuing to own LP Units, and helped to convince Limited Partners to sell their LP Units at abusively low prices; (v) contributed to Phase Two of the Conspiracy by promoting the success of Phase One, which was an essential component of the success of Phase Two; and (vi) contributed directly to Phase Two by conditioning the Limited Partners, including the Holder LPs, to expect little by way of economic return from the Partnership and, ultimately, to accept returns far lower than those to which they were and are rightfully entitled, and to believe the Consent Request's misrepresentations about to the Sale and Exchange and the value of the Partnership.

ii.      Second, HKAllen expressly approved every single sale of LP Units from the Seller LPs other than Hamill and McKinney to Newton Fund, Milton Fund, Concord Fund and Belmont Fund with the knowledge that refusing to grant such approval could have

prevented the sales from occurring. HKAllen failed to disclose to these Seller LPs each of the following facts, which was at the relevant time actually known to HKAllen: (i) the fact of HKAllen's participation in the Conspiracy; (ii) the fact that the purchases by the ERI Collaborators were an essential component of the Conspiracy whose express purpose was, at the culmination of Phase Two, to generate for the HK Collaborators and the ERI Collaborators returns of a magnitude that are seldom earned by those who conduct their business in compliance with the law, and all at the direct expense of the Limited Partners; (iii) the fact that HKAllen and its affiliates would, by virtue of the Conspiracy, profit at the expense of every Seller LP who sold LP Units to the any of the ERI Collaborators; (iv) the fact that, upon information and belief, HKAllen and/or one or more of its affiliates directed, approved or acquiesced to the mailing of the 2005 Burnes Letter to the Limited Partners, which materially misrepresented the Partnership's financial prospects in a way intended to condition the Seller LPs to sell their LP Units in response to the offers mailed to them by the ERI Collaborators; (v) the fact that, upon information and belief, HKAllen and/or one or more of its affiliates directed, approved or acquiesced to the mailing of the 2013 Burnes Letter to the Limited Partners, which was intended not to protect Limited Partners from third parties who might offer to buy their LP Units for low-ball prices, but to advance the Conspiracy by reducing the chances that, just as the Collaborators had almost completed Phase One, one or more Independent Limited Partners might jeopardize the success of Phase Two by selling LP Units to a third party who is not an ERI Collaborator and who, therefore, might not be fooled by the fraudulent solicitations HKAllen planned to distribute to obtain consent to the Sale and Exchange; (vi) material facts known to HKAllen regarding the true financial condition and prospects for the Property and the Limited Partners' investments in the Partnership that, if revealed to the Limited Partners, would most likely have caused the Limited Partners not to sell to any of the ERI Collaborators; (vii) the fact that the prices offered

by the ERI Collaborators in the 2006 ERI Offer, the March 2007 Offer, the September 2007

Offer, the 2008 ERI Offer, the 2008 ERI Reminder and the 2012 ERI Offer were, in each case,

abusively low; (viii) the fact that the prices actually paid to the Seller LPs for their respective LP

Units were, in each case, abusively low; and (ix) other material facts as set forth in this Complaint.

           iii.        Third, HKAllen orchestrated, participated in, and failed honestly

to disclose to the Holder LPs, Phase Two of the Conspiracy, which it executed together with

HKM, Burnes, HK Allen Inc., HKN Allen, HKN Manager LLC, Hall Keen Investments and the

ERI Collaborators. Such orchestration, participation and failure to disclose included, without

limitation, the following acts: (i) failing to disclose before seeking consent of the Limited Partners

to the Sale and Exchange the fact that HKAllen, its affiliates, and the ERI Collaborators owned

48.75% of the LP Units; (ii) materially misrepresenting numerous aspects of the Sale and

Exchange so that the Holder LPs would understand the Sale and Exchange as a transaction that

is beneficial to them when, in fact, it substantially harmed the Holder LPs and benefited HKAllen

and its affiliates and collaborators; (iii) failing to disclose the true facts regarding the financial

condition or prospects of the Partnership; (iv) failing to disclose the true financial implications of

the Sale and Exchange to the Holder LPs, to HKAllen and its affiliates, and to the ERI

Collaborators; (v) failing to disclose that the Sale and Exchange would reduce the degree to

which the Limited Partners could influence the Property's management, operations, and

disposition; (vi) failing to disclose that the Sale and Exchange would diminish the value to the

Holder LPs of HKAllen's ongoing fiduciary obligations to the Holder LPs; (vii) misleading the

Holder LPs into believing that the modification announced in Update Number One cured the

serious inequities and other flaws in the Sale and Exchange that the dissenting Limited Partners

communicated to HKAllen; (viii) grossly misrepresenting in Update Number Two the concerns

and issues raised by the dissenting Limited Partners; (ix) dishonestly implying that 95% of the

limited partners had affirmatively approved the Sale and Exchange; (x) failing to ensure that the Sale and Exchange was in the Holder LPs' best interests; (xi) consummating the Sale and Exchange, by which HKAllen and its affiliates stole millions of dollars from the Holder LPs for no consideration whatsoever, and by which the ERI Collaborators realized returns in excess of 2500% on their purchases of LP Units from the Seller LPs; and (xii) since the completion of the Sale and Exchange, by declining to exercise its authority under the operating agreement of the Property's New Owner to remove HKN Manager LLC from its position as manager of the New Owner, HKAllen has been allowing HKN Manager LLC to operate the Property and handle its finances in a manner consistent with the structure established by the Sale and Exchange, which HKAllen knows to be in gross violation of its own fiduciary duties to the Holder LPs.

320.    In breaching said duties as alleged herein, Defendants Allen and HKAllen proximately caused the Plaintiffs to suffer damages as follows:

a.    As to the breaches related to usurpation of the right to purchase Pfeiffer's interest, Defendant Allen proximately caused Plaintiffs damages because, if not for Defendants' breach, Plaintiffs would have had the option to purchase some or all of Pfeiffer's valuable 0.5 LP Unit for a price of $100 per 0.5 LP Unit and thereafter would have realized substantial gains, because that 0.5 LP Unit was then and is now worth substantially more than $100. Some or all of the Plaintiffs would have taken advantage of this opportunity.

b.    As to the breaches of duties owed to the Seller LPs other than Hamill and McKinney, HKAllen proximately caused all of the Seller LPs' damages by expressly and wrongfully approving the sale by each Seller LP of its LP Units to an ERI Collaborator at an abusively low price with the knowledge that it could have prevented each of these sales by refusing to approve it, thereby causing each Seller LP to lose the difference between the actual

fair market value of the LP Units and the price they received, and to forego future profits accruing to those LP Units in the form of income distributions and capital gains.

       c.    As to the breaches of duties owed to the Holder LPs, Defendants proximately caused the Holder LPs' damages by wrongfully inducing enough of them either to approve the Sale and Exchange affirmatively or not to respond at all to the Consent Request, so that Defendants obtained "Consent of the Investor Limited Partners" as defined in the Partnership Agreement, and were then able to complete the Sale and Exchange, which (i) substantially devalued the Holder LPs' LP Units; (ii) eroded the Holder LPs' rights to influence the management and disposition of the Property; and (iii) eroded the value of the fiduciary duties HKAllen still owes to the Holder LPs because HKAllen no longer directly controls the management and operations of the Property.

    321.    As a proximate cause of Plaintiffs' justified reliance on Defendants' misrepresentations and omissions of material fact, Plaintiffs suffered economic losses in an amount to be proven at trial.

    322.    In breaching said duties as alleged herein, Defendants Allen and HKAllen are required to disgorge their profits, and Plaintiffs are entitled to an award in the amount of these profits, and interest on all such sums from the respective dates of each injury.

    323.    As to each of the breaches of duty alleged herein prior to 2013, Plaintiffs did not have actual or constructive knowledge of the facts constituting the constructive fraud, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts. Moreover, Defendants had an affirmative duty of full and fair disclosure of said facts, thus Defendants' failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

324.     In performing the acts herein alleged, Defendants acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

325.     Under California Civil Code section 3345, Defendants are required to pay punitive damages to the California-resident Seller LPs and Holder LPs who were at least 65 years old when Defendants' wrongful conduct alleged herein harmed those Seller LPs and Holder LPs. Such punitive damages shall be in an amount up to three times greater than the amount the trier of fact would otherwise impose, because Defendants' conduct was directed to each of these Plaintiffs, and Defendants knew or should have known that each of these Plaintiffs was, at all relevant times, a senior citizen.

## FOURTH CAUSE OF ACTION

### Constructive Fraud

(All Plaintiffs Against Defendants Allen and HKAllen)

326.     Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

327.     During the periods of time alleged herein, there existed between Plaintiffs and Defendants Allen and HKAllen, a fiduciary and/or confidential relationship upon which Plaintiffs justifiably relied to their detriment.  The details of such fiduciary relationships and the dates during which these relationships existed are detailed in the Third Cause of Action. By virtue of the relationship between Plaintiffs and each of Defendants Allen and HKAllen, a fiduciary duty existed.

328.    Pursuant to said fiduciary duties, Defendants Allen and HKAllen owed the utmost good faith and fairness to Plaintiffs in all matters pertaining to their conduct with respect to Plaintiffs' property and investment in the Partnership. Defendants Allen and HKAllen furthermore had a duty to disclose all material facts pertaining to such investments and their personal interests and benefits accruing from any action or potential action involving said investments, including transfers of interest and sales of same.

329.    Defendants Allen and HKAllen accepted the reliance of Plaintiffs on the fiduciary and/or confidential relationship.

330.    Defendants Allen and HKAllen breached their aforesaid fiduciary duties as alleged herein, and in so doing gained an advantage over Plaintiffs in matters relating to the management, control and disposition of their Partnership-related assets.

331.    In particular and without limiting the generality of the foregoing, Defendants breached their duties as described in the Third Cause of Action.

332.    In breaching said duties as alleged herein, Defendants Allen and HKAllen proximately caused the Plaintiffs to suffer damages as described in the Third Cause of Action. As a proximate cause of Plaintiffs' justified reliance on Allen's and HKAllen's misrepresentations and omissions of material fact, Plaintiffs suffered economic losses in an amount to be proven at trial.

333.    In breaching said duties and committing said constructive fraud as alleged herein, Defendants Allen and HKAllen are required to disgorge their profits and Plaintiffs are entitled to an award in the amount of these profits, and interest on all such sums from the respective dates of each injury.

334.    As to each of the breaches of duty and commissions of constructive fraud alleged herein prior to 2013, Plaintiffs did not have actual or constructive knowledge of the facts

constituting the constructive fraud, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts. Moreover, Allen and HKAllen had an affirmative duty of full and fair disclosure of said facts, thus Allen's and HKAllen's failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

335.    In performing the acts herein alleged, Defendants Allen and HKAllen acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

336.    Under California Civil Code section 3345, Defendants are required to pay punitive damages to the California-resident Seller LPs and Holder LPs who were at least 65 years old when Defendants' wrongful conduct alleged herein harmed those Seller LPs and Holder LPs. Such punitive damages shall be in an amount up to three times greater than the amount the trier of fact would otherwise impose, because Defendants' conduct was directed to each of these Plaintiffs, and Defendants knew or should have known that each of these Plaintiffs was, at all relevant times, a senior citizen.

## FIFTH CAUSE OF ACTION

### Fraud

(All Plaintiffs Against Defendant Allen)

337.    Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

338.    As alleged herein, Allen falsely, fraudulently, and with the intent to deceive and defraud Plaintiffs, made multiple fraudulent and material omissions of facts, including but not limited to the following:

339.    Defendant Allen fraudulently omitted to disclose to all Plaintiffs that Pfeiffer had defaulted on his obligations under the Partnership Agreement and that the general partners had not exercised their option to purchase his interest within thirty days of such default, which facts Defendant Allen was under a fiduciary duty to disclose.  Defendant Allen furthermore fraudulently omitted to disclose that he and Myerson usurped Plaintiffs' rights by purchasing Pfeiffer's interest for themselves, and by delaying for nearly ten years after such purchases to disclose them to Plaintiffs. Even after the bare fact of the purchases by Allen and Myerson of Pfeiffer's interest was disclosed to the Plaintiffs in or about January 2001, neither Allen nor any of the other Defendants ever disclosed to Plaintiffs any of the circumstances surrounding Allen's and Myerson's acquisition of Pfeiffer's LP Units that might have alerted Plaintiffs to Allen's misconduct.

340.    Plaintiffs first learned about these circumstances and, as a result, the wrongful conduct of Allen and the harm such conduct caused Plaintiffs, in 2015 as a result of one Limited Partner's investigation of the Consent Request, which investigation included communications with Pfeiffer.

341.    Before the Plaintiffs learned in 2015 the facts that Allen wrongfully failed to disclose, Plaintiffs did not have actual or constructive knowledge of the facts constituting the constructive fraud, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts. Moreover, Allen had an affirmative duty of full and fair disclosure of said facts, thus Allen's and failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

342.    Plaintiffs are informed and believe and thereon allege that in truth and in fact, as the Allen well knew, Allen's failure to disclose facts he had a duty to disclose was intended to induce Plaintiffs' reasonable reliance, and thus was also fraudulent and that all of these fraudulent

omissions were made for the express purpose of defrauding Plaintiffs out of their rights, money, and property interests and converting same to Allen's and Myerson's and their affiliates' own use.

343.    As a proximate cause of Plaintiffs' justified reliance upon these omissions by Allen, Plaintiffs were denied the opportunity to which they were entitled to purchase some or all of Pfeiffer's valuable 0.5 LP Unit for a price of $100 per 0.5 LP Unit. If Plaintiffs had been given this opportunity to which they were entitled, some or all of the Plaintiffs would have exercised their right to purchase some of the LP Units, and those who did would have realized substantial gains in the value of the LP Units they bought, because that 0.5 LP Unit was then and is now worth substantially more than $100. Thus, by denying Plaintiffs the opportunity to purchase Pfeiffer's LP Units, denied Plaintiffs their rightful opportunity to earn a substantial profit. Allen denied Plaintiffs this opportunity so that he and Myerson could take the opportunity for themselves – as they did.

344.    In performing the acts herein alleged, Allen acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

345.    Under California Civil Code section 3345, Allen is liable to the California-resident Seller LPs and Holder LPs for punitive damages in an amount up to three times greater than the amount the trier of fact would otherwise impose because Allen's conduct was directed to each of these Plaintiffs, and such Defendants knew or should have known that one or more of these Plaintiffs was, at all relevant times, a senior citizen.

## SIXTH CAUSE OF ACTION

### Conspiracy to Commit Fraud

(All Plaintiffs Against Defendants Allen, HKAllen, HK Allen Inc., HKN Allen, HKN Manager LLC,

HKM, Hall Keen Investments, HallKeen LLC, Burnes, Carlen, ERI, Newton Fund, Milton Fund,

ERF Manager, ERF Fund 2011, ERF Fund 2013 and Dagbjartsson)

346.     Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

**Defrauding McKinney and Hamill**:

347.     As alleged herein, in or before April 2002, Defendants HKAllen, Burnes and Hall Keen Investments knowingly and willfully entered into an agreement and a conspiracy to defraud McKinney and Hamill.

348.     HKAllen, Burnes and Hall Keen Investments knowingly, willfully, falsely, fraudulently, and with the intent to deceive and defraud Hamill and McKinney, did defraud each of Plaintiffs Hamill and McKinney by: (i) intentionally misrepresenting that each of Hamill's and McKinney's investment in the Partnership was worthless and not likely to perform well in the future; (ii) making such misrepresentations for the purpose of inducing each of Hamill and McKinney to rely on those misrepresentations and to enter into an unfair and oppressive transaction so that Defendant Hall Keen Investments could purchase each of Hamill's and McKinney's LP Units at an abusively low price and, thereby, realize an extraordinarily high profit at the expense of each of Hamill and McKinney; (iii) failing, in violation of HKAllen's fiduciary duties to Hamill and McKinney, to disclose to Hamill and McKinney the true value of their LP Units and to ensure that the economic outcome of a transaction between its affiliate, Hall Keen Investments, and each of

Hamill and McKinney was fair to each of Hamill and McKinney; and (iv) causing each of Hamill and McKinney to agree to sell his LP Unit for only $100.00, which amount was only a small fraction of such LP Unit's true value.

**Defrauding All Plaintiffs Other Than McKinney and Hamill**:

349.    As alleged herein, Defendants HKAllen, HKM, Burnes, HK Allen Inc., HKN Allen, HKN Manager LLC, Hall Keen Investments, HallKeen LLC, Carlen, ERI, Newton Fund, ERF Manager LLC, Milton Fund, ERF Fund 2011, ERF Fund 2013 and Dagbjartsson, which Defendants are defined above as the Collaborators, all knowingly and willfully entered into an agreement and a conspiracy to defraud all of the Plaintiffs other than Hamill and McKinney by executing both Phase One and Phase Two of the Conspiracy.

350.    The Collaborators, acting together and in furtherance of Phase One and Phase Two of the Conspiracy, defrauded the Seller LPs by misrepresenting to the Seller LPs the condition and prospects of the Partnership and the Property, and by convincing the Seller LPs that their LP Units were worth far less than they were in fact worth and that it was in the Seller LPs' best interest to sell to one of the ERI Collaborators, which resulted in each of the Seller LPs: (i) reasonably relying on the apparent legitimacy of each of the ERI Collaborator's offers to purchase LP Units, HKAllen's implicit endorsement of those offers, and HKAllen's explicit approval of each such sale; and (ii) selling its LP Units to one of the ERI Collaborators at a price that was far below fair market value. The Collaborators achieved this fraud by, among other actions: (i) mailing the 2005 Burnes Letter to the Seller LPs; (ii) timing the distribution of the ERI Collaborators' offers to purchase LP Units to begin after years in which the Partnership allocated taxable income to Limited Partners but distributed no cash, and to be continue only in years when the same tax situation obtained; (iii) failing to disclose that the purchases of LP Units by the ERI Collaborators were essential acts in

furtherance of Phase One and Phase Two of the Conspiracy; (iv) failing to explain to the any of the Independent Limited Partners that the Partnership would, beginning in early 2014, begin to generate profits sufficient to pay cash distributions to the Limited Partners at a rate of more than $33,000 per LP Unit per year; (v) failing to disclose that, by virtue of the agreement among the Collaborators to execute both Phase One and Phase Two of the Conspiracy, every sale by a Seller LP to one of the ERI Collaborators was a self-dealing transaction from which HKAllen would profit at the expense of each Seller LP; (vi) failing to disclose that, by virtue of the agreement among the Collaborators to execute both Phase One and Phase Two of the Conspiracy, each ERI Collaborator who purchased LP Units from a Seller LP knew that the price it paid for those LP Units was abusively low in part because it knew that it would realize an enormous profit when it would receive just a fraction of each LP Unit's fair value upon completion of Phase Two; and (vii) HKAllen, in its capacity as general partner of the Partnership, formally and expressly approving every single purchase of LP Units made by any of the ERI Collaborators while knowing that the price each Seller LP received from the ERI Collaborator was abusively low, that it – HKAllen – would profit from the sale, and that, because HKAllen was a fiduciary to the Seller LPs, the Seller LPs would reasonably rely on HKAllen's approval of a sale as evidence of its fairness.

351.    The Collaborators defrauded the Holder LPs by: (i) completing Phase One, which is an essential component of Phase Two; (ii) intentionally misrepresenting, by means of both affirmative misrepresentation and by material omission, the Sale and Exchange transaction as one that is beneficial to and in the best interest of the Limited Partners, with the intent to cause enough of the Holder LPs reasonably to rely on such misrepresentations and either to approve the Sale and Exchange affirmatively or not to respond at all to the Consent Request, so that the Sale and Exchange would be approved under the applicable provisions of the Partnership Agreement; (iii) actually causing enough of the Holder LPs reasonably to rely on such misrepresentations so that

formal approval of the Sale and Exchange technically consistent with the Partnership Agreement's requirements was in fact obtained; (iv) misrepresenting to the Holder LPs that the modification to the Sale and Exchange announced in Update Number One cured the concerns voiced by two of the Holder LPs; (v) grossly misrepresenting in the Confirmation of Consent the concerns about the Sale and Exchange that two of the Holder LPs communicated to HKAllen, and portraying those Holder LPs as acting in a manner contrary to the interests of the other Holder LPs; (vi) erroneously implying in the same document that 95% of the Limited Partners had affirmatively approved the Sale and Exchange proposal when in fact, several Limited Partners had simply not responded at all to the Consent Request; and (vii) completing the Sale and Exchange and, thereby, stealing millions of dollars that rightfully belong to the Holder LPs.

352.    As set forth in detail herein, each of Defendants HKAllen, HKM, Burnes, HK Allen Inc., HKN Allen, HKN Manager LLC, Hall Keen Investments, HallKeen LLC, Carlen, ERI, Newton Fund, ERF Manager LLC, Milton Fund, ERF Fund 2011, ERF Fund 2013 and Dagbjartsson did falsely, fraudulently, and with the intent to deceive and defraud the all Plaintiffs other than Hamill and McKinney, commit at least one overt act in furtherance of the Conspiracy, as set forth below:

a.    HKM, in coordination with HKAllen, knowingly and intentionally, and without disclosure to the Limited Partners, mismanaged the Property by causing it to overpay for certain expenses, thereby contributing to Phase One and Phase Two of the Conspiracy as set forth in Paragraph 319(c)(i) hereof. HKM also participated in the fraudulent solicitation of the Limited Partners' consent to the Sale by, among other acts, (i) allowing each of the Consent Request, Update Number One, the Confirmation of Consent, the Closing Memo and the September 2016 Cash Flow Memo to be printed on HKM letterhead; (ii) allowing its contact information and that of two of its employees to appear in each of documents listed in clause (i) above as well as Update Number Two

and Updated Number Three; (iii) making these employees available to answer questions about the Sale and Exchange; and (iv) mailing to the Independent Limited Partners LPs, on behalf of HKAllen, each of the Consent Request, Update Number One, Update Number Two, Update Number Three, the Confirmation of Consent, the Closing Memo and the September 2016 Cash Flow Memo about the Sale and Exchange Exchange, Participated with HKAllen in sending solicitations for Sale and Exchange.

   b.  Along with Dagbjartsson, each of ERI, Newton Fund, ERF Manager LLC, Milton Fund, ERF Fund 2011, ERF Fund 2013, all of which are controlled by Dagbjartsson, contributed substantially in furtherance of Phase One and Phase Two by committing, among others, the following overt acts:

    i.  ERI mailed to the Limited Partners the 2006 Offer Package, the March 2007 ERI Letter and March 2007 ERI Letter, the September 2007 Offer Package, the 2008 Offer Package and the 2012 Offer Package.

    ii.  Each of Newton Fund and Milton Fund purchased LP Units from Seller LPs in direct furtherance of Phase One and in indirect furtherance of Phase Two.

    iii.  ERF Fund 2011 acted in its capacity as manager of Concord Fund: (a) to sign the Weide Assignment, thereby causing Concord Fund to purchase one LP Unit from the Weide Family Trust, and (b) to cause Concord Fund to assign its interest in the Weide Assignment to Belmont Fund.

    iv.  ERF Fund 2013 acted in its capacity as manager of Belmont Fund (a) to sign the Weide Assignment as Concord Fund's assignee, thereby causing Belmont Fund to purchase one LP unit from the Weide Family Trust, and (b) to complete the purchase of one LP Unit from the Weide Family Trust.

v.        Before circulating their respective offers to purchase LP Units, each of Newton Fund, Milton Fund, and ERF Fund 2011 (on behalf of Concord Fund) agreed to support Phase Two. Upon information and belief, ERI and/or Dagbjartsson caused each of them to so agree.

vi.        Before causing Belmont Fund to assume Concord Fund's rights in the Weide Assignment, ERF Fund 2013 caused Belmont Fund to agree to support Phase Two.

vii.        Each of Newton Fund, Milton Fund actually supported Phase Two by consenting to Sale and Exchange.

viii.        ERF Manager LLC actually supported Phase Two by causing Newton Fund to consent to the Sale and Exchange.

ix.        ERF Fund 2013 actually supported Phase Two by causing Belmont Fund to consent to the Sale and Exchange.

x.        Dagbjartsson personally signed every agreement by which each of Newton Fund, Milton Fund, Concord Fund and Belmont Fund purchased LP Units from each of the Seller LPs.

xi.        ERI and ERF Manager LLC both signed the two agreements by which Milton Fund purchased LP Units. ERI signed as sole member of ERF Manager LLC, which was manager of Milton Fund. Dagbjartsson signed as Manager of ERI.

xii.        ERF Fund 2011, in its capacity as manager of Concord Fund, signed the Weide Assignment. Dagbjartsson signed as managing member of ERF Fund 2011.

xiii.        ERF Fund 2013, in its capacity as manager of Belmont Fund, signed the Weide Assignment after Concord Fund assigned that agreement to Belmont Fund. Dagbjartsson signed as managing member of ERF Fund 2013.

xiv.    Dagbjartsson signed the $35,000 check that Belmont Fund mailed to Roberta Weide.

c.    HallKeen LLC printed the 2005 Burnes Letter on its letterhead and mailed it to the Independent Limited Partners. Burnes signed that letter as "Principal" of HallKeen LLC, indicating the letter was from both Burnes and HallKeen LLC. The 2005 Burnes Letter falsely represented the Partnership's financial condition and prospects as "bleak." It also explained unsuccessful efforts made by HallKeen LLC to improve the supposedly "perilous" situation, and promised that HallKeen LLC would continue to look for solutions. The descriptions of HallKeen LLC's efforts to improve the situation lent credibility to the false representations of the Partnership's financial state. By lending credibility to those misrepresentations, HallKeen LLC directly supported Phase One and indirectly supported Phase Two of the Conspiracy.

d.    HKAllen expressly approved every purchase of LP Units by an ERI Collaborator. Each such approval is also an act of HK Allen Inc., because (a) HKAllen, as a limited partnership, can act only through its general partner, and (b) HK Allen Inc. was the sole general partner of HKAllen when each HKAllen approved the purchase of LP Units from each Seller LP. Among other acts, HKAllen also: (a) directed HKM to mismanage the Property as set forth above; (b) fraudulently solicited approval of Sale and Exchange – Consent Request, Update Number One, Update Number Two, Update Number Three, Closing Memo, and September 2016 Cash Flow Memo; and (c) caused the Partnership to transfer the Property to New Owner. All of these acts of HKAllen that occurred before March 16, 2015 are attributable to HK Allen Inc., because HK Allen Inc. was during that time HKAllen's sole general partner. All of these acts of HKAllen's that occurred on or after March 16, 2015 are attributable to HK Allen Inc. and to HKN Allen, because HK Allen Inc. and HKN Allen have both been general partners of HKAllen since March 16, 2015.

e.      Among many other acts, Burnes signed every approval of each Seller LP's sale of LP Units to an ERI Collaborator; sent the 2005 Burnes Letter and the 2013 Burnes Letter; and signed, every key agreement to execute the Sale and Exchange – in more than one case he signed for every party to an agreement (see Paragraph 296 above).

f.      Carlen received LP Units from Newton Fund, and as a condition to such receipt, promised to support Phase Two of the Conspiracy. Carlen actually supported Phase Two by consenting to the Sale and Exchange even though he knew that the Sale and Exchange would devalue the LP Units he owned -- but would still enable him to receive an exceptionally large profit. Carlen signed on behalf of Franklin 81 to cause Franklin 81 to receive LP Units from Newton Fund and, upon information and belief, promised to support, and did in fact support, Phase Two on behalf of Franklin 81 even though he and Franklin 81 knew that the Sale and Exchange would devalue the LP Units Franklin 81 owned – but would still produce an exceptionally large return for Franklin 81.

g.      HallKeen Investments consented to Sale and Exchange with the knowledge that the Sale and Exchange would reduce the value of its LP Units – but would, in other ways, produce an enormous financial return for the affiliates of HallKeen Investments and for the HK Controlling Persons.

h.      HKN Manager LLC took numerous acts in furtherance of Phase Two, including, without limitation, executing, on behalf of New Owner, the documents for the New Loan; and, signing the limited liability company agreement of New Owner as manager of New Owner, thereby committing itself to cause New Owner to operate the Property in accordance with the Sale and Exchange, including causing New Owner wrongfully to divert to HKN Allen and others distributions that the Holder LPs are entitled to receive.

i.    HKN Allen signed the limited liability company operating agreement of New Owner as the sole Class B Member. Under that agreement, the Class B member receives 50% of the Property's cash flow after the Priority Return is paid to the Partnership. By signing the agreement as Class B Member, HKN Allen agreed to receive the cash flows from the Property that all of the participants in the Conspiracy helped to steal from the Holder LPs. Notably, HKN Allen is also: (a) the sole member of HKN Manager LLC; and (b) a general partner of HKAllen, along with HK Allen Inc. Thus, HKN Allen occupies a uniquely powerful and protected position: it receives the loot; it fully controls New Owner by virtue of its full control of HKN Manager LLC; and the person who controls HKN Allen – Andrew Burnes – has essentially complete control of the Partnership. Burnes controls the Partnership, because he controls HKN Allen and HK Allen Inc., which are the two general partners of HKAllen. HKAllen remains the Partnership's sole general partner. Upon information and belief, HKN Allen agreed to occupy this unique position to ensure that the HK Controlling Persons keep the cash flows they stole by executing the Sale and Exchange.

353.    Plaintiffs are informed and believe and thereon allege that in truth and in fact, as the Collaborators well knew, their representations were false and were intended to induce Plaintiffs' reasonable reliance, and thus were also fraudulent and that all of these fraudulent misrepresentations and omissions were made for the express purpose of defrauding Plaintiffs out of their rights, money, and property interests and converting same to such Defendants' and such Defendants' affiliates' own use.

354.    Plaintiffs are informed and believe and thereon allege that the true facts were known to the Collaborators at the time of the making of said misrepresentations and fraudulent omissions, and such Defendants made the misrepresentations and omissions to deceive and defraud Plaintiffs as detailed herein and for the purpose of fraudulently inducing Plaintiffs to act in reliance thereupon and to entrust and/or convey their property and interests to such Collaborators and such

Collaborators affiliates, and to induce a sufficient number of the Holder LPs to approve the Sale and Exchange Transaction, and to prevent Plaintiffs from making further inquiry.

355.    As a proximate cause of the justified reliance upon these misrepresentations and omissions by a sufficient number of Plaintiffs and other Independent Limited Partners, and the subsequent conduct of the Collaborators and such Collaborators' affiliates, as described herein, Plaintiffs suffered economic damages in an amount to be proven at trial.

356.    Before 2015, Plaintiffs did not have actual or constructive knowledge of the facts constituting the fraud described in this Sixth Cause of Action, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts.  Moreover, Defendants Allen and HKAllen had an affirmative duty of full and fair disclosure of said facts, thus such Defendants' and such Defendants' affiliates' failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

357.    The last overt act of the Conspiracy occurred no earlier than on or about September 16, 2016, when HKM mailed the September 2016 Cash Flow Memo to the Limited Partners. Nonetheless, the Conspiracy is ongoing.

358.    In performing the acts herein alleged, the Collaborators acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

359.    Under California Civil Code section 3345, the Collaborators are liable to the California-resident Seller LPs and Holder LPs for punitive damages in an amount up to three times greater than the amount the trier of fact would otherwise impose because such Defendants' conduct was directed to each of these Plaintiffs, and such Defendants knew or should have known that one or more of these Plaintiffs was, at all relevant times, a senior citizen.

## SEVENTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty and

### Aiding and Abetting Constructive Fraud

(All Plaintiffs Against Defendants Hall Keen Investments, Burnes, HK Allen Inc., HallKeen LLC,

HKM, HKN Manager LLC, HKN Allen, and the ERI Collaborators)

360.    Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

**Purchases by Hall Keen Investments:**

361.    HK Allen Inc., Hall Keen Investments and Burnes knew that Defendant HKAllen owed a fiduciary duty to the Seller LPs and their predecessors in interest, because HKAllen was a general partner of the Partnership.

362.    HK Allen Inc., Hall Keen Investments and Burnes knew that Defendant HKAllen violated its fiduciary duties to each of Hamill and McKinney by, among other things, engaging in the conduct set forth in the Third Cause of Action.

363.    HK Allen Inc., Hall Keen Investments and Burnes knew or should have known that HKAllen's herein-described breaches of fiduciary duty also constituted constructive fraud against Hamill and McKinney and their predecessors in interest.

364.    Knowingly and intentionally, HK Allen Inc., Hall Keen Investments and Burnes substantially assisted and encouraged Defendant HKAllen in its breaches of its fiduciary duties and commission of constructive fraud as alleged herein, including by, among other actions: (i) in the case of Hall Keen Investments, purchasing one LP Unit from each of Hamill and McKinney

122

for the nominal price of only $100.00 per LP Unit, when Hall Keen Investments was an affiliate of HKAllen and the profits Hall Keen Investments would reap from this purchase came at the expense of Hamill and McKinney and would, by virtue of the relationship between HKAllen and Hall Keen Investments, benefit many, if not all, of the same individuals who would benefit if HKAllen had purchased the LP Units directly; (ii) in the case of HK Allen Inc., acting in its capacity as general partner of HKAllen to cause HKAllen approve Hall Keen Investments' purchase of LP Units from each of Hamill and McKinney; (iii) in the case of Burnes, upon information and belief, communicating with and/or directing the communication with each of Hamill and Burnes to induce them to sell their LP Units, preparing and sending to each of Hamill and McKinney the documents by which Hall Keen Investments purchased their LP Units, and signing each of the Hamill Assignment and the McKinney Assignment both in his capacity as Manager of Hall Keen Investments and as President of HK Allen Inc., which was the general partner of HKAllen, to evidence HKAllen's consent to the assignments.

365.    HK Allen Inc., Hall Keen Investments and Burnes therefore aided and abetted HKAllen's breaches of its fiduciary duties and commissions of constructive fraud connected with the purchase by Hall Keen Investments of LP Units from Hamill and McKinney.  As a result, HK Allen Inc., Hall Keen Investments and Burnes are jointly responsible with HKAllen for the damages proximately caused and resulting from those breaches and acts.

366.    As a direct result of substantial assistance that HK Allen Inc., Hall Keen Investments and Burnes provided to HKAllen in its breaches of its fiduciary duties and constructive fraud, Hamill and McKinney were fraudulently induced into selling their LP Units for far less than their real value, and each of Hamill and McKinney lost his rights to future income, capital gains and other benefits from those LP Units.

**Phase One of the Conspiracy:**

367.    HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Collaborators knew that Defendant HKAllen owed a fiduciary duty to the Seller LPs and their predecessors in interest, because HKAllen was a general partner of the Partnership.

368.    HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Collaborators knew that Defendant HKAllen violated its fiduciary duties to each of the Seller LPs by: (i) participating in the Conspiracy; (ii) materially misrepresenting material facts about the Partnership; (iii) failing to disclose material facts about the Partnership; (iv) expressly approving every single sale of LP Units from the Seller LPs to an ERI Collaborator, while knowing that it would profit from each such sale at the expense of each Seller LP; and, among other things; (v) engaging in the conduct set forth in the Third Cause of Action.

369.    HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Collaborators knew or should have known that HKAllen's herein-described breaches of fiduciary duty also constituted constructive fraud against the Seller LPs and their predecessors in interest.

370.    Knowingly and intentionally, HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Collaborators substantially assisted and encouraged Defendant HKAllen in its breaches of its fiduciary duties and commission of constructive fraud as alleged herein, including by, among other actions: (i) in the case of the ERI Collaborators, soliciting, documenting, and, with assurance from HKAllen of its approval, completing the below-market and substantially unfair purchases of LP Units from the Seller LPs and agreeing to share with HKAllen a portion of the profit they would realize upon completion of Phase Two, as described in detail herein; (ii) in the case of HK Allen Inc., acting in its capacity as general partner of HKAllen to cause HKAllen approve every purchase of LP Units made by any of the ERI Collaborators; (iii) in the case of HallKeen LLC and Burnes, sending the 2005 Burnes Letter; (iv) in the case of Burnes, signing the

General Partner Consent for every purchase of LP Units made by any of the ERI Collaborators; and (v) in the case of HKM, mismanaging the Property by, among other things, overpaying for salary, wage and benefits, and other expenses, without disclosing such overpayment to the Limited Partners, which undisclosed overpayment caused the Partnership to pay approximately $60,000 more per year in operating expenses than was necessary and enabled Burnes and HallKeen LLC to employ in the 2005 Burnes Letter the false premise that the long term ability of the Partnership pay its operating expenses and loan payments was "bleak."

371.    HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Collaborators therefore aided and abetted HKAllen's breaches of its fiduciary duties and commissions of constructive fraud. As a result, HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Collaborators are jointly responsible with HKAllen for the damages proximately caused and resulting from those breaches and acts.

372.    As a direct result of substantial assistance that HK Allen Inc., HKM, HallKeen LLC, Burnes and the ERI Collaborators provided to HKAllen in its breaches of its fiduciary duties and constructive fraud, the Seller LPs and their predecessors in interest were fraudulently induced into selling their LP Units for far less than their real value, and the Seller LPs lost their rights to future income, capital gains and other benefits from those LP Units.

**Phase Two of the Conspiracy:**

373.    HKN Allen, HKN Manager LLC, HKM, Burnes and the ERI Collaborators knew throughout 2015 that Defendant HKAllen owed and still owes a fiduciary duty to the Holder LPs, because HKAllen was and is the sole general partner of the Partnership.

374.    HKN Allen, HKN Manager LLC, HKM, Burnes and the ERI Collaborators knew that Defendant HKAllen violated its fiduciary duties to each of the Holder LPs as alleged

herein, including by participating in Phase One and Phase Two of the Conspiracy and, among

other things, engaging in the conduct set forth in the Third Cause of Action.

375.    HKN Allen, HKN Manager LLC, HKM, Burnes and the ERI Collaborators

knew or should have known that HKAllen's herein-described breaches of fiduciary duty also

constituted constructive fraud against the Holder LPs.

376.    Knowingly, intentionally and with malice, HKN Allen, HKN Manager LLC,

HKM, Burnes and the ERI Collaborators substantially assisted and encouraged Defendant

HKAllen in its breach of its fiduciary duties and commission of constructive fraud as alleged

herein, including by, among other actions: (i) in the case of HKN Allen, in its capacity as co-

general partner of HKAllen, approving and signing the deed that transferred the Property to New

Owner; signing the operating agreement of New Owner as New Owner's sole Class B Member,

which will cause HKN Allen to receive the cash from the Property that the Collaborators stole

from the Holder LPs; and, upon information and belief, agreeing to use its position as sole

member of HKN Manager LLC to ensure that HKN Manager LLC causes New Owner to act in

a manner consistent with the Sale and Exchange; (ii) in the case of HKN Manager LLC,

controlling the operations and activities of HKN Danville House LLC so that the Sale and

Exchange was completed, and thereby enabling HKAllen to arrange a transaction that funneled

millions of dollars to its own affiliate at the expense of the Limited Partners while providing no

compensation at all to the Limited Partners; (iii) in the case of HKM, mismanaging the Property

by overpaying for certain expense items which supported Phase One and Phase Two, helping

HKAllen to solicit and obtain consent to the Sale and Exchange, and assisting HKN Manager

LLC and HKAllen to obtain the new HUD-guaranteed mortgage loan that was part of the Sale

and Exchange; (iv) in the case of Burnes, sending the 2013 Burnes Letter and the Confirmation

of Consent, and controlling each of HKAllen, HK Allen Inc., HKN Allen, HKN Manager LLC,

HKM, HallKeen LLC and Hall Keen Investments and causing each of them to act in furtherance of the Sale and Exchange; and (v) in the case of the ERI Collaborators, inducing HKAllen to propose, promote and execute the Sale and Exchange by committing, long before HKAllen mailed the Consent Request, to support Phase Two of the Conspiracy; and aiding HKAllen's efforts to complete the Sale and Exchange by consenting to the Sale and Exchange after the Consent Request was mailed.

377.    HKN Allen, HKN Manager LLC, HKM, Burnes and the ERI Collaborators therefore aided and abetted HKAllen's breaches of fiduciary duties and commissions of constructive fraud. As a result, HKN Allen, HKN Manager LLC, HKM, Burnes and the ERI Collaborators are jointly responsible with HKAllen for the damages proximately caused and resulting from those breaches and acts.

378.    As a direct result of the substantial assistance that HKN Allen, HKN Manager LLC, HKM, Burnes and the ERI Collaborators provided to HKAllen in its breaches of fiduciary duty and constructive fraud, the Sale and Exchange was technically, though not properly, approved and then completed, which caused the Holder LPs to suffer a substantial devaluation of their LP Units.

379.    In performing the acts herein alleged, HK Allen Inc., Hall Keen Investments, Burnes, HKM, the ERI Collaborators, HKN Allen and HKN Manager LLC acted fraudulently, maliciously, and oppressively, thereby justifying an award of attorney fees and punitive damages in an amount according to proof.

380.    Under California Civil Code section 3345, HK Allen Inc., Hall Keen Investments, Burnes, HKM, the ERI Collaborators, HKN Allen and HKN Manager LLC are liable to the California-resident Seller LPs and Holder LPs for punitive damages in an amount up to three times greater than the amount the trier of fact would otherwise impose because the conduct of

Defendants HK Allen Inc., Hall Keen Investments, Burnes, HKM, the ERI Collaborators, HKN Allen and HKN Manager LLC was directed to each of these Plaintiffs, and such Defendants knew or should have known that one or more of these Plaintiffs was, at all relevant times, a senior citizen.

## EIGHTH CAUSE OF ACTION

### Breach of Contract

(All Plaintiffs Against Defendant Allen)

381.    Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

382.    During the periods of time alleged herein, Defendant Allen occupied the positions of general partner, agent, and fiduciary to Plaintiffs.

383.    In March 1989, Pfeiffer breached the Partnership Agreement by failing to pay the seventh and final installment of his capital contribution. Defendant Allen neither exercised his option to purchase Pfeiffer's LP Units nor completed a purchase of Pfeiffer's LP Units within thirty days after the date of Pfeiffer's default.  He also never notified the non-defaulting Limited Partners of Pfeiffer's default.  Instead, he and Myerson, his co-general partner, bought Pfeiffer's LP Units nearly two years after Pfeiffer's default.  By failing to disclose to the Limited Partners that Pfeiffer had defaulted, and failing to disclose to the Limited Partners that the Limited Partners had a right to purchase Pfeiffer's interest for an amount determined by a formula in the Partnership Agreement, Allen violated his contractual obligation under section 5.2 of the Partnership Agreement.

384.    All of the Plaintiffs suffered damages as a proximate cause of the breach because, if not for Defendant's breach, they would have had the option to purchase some or all of

Pfeiffer's valuable 0.5 LP Unit for a price of $100 per 0.5 LP Unit and thereafter realized substantial gains in the value of that interest.  Some or all of the Plaintiffs would have taken advantage of this opportunity. Plaintiffs' actual damages are to be determined at trial.

385.    In performing the acts herein alleged, Defendant Allen acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

386.    As to each of the offending acts alleged herein, Plaintiffs did not have actual or constructive knowledge of the facts constituting the breach, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts.  Moreover, Defendant Allen had an affirmative duty of full and fair disclosure of said facts, thus Defendant's failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

## NINTH CAUSE OF ACTION

### Civil Theft under California Penal Code § 496

(Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners and Lippman Trust Against Defendant Allen)

387.    Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

388.    As set forth in detail in the Fifth Cause of Action and elsewhere in this Complaint, Defendant Allen defrauded each of Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners and Lippman Trust of their rightful opportunity to purchase the

LP Units that Pfeiffer had owned. In so doing, Allen bought and received property – the LP Units that Pfeiffer had owned – by fraudulent means.

389.    In performing the acts herein alleged, Defendant Allen injured each of Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners and Lippman Trust through theft by false pretense and fraudulent representation, in violation of California Penal Code § 496(c).

390.    By failing to return to each of Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners and Lippman Trust the property and/or money Allen wrongfully took from each of them after they have demanded such return, which demand they hereby repeat, Allen continues daily to withhold such property and/or money from such Plaintiffs, thereby continuing to violate California Penal Code § 496(c).

391.    Before 2015, none of Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners or Lippman Trust had actual or constructive knowledge of the facts constituting the theft, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts.  Moreover, Defendant Allen had an affirmative duty of full and fair disclosure of said facts, thus Defendant Allen's failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

392.    As a direct and proximate result of Allen's theft by false pretense and fraudulent representation, Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners and Lippman Trust suffered actual damages in an amount to be proven at trial.

393.    Under California Penal Code section 496(c), Defendant Allen is liable to the Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners and Lippman Trust for three times the amount of said Plaintiffs' actual damages, costs of suit, and attorney fees.

394.    In performing the acts herein alleged, Defendant Allen acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

395.    Under Civil Code section 3345, Defendant Allen is liable to Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners and Lippman Trust for punitive damages in an amount up to three times greater than the amount the trier of fact would otherwise impose because Defendant Allen knew that his conduct was directed to these Plaintiffs, and Defendant Allen knew or should have known that one or more of these Plaintiffs was, at all relevant times, a senior citizen.


**TENTH CAUSE OF ACTION**

**Conspiracy to Commit Civil Theft under California Penal Code § 496**

(Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners, Lippman Trust and Ball Against Defendants Allen, HKAllen, HK Allen Inc., HKN Allen, HKN Manager LLC, HKM, Hall Keen Investments, HallKeen LLC, Burnes, Carlen, ERI, Newton Fund, Milton Fund, ERF Manager, ERF Fund 2011, ERF Fund 2013 and Dagbjartsson)


396.    Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

397.    As alleged herein, Defendants HKAllen, HKM, Burnes, HK Allen Inc., HKN Allen, HKN Manager LLC, Hall Keen Investments, HallKeen LLC, Carlen, ERI, Newton Fund, ERF Manager LLC, Milton Fund, ERF Fund 2011, ERF Fund 2013 and Dagbjartsson, which Defendants are defined above as the Collaborators, all knowingly and willfully entered into an

agreement and a conspiracy to defraud the Limited Partners, including each of Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners, Lippman Trust and Ball, by executing both Phase One and Phase Two of the Conspiracy.

398.    As set forth in detail in the Sixth Cause of Action and elsewhere in this Complaint: (i) the Collaborators acted in concert with each other and, by means of false and fraudulent representation and pretense, bought or received money or property from each of Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners, and Lippman Trust; and (ii) each of the Collaborators committed at least one overt act in furtherance of the Conspiracy. Most of the Collaborators committed several such acts.

399.    With respect to Plaintiff Ball, who became a California citizen in July 2016, the Collaborators have, since July 2016, withheld from Ball the monies they had taken from her by means of false and fraudulent representation and pretense before July 2016. Further, as illustrated by the September 2016 Cash Flow Memo, the Collaborators have also continued since July 2016 to receive money from Ball and from each of Devor, Wapners, and Lippman Trust by means of false and fraudulent representation and pretense.

400.    In performing the acts herein alleged, the Collaborators have injured Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners, Lippman Trust and Ball through theft by false pretense and fraudulent representation, in violation of California Penal Code § 496(c).

401.    By failing to return to each of Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners, Lippman Trust and Ball the property and/or money the Collaborators wrongfully took from each of them after they have demanded such return, which demand they hereby repeat, the Collaborators continue daily to withhold such

property and/or money from such Plaintiffs, thereby continuing to violate California Penal Code § 496(c).

402.     Before 2015, none of Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners, Lippman Trust or Ball had actual or constructive knowledge of the facts constituting the thefts alleged in this Tenth Cause of Action, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts.  Moreover, certain of the Collaborators had an affirmative duty of full and fair disclosure of said facts, thus Defendants' failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

403.     The last overt act of the Conspiracy occurred no earlier than on or about September 16, 2016, when HKM mailed the September 2016 Cash Flow Memo to the Limited Partners. Nonetheless, the Conspiracy is ongoing.

404.     As a direct and proximate result of the Collaborators' thefts by false pretense and fraudulent representation, Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners, Lippman Trust and Ball suffered actual damages in an amount to be proven at trial.

405.     Under California Penal Code section 496(c), the Collaborators are liable to each of Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners, Lippman Trust and Ball for three times the amount of said Plaintiffs' actual damages, costs of suit, and attorney fees.

406.     In performing the acts herein alleged, the Collaborators acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiffs' rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

407. Under Civil Code section 3345, the Collaborators are liable to Plaintiffs Sherman, Richards Family Trust, Takahashi, Weide Family Trust, Devor, Wapners, Lippman Trust and Ball for punitive damages in an amount up to three times greater than the amount the trier of fact would otherwise impose because Defendants knew that their conduct was directed to these Plaintiffs, and Defendants knew or should have known that one or more of these Plaintiffs was, at all relevant times, a senior citizen.

## ELEVENTH CAUSE OF ACTION

### Conspiracy to Commit Civil Theft under North Carolina General Statutes Section 1-538.2

(Plaintiff Guy Against Defendants Allen, HKAllen, HK Allen Inc., HKN Allen, HKN Manager LLC, HKM, Hall Keen Investments, HallKeen LLC, Burnes, Carlen, ERI, Newton Fund, Milton Fund, ERF Manager, ERF Fund 2011, ERF Fund 2013 and Dagbjartsson)

408. Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

409. As alleged herein, Defendants HKAllen, HKM, Burnes, HK Allen Inc., HKN Allen, HKN Manager LLC, Hall Keen Investments, HallKeen LLC, Carlen, ERI, Newton Fund, ERF Manager LLC, Milton Fund, ERF Fund 2011, ERF Fund 2013 and Dagbjartsson, which Defendants are defined above as the Collaborators, all knowingly and willfully entered into an agreement and a conspiracy to defraud the Limited Partners, including Plaintiff Guy, by executing both Phase One and Phase Two of the Conspiracy.

410. As set forth in detail in the Sixth Cause of Action and elsewhere in this Complaint: (i) the Collaborators acted in concert with each other and, by means of false and fraudulent representation and pretense, bought or received money or property from Plaintiff

Guy; and (ii) each of the Collaborators committed at least one overt act in furtherance of the Conspiracy. Most of the Collaborators committed several such acts.

411.    In performing the acts herein alleged, the Collaborators injured Plaintiff Guy through theft by false pretense, in violation of North Carolina Gen. Stat. § 14-100(a) and giving rise to civil liability under North Carolina Gen. Stat. § 1-538.2.

412.    By failing to return to Plaintiff Guy the property and/or money the Collaborators wrongfully took from him after he has demanded such return, which demand he hereby repeats, the Collaborators continue daily to withhold such property and/or money from such Plaintiffs, thereby continuing to violate North Carolina Gen. Stat. § 14-100(a) and giving rise to civil liability under North Carolina Gen. Stat. § 1-538.2.

413.    Before 2015, Plaintiff Guy did not have actual or constructive knowledge of the facts constituting the theft alleged in this Eleventh Cause of Action, nor was he aware of facts giving rise to a duty of inquiry to uncover said facts.  Moreover, certain of the Collaborators had an affirmative duty of full and fair disclosure of said facts, thus Defendants' failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiff Guy delayed discovery of the facts is excusable.

414.    The last overt act of the Conspiracy occurred no earlier than on or about September 16, 2016, when HKM mailed the September 2016 Cash Flow Memo to the Limited Partners. Nonetheless, the Conspiracy is ongoing.

415.    As a direct and proximate result, Plaintiff Guy suffered actual damages in an amount to be proven at trial.

416.    Under North Carolina Gen. Stat. § 1-538.2, Defendants are liable to Plaintiff Guy for the loss of value to his LP Units, as well as consequential damages, punitive damages, and attorney fees.

417.    In performing the acts herein alleged, Defendants acted fraudulently, maliciously, and oppressively, and with behavior reflecting a callous disregard for Plaintiff Guy's rights where the conduct was substantially certain to vex, annoy or injure, thereby justifying an award of punitive damages in an amount according to proof.

## TWELFTH CAUSE OF ACTION

### Conspiracy to Commit Elder Financial Abuse

(Plaintiffs Richards Family Trust, Weide Family Trust, Takahashi, Devor, and Wapners and Ball Against Defendants Allen, HKAllen, HK Allen Inc., HKN Allen, HKN Manager LLC, HKM, Hall Keen Investments, HallKeen LLC, Burnes, Carlen, ERI, Newton Fund, Milton Fund, ERF Manager, ERF Fund 2011, ERF Fund 2013 and Dagbjartsson)

418.    Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

419.    As alleged herein, Defendants HKAllen, HKM, Burnes, HK Allen Inc., HKN Allen, HKN Manager LLC, Hall Keen Investments, HallKeen LLC, Carlen, ERI, Newton Fund, ERF Manager LLC, Milton Fund, ERF Fund 2011, ERF Fund 2013 and Dagbjartsson, which Defendants are defined above as the Collaborators, all knowingly and willfully entered into an agreement and a conspiracy to harm and defraud the Limited Partners, including each of Plaintiffs Richards Family Trust, Weide Family Trust, Takahashi, Devor, and Wapners and Ball, by executing both Phase One and Phase Two of the Conspiracy.

420.    As set forth in detail in the Sixth Cause of Action and elsewhere in this Complaint, the Collaborators acted in concert with each other and, by means of false and fraudulent representation and pretense, have wrongfully taken, secreted, and/or appropriated money and

property from each of Plaintiffs Richards Family Trust, Weide Family Trust, Takahashi, Devor, and Wapners and Ball. The Collaborators furthermore retain or have control of property that rightfully belongs to, or is in constructive trust for, each of each of Plaintiffs Richards Family Trust, Weide Family Trust, Takahashi, Devor, and Wapners and Ball.

421.    As set forth in detail in the Sixth Cause of Action and elsewhere in this Complaint, each of the Collaborators committed at least one overt act in furtherance of the Conspiracy. Most of the Collaborators committed several such acts.

422.    As set forth below, each of the Plaintiffs asserting this Twelfth Cause of Action was a California citizen and was at least 65 years old when the Collaborators wrongfully took its money and/or property:

a.    Irving Richards was 65 years old when he received the 2008 ERI Reminder, and when he signed the Richards Assignment.

b.    On September 27, 2013, when Brian and Roberta Weide, as co-trustees of the Weide Family Trust, signed the Weide Assignment, the Weide Family Trust had only one beneficiary: the mother of Brian Weide, who was 90 years old.

c.    Hirokawa is Takahashi's predecessor in interest. Hirokawa was 84 years of age when he received the 2006 ERI Letter and the 2006 ERI Offer, and when he signed the Hirokawa Assignment.

d.    Devor was in his 84 years old when he received the Consent Request.

e.    The Wapners were both in their 90s when they received the Consent Request.

f.    With respect to Plaintiff Ball, who became a California citizen in July 2016 (when she was 73 years old), the Collaborators have, since July 2016, retained money rightfully belonging to Ball. Further, as illustrated by the September 2016 Cash Flow Memo, the

Collaborators have continued since July 2016, by means of false and fraudulent representation and pretense, wrongfully to take, secret, and/or appropriate money and property from Ball and from each of Devor, Wapners, and Lippman Trust by means of false and fraudulent representation and pretense.

423.    The conduct of the Collaborators, and each of them, constitutes elder financial abuse under California Welfare and Institutions Code § 15610.30, thus giving rise to liability under California Welfare and Institutions Code § 15657.5.

424.    By failing to return to each of Plaintiffs Richards Family Trust, Weide Family Trust, Takahashi, Devor, and Wapners and Ball the property and/or money the Collaborators wrongfully took from each of them after they have demanded such return, which demand they hereby repeat, the Collaborators continue daily to retain and/or assist in retaining such property and/or money from such Plaintiffs, thereby continuing to violate California Welfare and Institutions Code § 15610.30, and giving rise to liability under California Welfare and Institutions Code §15657.5.

425.    Before 2015, Plaintiffs did not have actual or constructive knowledge of the facts constituting these acts of elder financial abuse, nor were they aware of facts giving rise to a duty of inquiry to uncover said facts.  Moreover, certain of the Collaborators had an affirmative duty of full and fair disclosure of said facts, thus the Collaborators' failure to disclose the facts constitutes fraudulent concealment of same such that Plaintiffs' delayed discovery of the facts is excusable.

426.    As a direct and proximate result, each of Plaintiffs Richards Family Trust, Weide Family Trust, Takahashi, Devor, and Wapners and Ball suffered actual damages in an amount to be proven at trial.

427.     Under California Welfare and Institutions Code § 15657.5, the Collaborators are liable to Plaintiffs Richards Family Trust, Weide Family Trust, Takahashi, Devor, and Wapners and Ball for the amount of said Plaintiffs' actual damages, costs of suit, and reasonable attorney fees.

428.     In performing the acts herein alleged, the Collaborators, and each of them, were guilty of recklessness, oppression, fraud, and malice within the meaning of California Welfare and Institutions Code § 15657.5 and California Civil Code § 3294.  An award of punitive and exemplary damages is therefore justified in an amount according to proof.  An award of attorneys' fees and costs is also justified.

429.     Under Civil Code section 3345, the Collaborators are liable to the Plaintiffs Richards Family Trust, Weide Family Trust, Takahashi, Devor, and Wapners and Ball, for punitive damages in an amount up to three times greater than the amount the trier of fact would otherwise impose, because Defendants knew that their conduct was directed to these Plaintiffs, and Defendants knew or should have known that one or more of the above-listed Plaintiffs was, at all relevant times, a senior citizen.


**THIRTEENTH CAUSE OF ACTION**
**Derivative Action**

(All Plaintiffs Against Nominal Defendant HKAllen)

430.     Plaintiffs re-allege here and incorporate by reference into this Cause of Action all preceding Paragraphs of this Complaint.

431.     Plaintiffs bring the causes of action set forth above both individually and derivatively on behalf of the Partnership.

## PRAYER FOR RELIEF

432.    WHEREFORE, Plaintiff demands judgment against Defendants for the following:

a.    For an accounting to determine the amount of improper Partnership expenditures and/or Partnership debt for which Defendants must reimburse Plaintiffs;

b.    For imposition of constructive trusts over property belonging to one or more Plaintiffs that is wrongfully held by one or more Defendants;

c.    For rescission of the wrongful transactions as set forth above;

d.    For compensatory damages according to proof;

e.    For trebling of compensatory damages recoverable under 18 U.S.C. § 1964(c).

f.    For pre-judgment and post-judgment interest;

g.    For general damages according to proof;

h.    For treble damages;

i.    For punitive damages;

j.    For enhancement of punitive damages pursuant to California Civil Code § 3345;

k.    For an injunction: (i) compelling HKAllen to resign from its position as general partner of the Partnership; (ii) compelling HKN Manager LLC to resign as managing member of HKN Danville House LLC; (iii) compelling HKM to resign as Managing Agent of the Property; (iv) compelling all Defendants, and all principals and affiliates of each, to waive any and all claims any of them may have to receive, directly or indirectly, any monies whatsoever from the Property, the Partnership or HKN Danville House LLC; (v) compelling all Defendants to take all actions reasonably necessary to effectuate a smooth transition of control of the Property and its operations to an entity duly approved by the Independent Limited Partners; (vi) appointing a

receiver to oversee operations and management of HKN Danville House LLC, the Partnership and the Property until such time as the Independent Limited Partners determine how the Property will be held and managed; and (vii) prohibiting all Defendants, and all principals and affiliates of each, from exercising any control over any aspect of the Property, the Partnership or HKN Danville House LLC other than as expressly approved by a majority of the Independent Limited Partners to achieve the aims of item (v) above.

l.      For attorney fees and costs of suit incurred herein; and

m.      For such other and further relief as the court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs request a jury trial on all issues so triable.

Dated: September 20, 2017

BAILEY & GLASSER LLP

/s/ Elizabeth Ryan
Elizabeth Ryan, BBO # 549632
99 High Street, Ste. 304
Boston, MA 02110
Telephone:      617-439-6730
Facsimile:      617-951-3954
Email: eryan@baileyglasser.com

Jonathan S. Ball (admitted pro hac vice)
BALL LAW CORPORATION
One Market / Spear Tower, 36th Floor
San Francisco, CA  94105
Telephone:      415-349-0721
Facsimile:      415-520-6864
Email:  jb@ball-lawcorp.com

Adam B. Wolf (admitted p*ro hac vice*)
Catherine Cabalo (admitted p*ro hac vice*)
PEIFFER ROSCA WOLF ABDULLAH
CARR & KANE, APLC
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone:      415-426-5641
Facsimile:      415-402-0058
Email: awolf@prwlegal.com
          ccabalo@prwlegal.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 20th day of September 2017.

*/s/ Elizabeth Ryan*
Elizabeth Ryan